# Docket No. 18-966

===========================================================

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

===========================================================

CRAIG ROTH,

Plaintiff-Appellant,

v.

COUNTY OF NASSAU,

Defendant-Appellee.

_____

ON APPEAL FROM A FINAL ORDER OF
THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF NEW YORK
Case No. 1:15-cv-06358-LDW-AYS
Sat Below: Leonard D. Wexler, U.S.D.J.

_____

**APPENDIX VOL. III (A474-757)**
**OF PLAINTIFF-APPELLANT, CRAIG ROTH**

_____

Michael Confusione (MC-6855)
HEGGE & CONFUSIONE, LLC
P.O. Box 366, Mullica Hill, NJ 08062-0366
(800) 790-1550; (888) 963-8864 (facsimile); mc@heggelaw.com

Michael Confusione
  Of Counsel and On the Brief

### TABLE OF SPECIAL APPENDIX (SA1-15, bound with Brief)

District Court Memorandum Opinion granting summary judgment
for defendant (3/27/18)                                          SA1

Final Judgment (3/27/18)                                         SA14

Notice of Appeal (4/6/18)                                        SA15

### TABLE OF APPENDIX (bound separately)

#### Volume I (A1-204)

District Court Docket Sheet                                      A1

Complaint (11/5/15)                                             A11

Answer (1/11/16)                                               A20

Defendant's Motion for Summary Judgment (6/16/17)              A26

Declaration of Joseph Covello in support of summary judgment    A28

Defendant's Statement of Material Facts                         A57

Affidavit of Karl Kampe in support of summary judgment          A74

Defendant's summary judgment exhibit list                       A82

Exhibit A (Complaint)                                           A86

Exhibit B (Answer)                                             A96

Exhibit C (Transcript of Deposition of Craig Roth, 3/27/17)    A103

Exhibit D (List of Ambulance Calls Prepared by Craig Roth)     A121

Exhibit E (Prescription dated April 7, 2014)                   A123

i

Exhibit F (Renewal Physician's Written Order for Insulin Pump Therapy for Commercial Insurance, dated August 7, 2014)                    A125

Exhibit G (Physician's Written Order: Continuous Glucose Monitoring Device and Components, dated August 7, 2017)                    A127

Exhibit H (Physician's Written Order for Diabetes Testing Supplies, dated October 7, 2014)                    A129

Exhibit I (Physician's Certification for External Pump and/or Pump Supplies, dated October 7, 2014)                    A131

Exhibit J (Physician's Written Order for Continuous Glucose Monitoring Device and Components, dated October 7, 2014)                    A133

Exhibit K (Physician's Certification for External Pump and/or Pump Supplies, dated January 21, 2015)                    A135

Exhibit L (Prescription, dated February 23, 2015)                    A137

Exhibit M (Renewal Physician's Written Order for Insulin Pump Therapy, dated June 29, 2015)                    A139

Exhibit N (CGM Referral with Physician's Order, dated June 29, 2015) A141

Exhibit O (Renewal Physician's Written Order for Insulin Pump Therapy, dated July 15, 2015)                    A143

Exhibit P (CGM Referral with Physician's Order, dated July 15, 2015) A145

Exhibit Q (Renewal Physician's Written Order for Insulin Pump Therapy, dated July 28, 2015)                    A147

Exhibit R (Lab Report from Quest Diagnostics Incorporated, dated November 21, 2014)                    A149

Exhibit S (Physician Order for Insulin Pump Therapy and Diabetes Testing, dated May 24, 2016)                    A151

Exhibit T (CGM Referral with Physician's Order, dated July 30, 2015) A153

Exhibit U (Transcript of Deposition of Dr. Daniel Lorber, 4/24/17     A155

**Volume II (A205-473)**

Exhibit V (Transcript of Deposition of Mr. Karl Kampe,
taken on April 6, 2017)                                           A205

Exhibit W (Transcript of Deposition of Dr. David S. Rosenthal,
taken on July 28, 2016)                                           A363

Exhibit X (Transcript of Deposition of Dr. Perry Herson,
taken on November 10, 2016)                                       A399

Exhibit Y (Transcript of Continued Deposition of Dr. Perry Herson,
taken on November 14, 2016)                                       A414

**Volume III (A474-757)**

Exhibit Z (Transcript of Deposition of Dr. Marlaine Tapply,
taken on September 26, 2016)                                      A474

Exhibit AA (Transcript of Deposition of Craig Roth,
taken on May 10, 2017)                                            A614

Exhibit BB (Medical Record from Dr. Perry Herson dated July 6, 2016) A639

Exhibit CC (Medical Record from Dr. Perry Herson dated May 16, 2016
showing A1C index of 8.5%)                                        A641

Exhibit DD (Medical Record from Dr. Perry Herson dated November 6,
2015 showing A1C index of 8.2%)                                   A643

Exhibit EE (Medical Record from Dr. Perry Herson dated March 6, 2014
showing A1C index of 7.8%)                                        A645

Exhibit FF (Medical Record from Dr. Perry Herson dated January 6, 2015
showing A1C index of 7.5%)                                        A647

Exhibit GG (Medical Record from Dr. Perry Herson dated October 23, 2014 showing A1C index of 7.6%)                                      A649

Exhibit HH (Billing Record dated January 6, 2015 from Dr. Perry Herson, which indicates that plaintiff's condition is "uncontrolled")        A651

Exhibit II (Billing Record from Dr. Perry Herson dated July 10, 2015 which indicates that plaintiff's condition is "uncontrolled")        A653

Exhibit JJ (American College of Occupational and Environmental Medicine Guidance for the Medical Evaluation of Law Enforcement Officers)    A655

Exhibit KK (Municipal Police Training Council Medical and Physical Fitness Standards and Procedures for Police Officer Candidates)        A670

Exhibit LL (Expert Report of Dr. Howard Kolodny, M.D., dated March 28, 2017)                                                    A689

Exhibit MM (Nassau County Police Officer Job Specifications)        A694

Exhibit NN (Medical Hold, dated January 28, 2015, and request for additional medical records dated January 28, 2015)                A696

Exhibit OO (Original Blood Glucose Logs Submitted in Response to January 28, 2015 Request)                                          A699

Exhibit PP (Dr. Tapply's First Recommendation to Disqualify Plaintiff, and supporting documents, dated April 1, 2017)                A748

Exhibit QQ (Commission's April 1, 2015 Resolution Disqualifying Plaintiff) A756

**Volume IV (A758-1009)**

Exhibit RR (Unaltered Blood Glucose Logs submitted with plaintiff's appeal)                                                      A758

Exhibit SS (Handwritten Letter from Dr. Perry Herson, dated May 27, 2015, submitted on plaintiff's appeal)                        A783

iv

Exhibit TT (Dr. Tapply's Recommendation to Disqualify Plaintiff for
Attempting to Practice Deception in Altering Medical Records,
dated July 1, 2015)                                                            A787

Exhibit UU (Commission's July 8, 2015 Resolution Denying Plaintiff's
Appeal and Notification to Plaintiff, dated July 29, 2015)          A789

Exhibit VV (Letters from Dr. Herson and Dr. Lorber that were supplied
to Dr. David Rosenthal)                                                         A792

Exhibit WW (Report of Dr. David Rosenthal, M.D.,
dated August 19, 2015)                                                         A795

Exhibit XX (Copies of Dr. Tapply's Recommendation and Commission's
Resolution that plaintiff remain disqualified, dated September 2, 2015) A799

Exhibit YY (Letter dated September 9, 2015 advising plaintiff that his appeal
was complete)                                                                     A802

Exhibit ZZ (Short Form Order of Justice Denise Sher, in *Matter of the
Application of Craig Roth v. The Nassau County Civil Service Commission, et al.*,
Index No. 9631/2015 (Sup. Ct. Nassau Co. May 3, 2016), denying plaintiff's
Article 78 proceeding, and holding that the Commission's determination was
rational and supported by substantial evidence)                     A804

Exhibit AAA ( Notice of Petition, dated October 29, 2015 in *Matter of the
Application of Craig Roth v. The Nassau County Civil Service Commission,
et al.*, Index No. 9631/2015 (Sup. Ct. Nassau Co.))               A817

Exhibit BBB ( Verified Petition (without exhibits) dated October 29, 2015,
filed in *Matter of the Application of Craig Roth v. The Nassau County Civil
Service Commission, et al.*, Index No. 9631/2015 (Sup. Ct. Nassau Co.)) A822

Exhibit CCC (Memorandum of Law in Support of Verified Petition, dated October
29, 2015, filed in *Matter of the Application of Craig Roth v. The Nassau County
Civil Service Commission, et al.*, Index No. 9631/2015 (Sup. Ct. Nassau Co.) A836

Exhibit DDD (Respondents' Memorandum of Law in Opposition to Verified
Petition, dated January 11, 2016, filed in *Matter of the Application of*

v

*Craig Roth v. The Nassau County Civil Service Commission, et al.*, Index No. 9631/2015 (Sup. Ct. Nassau Co.))                    A859

Exhibit EEE (Petitioner's Reply Memorandum of Law in Further Support of Verified Petition dated March 18, 2016, filed in *Matter of the Application of Craig Roth v. The Nassau County Civil Service Commission, et al.*, Index No. 9631/2015 (Sup. Ct. Nassau Co.))                    A877

Exhibit FFF (Plaintiff's Supplemental FRCP Rule 26 Disclosures, dated April 27, 2017)                    A914

Exhibit GGG (Nassau County PBA Contract FY 2007-2017)          A918

Exhibit HHH (Nassau County PBA Contract Extension FY 2013-2015) A936

Exhibit III (Nassau County PBA Wage Freeze Settlement and Contract Extension, dated March 15, 2014)                    A950

Exhibit JJJ (New York City PBA Newsletter dated February 3, 2017 describing the terms of the proposed contract with the City of New York for the 2012-2017 period)                    A977

Exhibit KKK (Email newsletter from New York City PBA dated February 1, 2017, describing the terms of the proposed contract with the City of New York for the 2012-2017 period)                    A980

Exhibit LLL (New York City Police Pension Fund—Tier 3 Members Summary Plan Description)                    A986

Exhibit MMM (Copy of email thread between M. Boroosan and G. Calliste, dated May 9, 2017, regarding documents supporting claim for emotional and economic damages)                    A1005

**Volume V (A1010-1305)**

Plaintiff's Response to and additional Statement of Material Facts (6/16/17)                    A1010

Declaration of Gregory Calliste in opposition to summary judgment    A1062

Exhibit "1" (Plaintiff's Complaint)    A1072

Exhibit "2" (Defendant's Answer)    A1082

Exhibit "3" (Examination Before Trial of Craig Roth, dated March 27, 2017) A1089

Exhibit "4" (Deposition of Craig Roth, dated May 10, 2017)    A1134

Exhibit "5" (Nassau County Police Benevolent Association Contract Extension 2013-2015)    A1152

Exhibit "6" (Deposition of Non-Party Witness, Perry Bruce Herson, M.D., dated November 10, 2016)    A1221

Exhibit "7" (Deposition of Non-Party Witness, Perry Bruce Herson, M.D., dated November 14, 2016)    A1238

Exhibit "8" (Deposition of Karl Kampe, dated April 6, 2017)    A1255

Exhibit "9" (Exhibit A to Deposition of Karl Kampe)    A1296

Exhibit "10" (Exhibit B to the Deposition of Karl Kampe.    A1298

Exhibit "11" (Exhibit C to the Deposition of Karl Kampe)    A1300

Exhibit "12" (Exhibit D to the Deposition of Karl Kampe)    A1302

Exhibit "13" (Exhibit E to the Deposition of Karl Kampe)    A1304

**Volume VI (A1306-1593)**

Exhibit "14" (Exhibit F to the Deposition of Karl Kampe)    A1306

Exhibit "15" (Exhibit G to the Deposition of Karl Kampe)    attached at A1715

Exhibit "16" (Exhibit H to the Deposition of Karl Kampe)    A1314

Exhibit "17" (Exhibit I to the Deposition of Karl Kampe)     A1317

Exhibit "18" (Exhibit J to the Deposition of Karl Kampe)     A1319

Exhibit "19" (Exhibit K to the Deposition of Karl Kampe)     A1321

Exhibit "20" (Exhibit L to the Deposition of Karl Kampe)     A1324

Exhibit "21" (Exhibit M to the Deposition of Karl Kampe)     A1326

Exhibit "22" (Exhibit N to the Deposition of Karl Kampe)     A1328

Exhibit "23" (Exhibit O to the Deposition of Karl Kampe)     A1330

Exhibit "24" (Exhibit P to the Deposition of Karl Kampe)     A1332

Exhibit "25" (Exhibit Q to the Deposition of Karl Kampe)     A1334

Exhibit "26" (Exhibit R to the Deposition of Karl Kampe)     A1336

Exhibit "27" (Exhibit S to the Deposition of Karl Kampe)     A1338

Exhibit "28" (Exhibit T to the Deposition of Karl Kampe)     A1340

Exhibit "29" (Exhibit U to the Deposition of Karl Kampe)     A1342

Exhibit "30" (Exhibit V to the Deposition of Karl Kampe)     A1344

Exhibit "31" (Exhibit W to the Deposition of Karl Kampe)     A1348

Exhibit "32" (Exhibit X to the Deposition of Karl Kampe)     A1350

Exhibit "33" (Exhibit Y to the Deposition of Karl Kampe)     A1357

Exhibit "34" (Exhibit Z to the Deposition of Karl Kampe)     A1359

Exhibit "35" (Exhibit AA to the Deposition of Karl Kampe)     A1361

Exhibit "36" (Deposition of Non-Party Witness, David Stanley Rosenthal, dated July 28, 2016)                                        A1376

Exhibit "37" (Errata Sheet for Dr. Rosenthal)                 A1404

Exhibit "38" (Deposition of Non-Party Witness, Dr. Marlaine Tapply, dated September 26, 2016)                                   A1407

Exhibit "39" (Deposition of Non-Party Witness, Dr. Daniel Lorber, dated April 24, 2017)                                         A1444

Exhibit "40" (Dr. Herson's letter, bates-stamped Defendant's Production ROTH_000091)                                             A1494

Exhibit "41" (Dr. Lorber's letter, bates-stamped Defendant's Production ROTH_000092)                                             A1496

Exhibit "42"(ACOEM Guidelines, Appendix A)                   A1498

Exhibit "43" (PowerPoint presentation titled "ACOEM Guidance for the Medical Evaluation of Law Enforcement Officers: Diabetes," bates-stamped Defendant's Production ROTH_000236 – ROTH_000253) A1501

Exhibit "44" (Ambulance Call List, bates-stamped Defendant's Production ROTH_000017)                                             A1520

Exhibit "45" (Dr. Tapply's First Recommendation to Disqualify Plaintiff, at bates-stamped Defendant's Production ROTH_000014- ROTH_000020) A1522

Exhibit "46" (Dr. Herson's Prescription, dated April 7, 2014)        A1530

Exhibit "47" (Renewal Physician's Written Order for Insulin Pump Therapy, dated August 7, 2014)                                       A1532

Exhibit "48" (Renewal Physician's Written Order: Continuous Glucose Monitoring Device and Components, dated August 7, 2014)          A1534

Exhibit "49" (Physician Written Order for Diabetes Testing Supplies, dated October 7, 2014)                                      A1536

Exhibit "50" (Physician's Certification for External Pump and/or Pump Supplies, dated October 7, 2014)                                                                 A1538

Exhibit "51" (Physician's Written Order for Continuous Glucose Monitoring Device and Components, dated October 7, 2014)                                A1540

Exhibit "52" (Physician's Certification for External Pump and/or Pump Supplies, dated January 21, 2015)                                                            A1543

Exhibit "53" (Dr. Herson's Prescription, dated February 23, 2015)      A1545

Exhibit "54" (Renewal Physician's Written Order for Insulin Pump Therapy, dated June 29, 2015)                                                                  A1547

Exhibit "55" (CGM Referral with Physician's Order, dated June 29, 2015) A1549

Exhibit "56" (Renewal Physician's Written Order for Insulin Pump Therapy, dated July 16, 2015)                                                                 A1551

Exhibit "57" (CGM Referral with Physician's Order, dated July 16, 2014)  A1553

Exhibit "58" (Renewal Physician's Written Order for Insulin Pump Therapy, dated July 28, 2015)                                                                 A1555

Exhibit "59" (Lab Report from Quest Diagnostics Inc., dated November 21, 2014)                                                                            A1557

Exhibit "60" (Physician Order for Insulin Pump Therapy and Diabetes Testing, dated May 24, 2016)                                                               A1559

Exhibit "61" (CGM Referral with Physician's Order, dated July 30, 2015) A1561

Exhibit "62" (Billing Record, dated January 6, 2015)                       A1563

Exhibit "63" (Billing Record, dated July 10, 2015)                        A1565

Exhibit "64"( Plaintiff's Civil Service Exam Results)                      A1567

Exhibit "65" (Inter-Departmental Memo from Dr. Tapply, bates-stamped Defendant's Production ROTH_000082 – ROTH_000085)          A1569

Exhibit "66" (Report of Dr. David Rosenthal, M.D., dated August 19, 2015, bates-stamped Defendant's Production ROTH_000088 – ROTH_000092) A1574

Exhibit "67" (EEOC Intake Questionnaire, dated July 17, 2015)          A1580

Exhibit "68" (EEOC Notice of Right to Sue, dated October 15, 2015)  A1585

Exhibit "69" (Notice of Petition *In the Matter of the Application of Craig Roth v. The Nassau County Civil Service Commission, et. al.* (Sup. Ct. Nassau Co.)) A1589

## Volume VII (A1594-1759)

Exhibit "70" (Verified Petition *In the Matter of the Application of Craig Roth v. The Nassau County Civil Service Commission, et. al.* (Sup. Ct. Nassau Co.)          A1594

Exhibit "71" (Petitioner's Memorandum of Law in Support of Article 78 Petition *In the Matter of the Application of Craig Roth v. The Nassau County Civil Service Commission, et. al.* (Sup. Ct. Nassau Co.) dated October 30, 2015)          A1608

Exhibit "72" (Respondent' Memorandum of Law in Opposition to Article 78 Petition *In the Matter of the Application of Craig Roth v. The Nassau County Civil service Commission, et. al.* (Sup. Ct. Nassau Co.) dated January 11, 2015)  A1631

Exhibit "73" (Petitioner's Reply Memorandum of Law *In the Matter of the Application of Craig Roth v. The Nassau County Civil Service Commission, et. al.* (Sup. Ct. Nassau Co.) dated March 18, 2016)          A1649

Exhibit "74" (Short Form Order, by Denise L. Sher J.S.C. for *In the Matter of the Application of Craig Roth v. The Nassau County Civil Service Commission, et. al.* (Sup. Ct. Nassau Co. May 3, 2015)          A1686

Exhibit "75" (Full Duties for Nassau County Police Officer, bates- stamped Defendant's Production ROTH_000216 – ROTH_000217)          A1699

Exhibit "76" (Marked Full Duties for Nassau County Police Officer,
bates-stamped Defendant's Production ROTH_000083 – ROTH_000084) A1702

Exhibit "77" (Notes of Dr. Herson dated March 6, 2014)                A1705

Exhibit "78" (Expert Report of Dr. Howard D. Kolodny M.D.,
dated March 28, 2017)                                                 A1707

Exhibit "79" (Patrolmen's Benevolent Association of the City of New York,
Incorporated 2012-2017 Proposed PBA Contract Terms, 2/3/17)          A1712

Exhibit "15" (Exhibit G to the Deposition of Karl Kampe)             A1715

Defendant's Response to Plaintiff's Counterstatement of Material Facts A1740

# EXHIBIT "Z"



**PHILLIPS & ASSOCIATES**

*Attorneys at Law*

45 Broadway, Suite 620
New York, New York, 10006
(212) 248-7431 (telephone)
(212) 901- 2107 (facsimile)

September 29, 2016

**Via First Class Mail**
Moshe Boroosan, Esq.
Joseph Covello, Esq.
Lynn, Gartner, Dunne & Covello LLP
330 Old Country Road, Suite 103
Mineola, NY, 11501

     Re:    **Craig Roth v. County of Nassau**
             **Index No.: 15-cv-6358**

Dear Counsel,

     Enclosed please find the original transcript of Dr. Marlaine Tapply. Please have your clients review, sign and notarize the transcript, noting any necessary corrections on the errata sheet. As you are well aware, pursuant to Fed. R. Civ. P. 30(e)(1), any changes must be noted within 30 days.

     Thank you for your attention to this matter. Should you have any questions, please feel free to contact us.

                               Sincerely Yours,

                               Candy N. Hernandez
                               Paralegal

Enclosure.

RECEIVED
OCT 0 6 2016
BY: _____

A0475

# *ORIGINAL*

1

2   UNITED STATES DISTRICT COURT

3   EASTERN DISTRICT OF NEW YORK

4   ----------------------------------------------- x

CRAIG ROTH,

5

                              Plaintiff,

6                               Index No. 15-CV-6358

7        -against-

8

COUNTY OF NASSAU,

9

                              Defendant.

10  ----------------------------------------------- x

11

12  EXAMINATION BEFORE TRIAL of the Non-Party Witness,

13        DR. MARLAINE TAPPLY, taken by the Plaintiff,

14        pursuant to Notice, held at the offices of

15        LYNN, GARTNER, DUNNE & COVELLO, LLP, 330 Old

16        Country Road, Mineola, New York, on September

17        26, 2016, at 10:15 a.m. before a Notary Public

18        of the State of New York.

19

20

21

22

23

24

25

2

2    A P P E A R A N C E S:
3

    PHILLIPS & ASSOCIATES, PLLC
4            Attorneys for Plaintiff
             CRAIG ROTH
5            45 Broadway, Suite 620
             New York, New York  10006
6
    BY:  MARJORIE MESIDOR, ESQ.
7

8

    LYNN, GARTNER, DUNNE & COVELLO, LLP
9            Attorneys for Defendant
             COUNTY OF NASSAU and
10           Non-Party Witness, MARLAINE TAPPLY
             330 Old Country Road, Suite 103
11           Mineola, New York  11501
12   BY:  JOSEPH COVELLO, ESQ.
             -and-
13   BY:  MOSHE O. BOROOSAN, ESQ.
14

15

    ALSO PRESENT:
16   CRAIG ROTH
                        xxxxx
17

18

19

20

21

22

23

24

25

3

2                    S T I P U L A T I O N S

3

4    IT IS HEREBY STIPULATED AND AGREED by and between

5         the attorneys for the respective parties

6         herein, that filing, sealing and certification,

7         and the same are, hereby waived.

8

9              IT IS FURTHER STIPULATED AND AGREED that all

10   objections except as to the form of the question, shall be

11   reserved to the time of the trial.

12

13             IT IS FURTHER STIPULATED AND AGREED that the within

14   deposition may be signed and sworn to by an officer

15   authorized to administer an oath, with the same force and

16   effect as if signed and sworn to before the Court.

17

18

19

20

21

22

23

24

25

4

2    M A R L A I N E   T A P P L Y,

3         Having been first duly sworn before a Notary

4         Public of the State of New York, was examined

5         and testified as follows:

6    EXAMINATION BY

7    MS. MESIDOR:

8         Q.   Please state your name for the

9    record.

10        A.   Marlaine Tapply.

11        Q.   What is your address?

12        A.   My business address is 40 Main

13   Street, Hempstead, New York, 11550.

14        Q.   Good morning, Dr. Tapply.  My name

15   is Marjorie Mesidor.  I represent Craig Roth

16   in an action against Nassau County.

17             This morning I am going to be

18   asking you a series of questions regarding

19   your evaluation and determination that

20   Mr. Craig Roth should be medically

21   disqualified for the position of police

22   officer in Nassau County.

23             I am going to be asking you a

24   series of questions under oath, but before we

25   begin I would like to give you what the

Case 1:15-cv-06388-LDW-AYS Document 52-1 06/26/2018 2533108 Page 20 of 214

5

```
 1                      Tapply
 2    ground rules of this proceedings are going to
 3    be.  Okay?
 4         A.   Okay.
 5         Q.   This is what is considered a
 6    quazi-judicial proceeding.  We are not before
 7    a judge or a jury.  However, the environment
 8    in which we find ourselves should be treated
 9    much like the environment should be if we
10    were actually before a court and jury,
11    meaning the same level of professionalism and
12    decorum.  This is why it necessitated that
13    you receive the oath before we begin.  Do you
14    understand that?
15         A.   Yes.
16         Q.   And although we are not before a
17    judge, the oath you took bears with it the
18    same responsibility to tell the whole truth
19    and with it also the same penalty should you
20    violate that truth.  Do you understand that?
21         A.   Yes.
22         Q.   As you can see, we have a court
23    reporter who is to my right, who is to your
24    left, who is going to be taking down
25    everything that you say.  So, it is going to
```

Case 1:15-cv-06388-LDW-AYS Document 52-1 06/26/2018 2538108 Page 21 of 214

6

```
 1                        Tapply
 2    be very important that you keep your
 3    responses elevated, your voice elevated and
 4    your responses verbal.  She cannot take any
 5    gestures or nods of the head and please try
 6    to refrain from using colloquialisms such as
 7    "um-hum" or "uh-huh" because they are spelled
 8    the same way on the transcript.  Do you
 9    understand?
10         A.   Yes.
11         Q.   Also, as we begin on this question
12    and answer period, it may begin to feel like
13    a discussion.  You may see where a question
14    is going and may want to jump in with an
15    answer.  I may understand the question that
16    you are giving and may want to jump in with
17    another question.  Since our court reporter,
18    who is very capable, cannot take two people
19    speaking at the same time, you have to allow
20    me to finish the question before you respond
21    and I, likewise, need to allow you to finish
22    responding before I go ahead and ask you
23    another question.  Do you understand?
24         A.   Yes.
25         Q.   If at any time I ask you a question
```

Case 18-966 Document 52-1 06/26/2018 2333108 Page 22 of 214

```
 1                         Tapply
 2    that you do not understand, I ask that you
 3    please let me know that you do not understand
 4    the question.  You should not be prideful or
 5    in any way embarrassed or ashamed if you do
 6    not understand a question.  Do not answer a
 7    question that you do not understand.  Do you
 8    understand?
 9         A.    Yes.
10         Q.    However, if you respond to a
11    question without telling me that you do not
12    understand it, then I am going to presume you
13    understood the question the way that it was
14    asked.  Do you understand?
15         A.    Yes.
16         Q.    In addition, if at any time you
17    need to take a break to use the restroom or
18    if you need to get a glass of water or you
19    otherwise need to take a break, you may take
20    a break for any reason.  The only thing that
21    I ask is that if we have a question pending,
22    meaning a question that has not yet been
23    answered, or you have a document that I have
24    already placed before you, that we finish the
25    document or we finish the question before you
```

8

1                    Tapply

2    go ahead and take a break.  Do you

3    understand?

4        A.    Yes.

5        Q.    The first series of questions that

6    I am going to ask you are of a personal

7    nature.  They are not made to make you feel

8    embarrassed or to make you feel uncomfortable

9    in any way.  The purpose of those questions

10   is only for me to get a statement on the

11   record that you are of completely sound mind,

12   so I am not going to be asking you anything

13   that I wouldn't ask any other person that I

14   was deposing.  Do you understand?

15       A.    Yes.

16       Q.    Are you under the influence of any

17   alcohol?

18       A.    No.

19       Q.    Are you under the influence of any

20   recreational, prescriptive or

21   over-the-counter drugs?

22       A.    No.

23       Q.    Do you currently suffer from any

24   condition that impairs your memory?

25       A.    No.

9

```
 1                          Tapply
 2        Q.   Do you currently suffer from any
 3   condition that impedes your ability to
 4   understand me?
 5        A.   No.
 6        Q.   Do you currently suffer any
 7   condition that impairs your ability to
 8   testify truthfully?
 9        A.   No.
10        Q.   Is English your first language?
11        A.   Yes.
12        Q.   What is your highest degree of
13   education?
14        A.   Medical doctor.
15        Q.   Where do you have your MD from?
16        A.   Boston University.
17        Q.   What year?
18        A.   1984.
19        Q.   Prior to that what was the next
20   degree that you earned, before that?
21        A.   Bachelor's degree.
22        Q.   From where?
23        A.   Tufts University.
24        Q.   What year?
25        A.   1980.
```

1                    Tapply

2        Q.   Are you a licensed medical doctor?

3        A.   I am.

4        Q.   What is your license number?

5        A.   167601.

6        Q.   Have you ever been subject to any

7    reprimand, discipline or sanction or

8    revocation or suspension of your medical

9    license?

10       A.   No.

11            MS. MESIDOR:  Let's go off the

12       record.

13                 (Whereupon, discussion held off

14                 the record.)

15       Q.   Dr. Tapply, do you hold any

16   specialties or special licenses, other than

17   your medical degree?

18       A.   Yes.

19       Q.   In what?

20       A.   Pediatrics.

21       Q.   Anywhere else, any others?

22       A.   No.

23       Q.   Are you currently employed?

24       A.   Yes.

25       Q.   Who is your current employer?

1                    Tapply

2        A.    Nassau County.

3        Q.    How long have you been an employee

4   of Nassau County?

5        A.    It's not quite clear cut.  I was

6   employed by them, then I went to private

7   practice, went back to them, so.

8        Q.    Cumulative, how long have you been

9   employed with Nassau County?

10       A.    18 years.

11       Q.    From what year to what year did you

12  first become employed by Nassau County?

13       A.    '91 to '92 maybe.

14       Q.    In 1992 you left?

15       A.    I am going to be screwing up on my

16  dates.  I can refer to my resume or I can

17  guesstimate the dates, but I don't want to be

18  inaccurate either so whatever, if you want

19  exact dates.

20       Q.    Do you believe the first time you

21  were employed by Nassau County it was longer

22  than for a one-year period?

23       A.    Yes.

24       Q.    How long was the first time that

25  you were employed by Nassau County for?

Tapply

2    A.   I would have to think out loud for

3    a second.  I came up from Florida, '91,

4    probably 15 months and then I did private

5    practice for a bit.

6       Q.   How long were you in private

7    practice?

8       A.   That practice, a year.

9       Q.   Then did you return to Nassau

10   County after that year of private practice?

11      A.   Um-hum, yes.

12      Q.   Was that somewhere in 1993 or 1994?

13      A.   I really need to refer to my resume

14   to answer your question.

15      MR. COVELLO:  Do you have one to

16      refer to?

17      THE WITNESS:  I do have one with me

18      if that is okay with you.

19      MR. COVELLO:  Is it okay if she

20      takes a look?  You can mark it.

21      Q.   I just really need to know how long

22   approximately when you came back to Nassau

23   County.  Was it in the middle of the '90s?

24      A.   No, early '90s.

25      Q.   How long from early '90s were you

13

```
 1                       Tapply
 2   at Nassau County for your second stint?
 3        A.   It's been intermittent, total of
 4   about 18 years.  Why it is confusing is there
 5   is overlapping employment.  I would be part
 6   time with the county, for example in the
 7   clinics, not in my current position --
 8        Q.   Okay?
 9        A.   -- while I was doing part time
10   private practice, which was kind of
11   overlapping and it weaves around, that's why
12   it seems a little muddy but about, for
13   example, in the pension system they were
14   counting me as 18 years employed with Nassau
15   County but it has been in and out.
16        Q.   Of that 18 years how many years do
17   you believe that you were part time?
18        A.   Probably four, three to four, I
19   would say, something like that.
20        Q.   When you were first hired, what was
21   your position?
22        A.   Pediatrician.
23             MR. COVELLO:  This is with the
24        county still, correct?  This is with the
25        county we are talking?
```

14

1                    Tapply
2          MS. MESIDOR:  Yes.
3     Q.   When you returned after the one
4   year of private practice, did you return into
5   the position of pediatrician?
6     A.   Yes, for purposes of employment,
7   perhaps I should add I am medical doctor, as
8   a pediatrician I could be assigned to clinics
9   that were not necessarily pediatric clinics,
10  so I was performing, for example, adolescent
11  medicine, I was doing clinics with that,
12  tuberculosis clinic, family planning clinic.
13    Q.   Let's take it one step at a time.
14  Right now we have only done the first stint.
15  The first stint you were absolutely a
16  pediatrician, is that correct, and that is
17  the 1991 to 1992-ish period?
18    A.   That was, no, I would correct that
19  to say medical doctor because that was in
20  a --
21    Q.   Was that your title?
22    A.   Yes, it was.
23    Q.   So, where does pediatrician come
24  from?
25    A.   Perhaps I am saying that because

A0489

Case 1:18-cv-Document 52-1 06/26/2018 236916987 Page 30 of 214

15

1                          Tapply

2      that was the bulk of my employment.

3          Q.    Right now we are just talking about

4      titles.  We will get into duties and

5      responsibilities after.

6          A.    Okay.

7          Q.    It is very important when I lay a

8      question out to you, that you just respond to

9      the question I am asking.

10         A.    Okay.  The entire employment with

11     the county I am MD.  They don't care what

12     your field is.  That is my employment with

13     them, as medical doctor.

14         Q.    So, your title has always been MD

15     and has not ever changed; is that correct?

16         A.    Yes.

17         Q.    So, from 1991 to 1992, I understand

18     these are approximate years --

19         A.    Um-hum.

20         Q.    -- where did you work in the county

21     in terms of the types of clinics and the

22     types of work that you were doing as a

23     medical doctor?

24         A.    My first position with them was STD

25     clinic, which was a public clinic for

16

1                        Tapply
2    gynecology for the ladies, and for men STD
3    control.
4         Q.   When you say STD, is that in
5    reference to sexually transmitted diseases?
6         A.   Yes.
7         Q.   When you say that it was a public
8    clinic, it was open to all residents of
9    Nassau County?
10        A.   Correct.
11        Q.   Were you in that position for that
12   entire 15 month or so period?
13        A.   I was and I was trying to recall
14   were they also pulling me, it was part time
15   then, off to do pediatrics here and there or
16   family planning and I don't recall, it's too
17   long ago.  I can't remember if it was just
18   STD clinic or if I was a float, they would
19   call it a float.
20        Q.   Were you full time during this
21   period of time?
22        A.   I believe that was part time or
23   they would refer to it technically as per
24   diem or per session, not officially part
25   time.

17

1                         Tapply

2        Q.    And how many hours would you say

3   you were working?

4        A.    I would say probably 20 hours a

5   week back then.

6        Q.    Then we have the stint in private

7   practice; is that correct?

8        A.    Yes.

9        Q.    When you were in private practice

10  were you in business for yourself or were you

11  working for another entity?

12       A.    I was working for another doctor.

13       Q.    And who was that?

14       A.    Doctor Steven LaSala.  L-A-S-A-L-A.

15       Q.    Where is Dr. LaSala's office

16  located during that period of time that you

17  worked for him?

18       A.    Plandome Road, Manhasset.

19       Q.    What were the surrounding

20  circumstances behind you leaving Mr. LaSala's

21  practice?

22       A.    I wanted to leave and come back to

23  work for the county and hopefully to get a

24  full time position with Nassau County.

25       Q.    And when you returned to Nassau

Case 1:15-cv-06358-LDW-AYS   Document 52-1   06/26/2018   2363 1087   Page 33 of 214

18

```
 1                         Tapply
 2    County, were you returning into a full time
 3    position?
 4         A.   No, part time or per diem per
 5    session, when I first returned.
 6         Q.   When you returned the second time,
 7    what type of work were you doing in terms of
 8    what kind of clinics that you were working in
 9    or the type of work that you were doing for
10    the county?
11         A.   Hodgepodge, the STD clinic,
12    tuberculosis clinic, adolescent medicine,
13    pediatrics, mammography, I did that, a little
14    bit of everything.
15         Q.   When you said that you were
16    involved with mammography, was it as part of
17    another clinic or was there a separate clinic
18    for imaging that you were involved with, what
19    do you mean by you did some mammography?
20              MR. COVELLO:  Objection to form.
21         You can answer.
22              THE WITNESS:  I can answer.
23         A.   I would do the physical examination
24    of the ladies and then they would go down the
25    hall essentially and have their imaging
```

19

```
 1                    Tapply
 2   performed.
 3        Q.   As part of which clinic or facility
 4   that you were working with when you examined
 5   the women and did mammographies?
 6        A.   It was Nassau County was providing
 7   a mammography clinic, quote-unquote, clinic,
 8   and that encompassed a breast exam and
 9   imaging in the same visit.
10        Q.   These various clinics that you
11   worked for, were they on a rotation or were
12   there different periods of time that you
13   worked in each?
14        A.   Both.  I could be assigned to, say,
15   three solid pediatric clinics a week and then
16   on call for whoever needed me and the medical
17   director would call and say, "Are you free,
18   we need someone here or there".
19        Q.   And this second stint that we are
20   discussing now after you came back from
21   private practice, how long do you believe
22   that you were assisting with this,
23   quote-unquote, hodgepodge of clinics?
24        A.   I believe that continued until I
25   was hired full time, which I believe was '94,
```

1                          Tapply

2    1994.

3         Q.    So, were you giving assistance to

4    all these clinics for approximately two

5    years?

6         A.    Um-hum, at least, probably more

7    like three or four.

8         Q.    So, in 1994 you became full time?

9         A.    Um-hum, yes.

10        Q.    When you became full time, did you

11   have a specific clinic or facility to which

12   you reported every day or did you continue

13   being of service to the various clinics?

14        A.    The second thing, as needed, it was

15   just a guaranteed whatever, 40 hours, but

16   wherever they needed me.

17        Q.    Was there one clinic or area in

18   which you worked more than others?

19        A.    Pediatrics.

20        Q.    How long did you continue to serve

21   the County of Nassau in that capacity from

22   1994?

23        A.    That is a tiny bit complicated.  In

24   1999 Nassau County Medical Center, which was

25   also a county hospital, morphed into Nassau

1                    Tapply
2    University Medical Center, which was
3    partially privatized and partially county,
4    so, I was employed, I am not positive who was
5    writing our checks, it might have been the
6    county for awhile, from '99 and laid off all
7    the pediatricians in 2001.
8         Q.   Were you amongst them?
9         A.   I was, and they used for the
10   clinics, they used the hospital
11   pediatricians, so that was an interruption in
12   service to the county at that moment, '01,
13   that's right.
14        Q.   Were you considered a hospital
15   pediatrician?
16        A.   No.  No, I was out in the county
17   clinics, rotating around the clinics, so me
18   and the other seven were --
19        Q.   Laid off?
20        A.   Correct.
21        Q.   And what did you do from 2001,
22   after 2001?
23        A.   2001 to 2004 was back to private
24   practice again.
25        Q.   Where did you work?

22

```
 1                      Tapply

 2      A.    Mid-Suffolk Pediatrics.

 3      Q.    Okay, and what happened in 2004?

 4      A.    I got a phone call from a gentleman

 5  in human resources for the county inviting me

 6  to come work for civil service now under the

 7  auspices of the county as medical director.

 8  He remembered me from my prior service.

 9            MR. COVELLO:  Where did you go next

10       was the question.

11            THE WITNESS:  I'm sorry.  Did I not

12       focus?  Nassau County civil service

13       asked me to come and interview, meet

14       Mr. Kampe, K-A-M-P-E, and I was hired.

15      Q.    When you returned in 2004 what did

16  you say that your title was?

17      A.    Medical director.

18      Q.    What were your duties and

19  responsibilities as medical director?

20      A.    I review medical histories and

21  examinations of candidates for employment,

22  different types of employment, with the

23  county before they are hired.

24      Q.    What are the types of employment

25  for which you review medical histories and
```

1                              Tapply

2    examinations for Nassau County?

3        A.   Every title of job that the county

4    offers that would be from laborer and

5    secretarial, clerical, to police officer,

6    part of it is law enforcement, part of it is

7    completely unrelated to law enforcement, all

8    sorts of titles.

9        Q.   You review medical histories for

10   secretaries?

11       A.   Yes.  They fill out a form when

12   they come in for their checkup.  I am not

13   doing the checkup.  I am reviewing the work

14   of the people who do the checkups but they

15   fill out a form of their medical history and

16   the flip side, for example, a secretary,

17   would be her checkup by whatever doctor is

18   with me that day, and then it flipped across

19   my desk, I am checking completeness and

20   whether I might want to ask her for more

21   specific medical records, her or him.

22       Q.   Are those for specific employees

23   who have identified some sort of medical

24   condition for which they need an

25   accommodation or is your testimony that all

24

                         Tapply
1    Nassau County employees have to release
2    medical histories in order for them to be, in
3    order for them to be considered for their
4    respective positions?
5
6         MR. COVELLO:  Objection.  I am not
7         sure she said all.  So far we have heard
8         secretaries and something else.
9         MS. MESIDOR:  Counsel, your
10        objection is noted for the record.  The
11        question is before you, Dr. Tapply.
12        A.   We have to back up one step which
13   is before you get to a physical, any sort of
14   a medical review, you are signing a release
15   in your application for employment in it, a
16   special paper, release of medical information
17   that you would be willing to provide civil
18   service as well as the commission medical
19   history and it is basically a HIPAA waiver
20   that we were allowed to investigate.
21        Q.   Is that for all Nassau County
22   employees or only civil service positions?
23        A.   All Nassau, hum, I guess accurately
24   anyone in a civil service title because some
25   employees are exempt, political appointments,

1                    Tapply

2    that's true.

3        Q.   Are there specific guidelines that

4    are, that you are provided for each one of

5    the respective positions for which you need

6    to assure the particular employee's medical

7    history would not in any way impede those

8    particular qualifications?

9             MR. COVELLO:  Objection.  You can

10        answer it if you understand it.

11       A.   Could you be a little bit more

12   specific?

13       Q.   Okay.  Do you have a list of

14   guidelines that you have to look at in

15   determining whether or not a person is

16   medically fit in order to complete their job

17   duties?

18       A.   There is a division in civil

19   service that is called classification and

20   they draw up duties, literally duties,

21   specific duties that are associated with

22   every single job title.  Those duties are

23   reviewed while the person is applying for the

24   position at the time of their medical.

25       Q.   Are those list of duties used as

26

1                     Tapply

2    the metric against which you look at the

3    individual's medical history to see whether

4    or not they could complete, whether they

5    could perform their position?

6        A.   Yes.

7             MR. COVELLO:  Objection.

8        Q.   Do you, yourself, review the

9    medical history and any medical

10   examinations --

11            MR. COVELLO:  Objection.

12       Q.   -- for individuals who are applying

13   for law enforcement positions?

14            MR. COVELLO:  Objection.  You said

15            and review medical examination.  Is that

16            a report or is that during the exam?

17            MS. MESIDOR:  Do you understand the

18            question?

19            THE WITNESS:  No.

20            MS. MESIDOR:  What is it that you

21            don't understand about the question?

22            THE WITNESS:  I just need you to

23            repeat the question.

24            MS. MESIDOR:  Read the question

25            back for the witness.

Case 1:15-cv-06358-LDW-AYS Document 52-1 06/26/2018 26601087 Page 42 of 214

27

1                           Tapply

2                           (Whereupon, the reporter read

3                           back as requested.)

4          A.    Yes.

5          Q.    Do you have other individuals who

6     assist you in that capacity or does

7     everything come through you?

8                MR. COVELLO:  Objection.

9          A.    Other doctors perform the medical

10    exams.  Other doctors on occasion will review

11    the medical histories, the medical history

12    investigation it is referred to, and provide

13    their opinion to me.

14         Q.    In the circumstance when other

15    doctors do the medical examination or other

16    doctors review the medical history, do you go

17    back and re-review or do you only look at the

18    recommendation that is provided?

19               MR. COVELLO:  Objection.

20         A.    It depends.  It is case by case.

21         Q.    Do you, yourself, do medical

22    examinations of candidates for law

23    enforcement positions for Nassau County?

24         A.    Rarely, on occasion I do.

25         Q.    How much information in terms of

Case 18-866, Document 52-1, 06/26/2018, 2360108, Page43 of 214

```
 1                      Tapply
 2    medical history is required of a candidate
 3    for law enforcement position, specifically
 4    that of a police officer?
 5            MR. COVELLO:  Objection.
 6        A.   It is too broad to answer.  It is
 7    case by case.
 8        Q.   How do you determine how much
 9    information is required, how much medical
10    history that you are going to review a
11    particular candidate?
12        A.   The candidate fills out a form
13    before they get to us with a bunch of
14    questions on it, a lot of questions.
15        Q.   Is the-- were you finished with
16    your answer?
17        A.   Essentially.
18        Q.   When the candidate fills out that
19    form, is that a form including their medical
20    history?
21        A.   Yes.
22        Q.   Does that information include any
23    ailments that they had previously suffered
24    from or they are currently suffering from?
25        A.   Yes.
```

1                    Tapply

2      Q.   Once you receive that form, is that

3    when a determination is made how much further

4    medical history is needed from that

5    particular candidate?

6      A.   That and then the physical

7    examination itself, which there could be

8    issues that come to light during the checkup,

9    so it is two-pronged.

10      Q.   When you seek additional

11    information regarding a person's medical

12    history, do you have them fill out another

13    HIPAA release form?

14           MR. COVELLO:   Objection.

15      A.   They fill out one, there's one

16    filled out for civil service I alluded to

17    already.   The police department itself

18    assigns investigators, actual police officers

19    who happened to be assigned to the applicant

20    investigation unit of the police department.

21    They have a bunch of candidates.   They fill

22    out another medical release and they fill out

23    another bunch of questions, that's called, to

24    streamline things a little bit, that is

25    called a phase two investigation.   That is

30

1                       Tapply

2    the police department's medical investigation

3    of the candidate.   That comes to my desk as

4    well.

5         Q.   Do you have any involvement in the

6    police department's investigation?

7         A.   No.

8         Q.   When you receive the information,

9    is the information conclusions or are you

10   also looking at any documents that they

11   reviewed in furtherance of their conclusions?

12        A.   I don't understand your use of the

13   word "conclusions" in this context.

14        Q.   Sure.   The police department

15   conducts an investigation into whatever the

16   candidate has revealed to be particular

17   ailments, is that correct, or conditions; is

18   that correct?

19        A.   It is an honor system for the

20   candidate to disclose to their

21   investigator --

22        Q.   Right.

23        A.   -- any conditions they may have or

24   have had.

25        Q.   Once the police department receives

1                    Tapply

2    that information, then they have an

3    investigation unit that looks into it; is

4    that correct?

5        A.   The onus again is upon the

6    candidate to provide to us or her

7    investigator all the medical records the

8    investigator requests regarding their medical

9    conditions.

10       Q.   And once the investigator has the

11   medical records that have been required of

12   the candidate, does the investigator make any

13   findings or make any suggestions at all?

14       A.   They do not, with the exception on

15   occasion if the investigator is disturbed,

16   they feel in the sense that the candidate is

17   failing to disclose information or perhaps,

18   let me back up again, they have polygraph

19   information, so this can overlap, so the

20   police department has broader eyes here and

21   perhaps something has come to light on a

22   polygraph medical, for example, that was not

23   in their investigation, then they are going

24   to -- conclude is almost always going to be

25   the wrong word because everything goes to the

32

```
 1                      Tapply
 2   commissioners and they literally vote, I am
 3   putting my hand up, voting.  They would
 4   present to the commission we have information
 5   that of a medical regard that has not been
 6   included in our written investigation of the
 7   candidate, nothing in any sort of a
 8   conclusion format.  That is the commissioners
 9   make conclusions.
10        Q.   My understanding of your testimony
11   is that the investigator is there to gather
12   any information and highlight any red flags
13   that may come out from any other portion of
14   the process --
15             MR. COVELLO:  Objection.
16        Q.   -- is that correct?
17             MR. COVELLO:  I'm sorry.
18   Objection.
19        A.   I shouldn't speak for the job of
20   the investigators.  I would be speculating on
21   exactly what their proper job is.  I am on
22   the receiving end.  What I receive is the
23   result of their investigation.
24        Q.   And when you get the result of the
25   investigation, do the results include any
```

1                    Tapply

2    sort of recommendation as to that particular,

3    whether that particular candidate should

4    advance or not, based on the medical

5    information that they have received?

6         A.   No.  Only, again, I will mention

7    the proviso that if there is conflicts in the

8    medical information they received with other

9    parts of their more broad investigation, they

10   again won't make conclusions but will bring

11   any conflict to the commissioners, so they

12   are presenting information to us, whether it

13   is my desk or the commissioner's desk, they

14   are presenting information that they have

15   gathered.

16        Q.   After they have gathered the

17   information is your office or your desk the

18   next step in the candidate's process?

19        A.   Medically, yes, medically.

20        Q.   Once you receive the information,

21   what do you do with it?

22        A.   After their medical investigation

23   is received, they are scheduled for a medical

24   appointment and they have their examination

25   and that's it, everything is reviewed, put

34

```
 1                      Tapply
 2    together at a later date.
 3         Q.   Does the examination include any
 4    testing, medical examination, does it include
 5    any testing?
 6         A.   Blood pressure testing, urine test
 7    and EKG testing.
 8         Q.   Does it include any blood work?
 9         A.   No, it does not.
10         Q.   Once you have received the medical
11    examination results as well as the
12    investigation, the documents collected during
13    the police investigation, what then do you do
14    with the information?
15         A.   There is nothing further to
16    investigate.  I am done with that particular
17    candidate.
18         Q.   Do you make a recommendation
19    whether the candidate should move forward or
20    should be disqualified?
21         A.   Um-hum, I do.
22         Q.   Prior to, we had previously
23    discussed that there are circumstances in
24    which an individual, other than yourself,
25    would review the medical histories?
```

35

 1                      Tapply

 2        A.    Um-hum, yes.

 3        Q.    Is that correct?

 4        A.    Yes.

 5        Q.    In the circumstances when that

 6   takes place do you receive then the medical

 7   history and the medical examination at the

 8   same time that that is done?

 9        A.    Not necessarily.  Also, I should be

10   a little more careful.  Occasionally the

11   physical examinations in the past have been

12   done before all of the phase two, the medical

13   investigation.  It isn't always the

14   background medical history comes before the

15   checkup.  There are exceptions to that.  But

16   generally when, just for organizational

17   purposes it makes a lot more sense to do the

18   history and look at the type of a candidate

19   we have, whether it is a thick history or a

20   large history, and then we do the checkup and

21   then if there is anything further to

22   investigate, my office asks through a third

23   person, through the law enforcement unit

24   administrative staff over there, asks the PD

25   to ask the candidate for more medical

A0510

1                    Tapply

2    records.

3        Q.    When you say the PD, what do you

4    mean?

5        A.    The police department applicant

6    investigation unit, the people who provided

7    us with that original background information,

8    we have an opportunity to go back to them and

9    request more medical information if we need

10   it.

11       Q.    In the circumstance where the

12   medical history and the medical examination

13   is being done other than by you, do you

14   receive that particular doctor's

15   recommendation with the supporting

16   documentation or do you only receive the

17   recommendation of the doctor one way or the

18   other as to whether or not the individual

19   would be able to meet and perform their

20   duties?

21           MR. COVELLO:  Objection.  Isn't

22       there another choice?

23           MS. MESIDOR:  Counsel, your

24       objection is noted for the record.

25           MR. COVELLO:  I know and you could

1                 Tapply

2    give your speech but isn't there another

3    choice?

4       MS. MESIDOR:  This is a federal

5    deposition.  You know there are no

6    speaking objections during a federal

7    deposition.  You are completely

8    inappropriate.  Okay?

9       MR. COVELLO:  And so is your

10   question.

11      MS. MESIDOR:  Be that as it may.

12   The objections that you have are

13   objection to form or objection on the

14   basis of privilege.

15      MR. COVELLO:  Not everyone is

16   trying to sabotage you, sometimes we try

17   to help.

18      MS. MESIDOR:  Counsel, I am not

19   going to muddy up my record with all

20   this colloquy.  You have been instructed

21   as to what the appropriate objections

22   are.  If it continues to be an issue, we

23   will simply contact the judge.  There is

24   a question pending before the witness.

25   Speaking objections are completely

38

```
1                          Tapply

2        inappropriate.

3              Do you understand the question, Dr.

4        Tapply?

5              THE WITNESS:  I have forgotten the

6        question.

7              MS. MESIDOR:  Please repeat the

8        question for the witness.  Let me know

9        if you don't understand it and I will

10        try to rephrase it.

11              THE WITNESS:  Okay.

12                    (Whereupon, the reporter read

13                     back as requested.)

14        Q.   I would like to know whether you

15   receive the recommendation with the

16   supporting documents or whether you just

17   receive the recommendation when the medical

18   history and the examination is being done,

19   other than by yourself.

20              MR. COVELLO:  Objection.  Was the

21        prior question withdrawn or this is in

22        addition to it?

23              MS. MESIDOR:  That is the question

24        that is currently before you.

25        A.   The examining doctors do not make a
```

1                       Tapply

2    recommendation as to qualification.

3         Q.    In the circumstance that the doctor

4    is not only examining the candidate but is

5    also reviewing the history, do they also not

6    make a recommendation?

7         A.    They do not make a written

8    recommendation.

9         Q.    What kind of recommendation do they

10   make?

11        A.    If we are in tandem rooms and the

12   doctor is performing an examination and he is

13   done and we finish looking at the medical

14   history, there is no rule here, sometimes

15   with the medical center completely different,

16   sometimes we are over by my office.  If we

17   are in tandem rooms and the doctor comes in

18   and says, "I just want to show you these two

19   blood pressures were a little high but the

20   third one was perfect and I will leave this

21   on your desk and when we are done you can

22   review everything later".  So, there is

23   casual communication between myself and

24   whoever is helping me but they do not make a

25   recommendation for qualification or

1                    Tapply

2    disqualification.

3         Q.   Whether verbally or in writing?

4         A.   No.  Correct.

5              MR. COVELLO:  Let's take a short

6         break.

7              MS. MESIDOR:  Sure.

8                     (Whereupon, a brief recess was

9                     taken at this time.)

10             MS. MESIDOR:  Mark this for

11        identification as Tapply Exhibit 1.

12                    (Whereupon, Tapply Exhibit 1

13                    marked for identification.)

14             MS. MESIDOR:  Let's have the

15        reporter read that back.

16                    (Whereupon, the reporter read

17                    back as requested.)

18        Q.   After you had received the

19   documentation from the reviewing physician,

20   the one that is actually doing the medical

21   examination, and any documentation that you

22   need from the police department in terms of

23   the investigation into the medical history,

24   what is your next step?

25        A.   Referring to police officers only

Case 1:15-cv-06358-Document 52-1 06/26/2018 2360-1087 Page 56 of 214

41

1                           Tapply

2    or other titles?

3         Q.    Just police officers.

4         A.    I would determine if at that moment

5    the candidate is qualified, finished or

6    whether we need more information.

7         Q.    Are you familiar with the plaintiff

8    Craig Roth's case?

9         A.    Yes.

10        Q.    Mr. Roth was medically disqualified

11   due to his diabetic condition; is that

12   correct?

13        A.    Correct.

14        Q.    Prior to Mr. Roth's application for

15   a position as a Nassau police officer had you

16   ever had any other candidates for the same

17   position have a diabetic condition?

18        A.    Yes, yes.

19        Q.    Do you recall whether that person

20   was also disqualified?

21        A.    I am not positive of a proper

22   answer.  I did not have any independent

23   recollection of, I believe a total of three

24   police officers with a diabetic condition,

25   until reviewing, we found in review of civil

42

Tapply

1                          Tapply

2     service records that there were, but I didn't

3     remember that.

4          Q.    That is not the question that I

5     asked you.

6          A.    Okay.

7          Q.    What I want to know is whether

8     prior to Mr. Roth were you aware of anyone

9     else, when I say prior to him, I mean from

10    the standpoint of whether there were any

11    candidates that applied prior to Mr. Roth who

12    also had a diabetic condition, not when you

13    found out they had one or the results

14    therein, I just want to know if anyone before

15    he applied had applied who also had a

16    diabetic condition for the position of police

17    officer of Nassau County?

18         A.    At the time I was reviewing

19    Mr. Roth I did not recall any prior applicant

20    with diabetes.

21         Q.    But since reviewing Mr. Roth's

22    file, you have now become aware of three

23    others or three including Mr. Roth?

24         A.    Three including Mr. Roth.

25         Q.    The other two that also applied who

43

```
 1                    Tapply

 2     had a diabetic condition, were they also

 3     medically disqualified?

 4              MR. COVELLO:  Let me caution you,

 5         don't use names.

 6              THE WITNESS:  Sure, of course.

 7         A.    I came to learn that one was

 8     medically disqualified.  The third was

 9     multifactorial disqualification, not just

10     medical.

11         Q.    Was one of the factors for which

12     this individual was disqualified medical, the

13     one that had the multifactorial

14     disqualification?

15         A.    Yes.

16         Q.    Was that based on that individual's

17     diabetic condition?

18         A.    The medical piece of the other

19     person's disqualification was based on a

20     complication of his underlying diabetic

21     condition, not just the condition of being

22     diabetic, it was a problem from that.

23         Q.    Was the diabetic condition a factor

24     in the medical disqualification?

25         A.    I feel like I just answered that.
```

Case 18-366, Document 52-1, 06/26/2018, 2360108, Page59 of 214

44

```
 1                      Tapply

 2   It was an underlying contributor to the

 3   reason he was medically disqualified.

 4       Q.   Okay.  My question is very, very

 5   nuanced.  I understand your response that the

 6   complication as a result of the diabetic

 7   condition is what ultimately led to the

 8   disqualification, is that correct, that is

 9   what your testimony is?

10       A.   That's correct, yes.

11       Q.   So, but my question is actually

12   more nuanced even than that.  My question is

13   whether the diabetic condition in and of

14   itself, separate and independent from the

15   complication, whether that diabetic condition

16   was a consideration in the medical

17   disqualification of the individual?

18            MR. COVELLO:  Objection.  Off the

19       record.

20                    (Whereupon, discussion held off

21                    the record.)

22            MR. COVELLO:  Read back the

23       question.

24                    (Whereupon, the reporter read

25                    back as requested.)
```

Case 1:8-366   Document 52-1   06/26/2018   2369 1087   Page 60 of 214

45

2     A.   It was not.

3     Q.   Are you aware of any candidates for

4  the position of police officer who have a

5  medically disclosed diabetic condition that

6  has not been medically disqualified?

7     A.   I am not aware that anyone has not

8  been disqualified.

9     Q.   Now my questions are going to be

10  more pointed toward Mr. Roth's case.  Do you

11  recall when it was first that it came to your

12  attention that there was a candidate by the

13  name of Craig Roth that was seeking the

14  position of police officer?

15     A.   I don't remember.

16     Q.   Do you recall what year it was?

17     A.   No, 2014 or 2015.

18     Q.   Do you recall how it is that you

19  came to become aware of Mr. Roth's candidacy?

20     A.   I am confused by the question.

21     Q.   Do you know whether somebody had

22  presented you with his file and indicated

23  that this person was a review, do you recall

24  if perhaps somebody gave you a call and said,

25  "Hi, I am sending some documents over

46

1                      Tapply

2    regarding Craig Roth", do you know how it is,

3    through what medium?

4         A.    No, I do not.

5         Q.    Did you ever become aware that

6    Mr. Roth had been placed on medical hold in

7    terms of his candidacy for police officer?

8         A.    That question, on medical hold?

9         Q.    Yes.

10        A.    That question doesn't make sense.

11        Q.    What do you mean?

12        A.    My office would be the one

13   recommending the medical hold if it was

14   purely for medical reasons, not any other

15   office, so.

16        Q.    So, how is it that, based on your

17   prior testimony my understanding was that

18   once a candidate's medical history

19   information had been filled out and received,

20   that your office was the one to review it; is

21   that correct?

22        A.    Yes.

23        Q.    My understanding was that that was

24   for all civil service employees who were in a

25   civil service title; correct?

47

Tapply

1

2      A.    Yes.

3      Q.    So, once there has been a flag of

4   some sort, whether it is that the person has

5   a condition that needs to be further

6   examined, what is that category called?

7      A.    It doesn't, there is no category at

8   that moment.  We continue processing the

9   candidates until they are finished.

10      Q.    So, at what point do you have a

11   specific recollection of being involved in

12   the processing of Mr. Roth's candidacy?

13      A.    I don't have a specific

14   recollection of being involved.  We were

15   doing many people, many, many people at the

16   same time.  I can't give you at any point in

17   time.

18      Q.    Is there any information that I

19   could provide to you that perhaps would

20   refresh your recollection to see at what

21   point you became involved in the processing

22   of Mr. Roth's candidacy?

23      A.    I am happy to look at anything you

24   have.

25      Q.    I have a lot of different things.

```
 1                      Tapply
 2   Is there something specific that you know
 3   that would help you recall?
 4        A.   I don't understand.
 5        Q.   I am going to give you a document
 6   that has been marked as Tapply 1 for
 7   identification.  It is Bates numbers 94
 8   through 121.
 9        A.   Okay.  (Witness perusing document).
10             MR. COVELLO:  Look it over.
11             THE WITNESS:  Okay.
12             MS. MESIDOR:  Read back the last
13        question.
14                  (Whereupon, the reporter read
15                  back as requested.)
16        Q.   Dr. Tapply, have you reviewed the
17   document marked as Tapply 1 for
18   identification?
19        A.   Yes.
20        Q.   Do the documents that I provided to
21   you in any way help to assist the refreshing
22   of your recollection as to at what point you
23   became involved in Mr. Roth's, in the
24   processing of Mr. Roth's candidacy
25   application?
```

1                    Tapply

2        A.    Yes.

3        Q.    At what point?

4        A.    I see a letter dated January 28,

5    2015.

6        Q.    What page number is that?  Please

7    refer to the bottom right Bates stamp number.

8        A.    104.

9        Q.    So, we are looking at Bates stamp

10   defendant's production Roth 000104.  It is a

11   letter dated January 28, 2015 that is signed

12   by the medical director.  Is that your

13   signature?

14       A.    Yes.

15       Q.    Were you the medical director at

16   the time?

17       A.    Yes.

18       Q.    Is it your belief that this was the

19   point in which you became involved in the

20   processing of Mr. Roth's application?

21       A.    Approximately that time,

22   approximately, yes.

23       Q.    Would you have already been

24   involved in the reviewing of Mr. Roth's

25   medical records and his medical examination

50

1                          Tapply

2     prior to this letter being sent out?

3         A.    Based on the contents of the letter

4     then, yes.

5         Q.    So, first question, did you conduct

6     Mr. Roth's medical examination?

7         A.    I don't remember.

8         Q.    Do you know how long Mr. Roth was

9     examined for?

10        A.    No.

11        Q.    Do you know what was done for

12    Mr. Roth's examination?

13        A.    I wasn't there.  Global concept of

14    what is involved in a checkup.

15        Q.    Do you know a Dr. Rosenthal?

16        A.    I do not personally know him.  I

17    know his name from these proceedings.

18        Q.    Is it possible that Dr. Rosenthal

19    had done Mr. Roth's medical examination?

20        A.    You have to be more specific.

21        Q.    In terms of are you aware that

22    Mr. Rosenthal, did Mr. Rosenthal go through

23    more than one examination from Nassau County?

24            MR. COVELLO:  Mr. Rosenthal?

25        Q.    I'm sorry.  Did Mr. Roth go through

51

1                    Tapply

2    more than one medical examination through

3    Nassau County?

4         A.   He had one medical examination with

5    a representative, one of the physicians that

6    works for the county.  I don't know which

7    one.

8         Q.   Was it you?

9         A.   I don't believe it was me.  I would

10   have to see his physical checkup paper to see

11   if it was me.

12        Q.   Going back to the document that we

13   were previously discussing, Roth 104, that

14   January 28, 2015, what kind of documentation,

15   where in the process is a letter like this

16   sent to the candidate?

17        A.   I will just reiterate for the

18   record every candidate is different, there

19   are no templates, so it is not a black or

20   white issue exactly.  In this particular

21   case, I am reading out loud from the letter,

22   "In order to continue your medical

23   evaluation, please note that your private

24   endocrinologist should review the enclosed

25   documents".  So, I am presuming Mr. Roth had

52

 1                    Tapply

 2    his medical checkup and that some of his

 3    medical records had been provided to the

 4    medical unit and we were looking for more

 5    medical information from the private doctor.

 6    So, that's where he was in the process.

 7         Q.    Drawing your attention to Exhibit

 8    C, which starts at defendant's production

 9    Roth 107?

10         A.    Got it.

11         Q.    Going to 1088, you see where it

12    says "general review medical"?

13         A.    Yes.

14         Q.    According to this, page 1 of 2 and

15    2 of 2, this is a two-page document, do you

16    know who prepares this document?

17         A.    Yes.

18         Q.    Is this part of the police

19    investigation that you previously discussed

20    that is done by the department?

21         A.    One page is and one page isn't.

22         Q.    Could you please distinguish it for

23    the record, which page is and which page

24    isn't?

25         A.    Roth 108 was provided to civil

A0527

53

1                          Tapply

2    service from the police department.

3        Q.    And what about Roth 109?

4        A.    107 was the other page.

5        Q.    I was talking about 108 and 109?

6        A.    I'm sorry.  So, 108 is provided by

7    the police department, as is 109.

8        Q.    Is this part of the documents that

9    you review prior to making your

10   recommendation?  When I say this, I am

11   talking about 108 and 109.

12       A.    You have to be more specific.  Did

13   you mean this recommendation 107?

14       Q.    No, we are talking about 108 and

15   109.

16       A.    Then I need you to explain the

17   question a little bit.

18           MS. MESIDOR:  Read back the

19       question.

20                  (Whereupon, the reporter read

21                  back as requested.)

22       Q.    This two-page document that you

23   have indicated comes from the police

24   department as part of their investigation, is

25   this document, again Bates 108 and 109, one

54

Tapply

1          of the documents that you review and that you

2          take into consideration in making your

3          recommendation as to whether or not Mr. Roth

4          should have been medically disqualified for

5          his position?

6

7          A.    Yes.

8          Q.    Looking now at page Roth 110, who

9          prepared this document, this page?

10         A.    Because it is written in the first

11         person, well, I didn't generate it so I am

12         going to say Mr. Roth, his name is in the

13         upper left and whoever is speaking the first

14         person, so I am going to suggest it was

15         Mr. Roth or someone writing on his behalf.

16         Q.    Was this information that was

17         provided by Mr. Roth upon the request of the

18         commission?

19         A.    I don't know who requested this

20         document.

21         Q.    The information contained in this

22         document, is this the kind of information

23         that is usually requested of diabetic

24         candidates?

25                MR. COVELLO:  Objection.  You can

55

1                          Tapply

2        answer.

3        A.   I wouldn't ever say usually,

4   period.

5        Q.   Do you know why in Mr. Roth's

6   specific case, why this information would

7   have been requested?

8        A.   I really can't make a conjecture

9   because I don't know who requested it or how

10   it came to become part of the record.  This

11   is him speaking in his own voice with

12   notations written on it.  I am guessing.  I

13   don't want to guess.

14        Q.   So, what is your understanding of

15   what this list is supposed to be?

16        A.   Mr. Roth, apparently, is saying

17   below are a list of requested ambulance calls

18   and perhaps he could explain better than I

19   could and I know he is not here being

20   deposed, so, nothing else to say.

21        Q.   Do you recall reviewing this

22   document prior to making your determination?

23        A.   Yes.  That is my handwriting on the

24   lower right or the right hand margin, I

25   should say.

Case 1:15-cv-06358-LDW-AYS Document 52-1 06/26/2018 2060607 Page 71 of 214
Case 1:15-cv-06358-LDW-AYS Document 41-31 Filed 06/16/17 Page 58 of 140 PageID #:
667

1                          Tapply

2        Q.    When you say the right hand margin,

3    are you referring to the handwriting that

4    says "emergency calls for low blood sugar"?

5        A.    That is my handwriting, that's

6    right.

7        Q.    So, according to this document, if

8    your presumption was correct that this was

9    written by Mr. Roth, it says, "Below are a

10   list of requested ambulance calls, when my

11   investigator reviewed those with me I thought

12   it pertained to only being transported to the

13   hospital via an ambulance.  Only one of the

14   incidents involved being transported to the

15   hospital which occurred in 2006 and was the

16   only incident where I passed out".  Do you

17   see that there?

18       A.    I do.

19       Q.    "The other incident simply involves

20   low blood sugars and the last one occurred

21   almost three years ago"; do you see that

22   there?

23       A.    I do.

24       Q.    Was it your recollection that

25   Mr. Roth's representation that the low blood

57

1                    Tapply

2   sugar, the last low blood sugar incident in

3   which an ambulance was called had happened

4   three years prior?

5      A.   He is stating that.  You are asking

6   me for a recollection.  I am reading exactly

7   the same document, so I am not sure what your

8   question is.

9      Q.   I am asking you if that is what you

10  recall, if you recall that being actually the

11  case.  I know what the document says.  I was

12  reading you the document only to give you a

13  reference point.

14         My question to you is whether

15  from your own memory, your own recollection,

16  whether you understood that to indeed be

17  truthful and be the case?

18     A.   I don't know.

19     Q.   It continues, it says, "Also be

20  advised that at the time of these events I

21  was still in puberty and due to hormonal

22  changes I was constantly changing my insulin

23  levels to adjust these changes".  Do you see

24  that statement there?

25     A.   Yes.

Case 1:15-cv-06358 Document 52-1 06/26/2018 236910087 Page 73 of 214

58

1                           Tapply

2       Q.   During your review of Mr. Roth's

3   medical records did the timing of these

4   incidents, in terms of where he was in his

5   adolescent development, play a factor in any

6   of your findings as to why there may have

7   been an instability at one point and it later

8   stabilized?

9            MR. COVELLO:  Objection.

10      A.   I don't remember.

11      Q.   Do you recall whether you had any

12  discussions with any of Mr. Roth's doctors to

13  verify the statement that he has placed in

14  there that insulin levels were being changed

15  due to the fact that he was going through

16  puberty at the time?

17           THE WITNESS:  I'm sorry.  Read it

18      back to me.

19           MS. MESIDOR:  We will read back the

20      question.

21                (Whereupon, the reporter read

22                back as requested.)

23      A.   I don't recall.

24      Q.   What sort of medical experience did

25  you have with the treatment or diagnosis of

59

```
 1                      Tapply
 2     diabetic conditions?
 3              MR. COVELLO:  At this point in
 4         time?
 5              MS. MESIDOR:  Yes.
 6              MR. COVELLO:  Mr. Roth's point in
 7         time?
 8              MS. MESIDOR:  Yes, what I mean by
 9         back in 2015, 2014 when you were
10         reviewing Mr. Roth's condition and
11         making determinations as to
12         qualification.
13         A.   How much experience did I have?
14         Q.   Yes.
15         A.   As a physician or as a medical
16     director?
17         Q.   As a physician in the diagnosis and
18     treatment of diabetic condition.
19         A.   Practicing pediatrics, I had some
20     experience.  I can't quantify it.  We had
21     diabetic children, yes.
22         Q.   When you say, "We had diabetic
23     children", I would like to have an
24     understanding whether the clinics in which
25     you served or perhaps while you were in
```

```
 1                    Tapply
 2   private practice, whether it was a common
 3   condition that you diagnosed and treated, can
 4   you give me a range of some sort for me to
 5   have an understanding of how much exposure
 6   and experience that you had actually dealing
 7   with patients who had diabetes?
 8           MR. COVELLO:  Objection.  You can
 9      answer.
10      A.   No, I wouldn't know how to quantify
11   that.
12      Q.   You became medical director for the
13   commission back in 2004; is that correct?
14      A.   Yes.
15      Q.   Let's talk about pre-2004; okay?
16      A.   Okay.
17      Q.   Prior to 2004 did you diagnose and
18   treat individuals with diabetic conditions?
19      A.   Perhaps.  Those are two different
20   questions.  One is diagnose and one is treat.
21      Q.   I understand that.
22      A.   Okay.
23      Q.   But prior to 2004 did you do either
24   as it relates to individuals with a diabetic
25   condition?
```

61

1                           Tapply

2        A.   Yes.  I am not going to have any

3   specifics.

4        Q.   Was it any significant portion of

5   the demographic in which you served when you

6   were working in the various clinics for the

7   County of Nassau?

8             MR. COVELLO:  Objection.

9        A.   The term "significant" is far too

10  vague, 10 percent, 1 percent, 90 percent.

11       Q.   How much of a percentage would you

12  consider significant, you, yourself?

13       A.   More than half.

14       Q.   So, using your barometer as

15  significant being more than half, going back

16  now to my question as to whether or not you

17  served any, whether you served a significant,

18  withdrawn, whether you served a demographic

19  in which there was a significant amount of

20  individuals who were, you were treating or

21  diagnosing with a diabetic condition?

22            MR. COVELLO:  Objection.

23            MS. MESIDOR:  I'm sorry?

24            MR. COVELLO:  Is there a question?

25            MS. MESIDOR:  Yes.  I believe you

62

1                    Tapply

2        understood that.

3              THE WITNESS:  I believe I did.

4              MS. MESIDOR:  Okay.

5        A.   I am sure that at no point in my

6   practice prior to being medical director did

7   any proportion or any of the clinics or

8   private practice have over 50 percent of

9   their patients diabetic.

10       Q.   Would you say that any of them had

11  more than 10 percent?

12       A.   I would be guessing.  I have no

13  idea.

14       Q.   Do you recall since you have become

15  a medical director how many individuals have

16  you reviewed in regard to their qualification

17  for a particular, for a position, have had

18  the diabetic condition?

19       A.   Are you opening this up to all

20  civil service titles?

21       Q.   Yes.

22       A.   All titles?

23       Q.   Yes, ma'am.

24       A.   How many or what percentage?

25       Q.   Either one, whichever one you can

1                      Tapply

2    quantify, I will take either/or.

3         A.    I have reviewed thousands of civil

4    service applications, thousands, so the

5    number would be pure conjecture, would be

6    frivolous, percent.

7         Q.    Does that mean that you don't know?

8         A.    Correct.  I don't know the number,

9    that's correct.

10        Q.    But as it relates to just police

11   officers, we have already established that

12   there has just been the three?

13        A.    Correct.

14             MR. COVELLO:  Which doesn't

15        establish that she reviewed those three.

16             MS. MESIDOR:  I understand that.

17        Q.    Do you know whether during the

18   period of adolescence for a type one diabetic

19   whether it is necessary due to the hormonal

20   changes during the adolescent period that

21   insulin needs to be adjusted?

22             MR. COVELLO:  Objection.  You can

23        answer.

24        A.    The question wasn't worded clearly

25   in my understanding.

64

1                    Tapply

2      Q.   What was unclear about the

3   question?  My question is do you know during

4   the period of adolescence that insulin levels

5   need to be adjusted because of the hormonal

6   changes that occur during the puberty stage?

7           MR. COVELLO:  Objection.

8      A.   I am not going to answer that.  I

9   am not a specialist in endocrinology.

10      Q.   I am asking you whether you know.

11   You are not going to answer whether you know

12   this information or not?

13      A.   I am not going to answer.

14      Q.   What are the specifics of

15   Mr. Roth's diabetic condition that made him

16   unqualified to be a police officer?

17           MR. COVELLO:  Objection, but you

18       can answer.

19      A.   He was a, I want to back up, his

20   original disqualification, that is what you

21   are referring to or his final

22   disqualification?  Those are two separate

23   events.

24      Q.   Were there two different findings

25   as to his original disqualification and his

```
 1                         Tapply
 2   subsequent disqualification?
 3        A.   Yes.
 4        Q.   What were the findings for his
 5   original disqualification?
 6        A.   His medical history.
 7        Q.   Specifically what to his medical
 8   history that disqualified him?
 9        A.   How brittle and fragile his
10   diabetes was.
11        Q.   What made his diabetes brutal and
12   fragile?
13             MR. COVELLO:   Brittle.
14        A.   Brittle.
15        Q.   What made his diabetes brittle and
16   fragile?
17        A.   His, well, I don't want to tell you
18   what you mean.  You don't want me to
19   medically answer why he was brittle or
20   fragile, I don't believe you want me to
21   answer that.
22        Q.   You said that the brittle and
23   fragile condition of his diabetes at the
24   time, that was the reason why he was
25   medically disqualified, is that correct, the
```

66

Tapply

1
2    first time?
3         A.   Yes, in that I am characterizing
4    the scope of his diabetes to be up and down,
5    correct.
6         Q.   When you say his diabetes was up
7    and down, what do you mean by that?
8         A.   I should be more specific, that his
9    blood sugars went up and down, he had very
10   clear pump problems, I believe twice.
11        Q.   Six years prior to your evaluation
12   of him; right?
13        A.   I don't remember the dates exactly.
14        Q.   I believe, drawing your attention
15   to defendant's production Roth 107?
16        A.   Yes.
17        Q.   Do you have Roth 107 before you?
18        A.   I do.
19        Q.   Is this a document that is prepared
20   by you?
21        A.   Yes, the substance of it is.
22        Q.   When you refer to the substance,
23   what specifically are we talking about?
24        A.   Only with the one paragraph that
25   begins "Candidate and officer".

67

1                          Tapply

2          Q.    That is actually perfect because

3     that is exactly what I was going to ask you

4     about.  I am going to draw your attention to

5     the middle of that same paragraph that says

6     "The candidate reports"?

7          A.    Yes.

8          Q.    It says "The candidate reports pump

9     failure twice in 2010", do you see that

10    there?

11         A.    Yes.

12         Q.    This was a report that was dated

13    2015; is that correct?

14         A.    Yes.

15         Q.    So, the pump failure that you are

16    talking about had occurred on two occasions

17    five years prior; is that correct?

18         A.    Apparently, according to this

19    medical history.

20         Q.    Was there anything in his medical

21    history that you recall in which there was a

22    pump failure prior to 2010?

23         A.    Not that I recall.

24         Q.    And Mr. Roth had been using an

25    insulin pump since 2001; is that correct?

68

Tapply

2      A.   I don't know.

3      Q.   According to the same paragraph, we

4    are going to go to that first sentence?

5      A.   Yes.  I'm sorry, first sentence.

6      Q.   I believe it says there at the end,

7    "On an insulin pump since 2001"?

8      A.   Correct.

9      Q.   So, at least based on the

10   information that you had at the time there

11   was nine years without incident as far as you

12   knew; is that correct?

13     A.   I have no idea if that is correct.

14          MR. COVELLO:  Objection.

15     Q.   Do you have a specific --

16          MR. COVELLO:  Are you referring to

17     pump incident or just incident?

18          MS. MESIDOR:  Pump incident.

19          MR. COVELLO:  You didn't say that.

20     You said nine years without incident.

21          MS. MESIDOR:  We were referring to

22     pump since 2001.

23          MR. COVELLO:  That is why I

24     objected.

25     Q.   So, we are looking at, 2001 is when

1                    Tapply

2    he starts using the pump, prior to 2010 were

3    you aware of any incidents in which there was

4    any sort of pump failure?

5         A.    I am aware of only what was

6    reported by the candidate.

7         Q.    Which is two incidents in 2010;

8    correct?

9         A.    That's correct.

10        Q.    Were you aware of any pump

11   incidence after 2010 within the five years,

12   within 2010 reporting and the 2015 date in

13   which this finding was made?

14        A.    Based on what I put in that

15   paragraph, you are repeating my understanding

16   at the time, that's correct.

17        Q.    Now going back to your

18   characterization as his diabetes being

19   brittle and what was the word you used?

20        A.    Fragile.

21        Q.    Fragile, okay, so your

22   characterization of his diabetes being

23   brittle and fragile, where else does that

24   stem from?

25        A.    Well, do I mention hemoglobin A1C,

```
 1                    Tapply

 2  I do.

 3            MR. COVELLO:  Just answer the

 4       question.

 5            THE WITNESS:  That would be the

 6       answer then.

 7       Q.   Are you referring to where it says

 8  a review of his medical records reflect

 9  better glucose control in the last two years

10  with A1C measurements under 8?

11       A.   Yes.

12       Q.   That seemed to be a positive

13  reflection that in the past two years his

14  glucose control level seems to be rather

15  steady and under control, is that not the

16  case?

17            MR. COVELLO:  Objection.

18       Q.   Does this sentence have a different

19  significance than what I have just

20  characterized?

21       A.   Yes, it does.

22       Q.   Please explain it to me, what did

23  you mean by this sentence.

24       A.   Under 8, quote-unquote, is

25  relative.  No one's goal is to just be under
```

```
 1                    Tapply
 2   8.  The meaning of the paragraph is that he
 3   had improved his control.  That is not, under
 4   8 is not particularly good control.  It is
 5   improving.  It is a very relative comment and
 6   is not good, bad, it is working in the right
 7   direction.
 8        Q.   So, what is considered good?
 9        A.   You know, the endocrinologist would
10   be the proper person to address that to.
11        Q.   So, the endocrinologist which you
12   actually address in the very next sentence,
13   "His private endocrinologist has cleared him
14   for the duties of police officer"?
15        A.   Um-hum.
16             MR. COVELLO:  What does that mean,
17        "um-hum"?
18        A.   (Continuing) I'm sorry, did it
19   again.  What does that mean?  There is no
20   room for interpretation.  Mr. Roth's private
21   doctor believed that he could become a police
22   officer.
23        Q.   Do you know how long his private
24   doctor had been treating him?
25        A.   No, I don't know how long.
```

72

1                         Tapply

2        Q.    Had you received any letters or

3   documentation from his private physician?

4        A.    His private endocrinologist?

5        Q.    Yes.

6        A.    I had.

7        Q.    And the letter that was provided by

8   Mr. Roth's private endocrinologist was in

9   support of his candidacy for the position of

10  police officer?

11       A.    I believe so.  Was it not in this

12  packet?  Whatever.  I believe you are

13  correct.

14       Q.    You also cite multiple ambulance

15  calls involving low blood sugar, confusion

16  and passing out.  Do you see that there?

17       A.    Yes, I saw it before.

18       Q.    Wasn't there only one incident of

19  passing out that dated all the way back to

20  2006?

21       A.    I don't know how many times he

22  passed out.

23       Q.    Let me refer you back to 110.

24       A.    Okay.

25       Q.    That is where it has a list of

73

1                     Tapply

2    ambulance calls?

3         A.   Okay.

4         Q.   In the third sentence, Mr. Roth

5    indicates, "Only one of the incidents

6    involved being transported to the hospital

7    which occurred in 2006 and was the only

8    incident where I passed out", do you see that

9    there?

10        A.   I do.

11        Q.   Are you aware of any other

12   documentation that says something different,

13   that there was a pass-out after 2006 or

14   before 2006 that you took into consideration

15   before medically disqualifying him?

16        A.   Roth 111, I am pretty sure you are

17   passed out when you are in the middle of a

18   diabetic seizure.  That was May 25, 2011.

19        Q.   You said which one?

20        A.   Roth 111.

21        Q.   I am at Roth 111.

22        A.   There is a black marker around part

23   of the page there, diabetic seizure, May 11,

24   May of 2011, so you want to make a fine line

25   between passing out and actually having a

74

1                    Tapply

2    seizure.

3         Q.   It says, "My investigator showed me

4    a case report from May 25, 2011 where an

5    ambulance was called to my home for a

6    diabetic seizure".  It says "Refused

7    transportation to hospital, I do not recall

8    this incident".  Do you see that there?

9         A.   Um-hum.

10        Q.   So, would you agree with me that he

11   wouldn't have passed out if he refused

12   transportation to hospital?

13             MR. COVELLO:  Objection.

14        Q.   Surely, he was conscious enough to

15   say he didn't want transportation to

16   hospital; correct?

17        A.   I would not agree with you.

18        Q.   You would not agree?

19        A.   I would have no knowledge of the

20   state of affairs at that moment.

21        Q.   Right, but the person who it had

22   happened to very clearly says that there is a

23   reporting that he refused transportation to

24   hospital?

25        A.   I disagree with your conclusion.

75

```
 1                    Tapply
 2   I'm sorry.  I agree it is written there and
 3   you are reading it properly.
 4        Q.   But although you were not there you
 5   disagree that, what exactly are you
 6   disagreeing with?
 7        A.   That, I am stating that this is in
 8   the candidate's hand apparently and that for
 9   him to respectively characterize whether he
10   refused or did not refuse transportation at
11   the time, I guess following a diabetic
12   seizure, that is not an accurate history.  We
13   would need a better history.  I am also not
14   sure of the math there, if he is a minor or
15   not, in which case he would not have ability
16   to refuse transport.  It would be the
17   parents.
18        Q.   Do you have this report, this case
19   report, of May 25, 2011 ambulance call?
20        A.   Is it in this group of papers?
21             MR. COVELLO:  What page?
22        Q.   I am not referring you to a page.
23   I am asking whether this document exists.
24        A.   I don't know.
25        Q.   Have you seen the document?
```

1                          Tapply

2          A.    I'm sorry.   It is too long ago.   I

3     don't know exactly if I saw the document or

4     not.

5          Q.    Do you have a file in which all of

6     the documents that you reviewed regarding

7     Mr. Roth's case is kept?

8          A.    Police department provided me with

9     this.   I will give you the proper page here.

10               MR. COVELLO:   108 and 109.

11         A.    (Continuing) He is correct, 108,

12    109, where the bottom of 108, it continues to

13    the bulk of 109.   It is just a list of

14    ambulance calls and that was reviewed

15    apparently, and that was included with the

16    paperwork.   That is the police report.   That

17    is the police documenting from their own

18    police reports what they call aided calls, an

19    ambulance was called.

20         Q.    My question to you, did you

21    actually see the case report itself, not this

22    listing --

23         A.    I don't remember.

24         Q.    -- that you have identified at 108?

25         A.    I don't remember.

77

1                          Tapply

2       Q.    The question that I asked prior to

3    that, which you did not respond, is whether

4    or not you had a file that included all of

5    the documents and all of the information that

6    you reviewed and considered when you were

7    making the decision to medically disqualify

8    Mr. Roth?

9       A.    Yes.

10      Q.    Where is that file kept?

11            MR. COVELLO:   Objection to the last

12      question.

13      A.    I'm sorry?

14      Q.    Where is that file kept?

15      A.    At civil service.

16      Q.    Have you released the entirety of

17   that file?

18            MR. COVELLO:   To whom?

19            MS. MESIDOR:   In this litigation.

20      A.    I am not sure how much of the file

21   has been released.   I am not always there at

22   those meetings.

23            MS. MESIDOR:   We call for the

24      production of Mr. Roth's, of the entire

25      file that Dr. Tapply reviewed regarding

A0552

```
 1                       Tapply

 2        Mr. Roth's candidacy for police officer

 3        including any documents and medical

 4        documentation that you reviewed prior to

 5        medically disqualifying Mr. Roth, and we

 6        will follow up our request in writing.

 7             MR. COVELLO:  I will take that

 8        request under advisement.

 9             MS. MESIDOR:  Thank you.

10             MR. COVELLO:  Let's go off the

11        record.

12                    (Whereupon, discussion held off

13                     the record.)

14        Q.   Dr. Tapply, would it, would the

15   corresponding, I am referring to defendant's

16   production Roth 108, you see where it has a

17   date in it and it has a serial number, do you

18   see where it has a date and it has a serial

19   number?

20        A.   I recognize the date.  I don't know

21   what the rest means.

22        Q.   The first 11-21-2006, 206CR0005973?

23        A.   I see that.

24        Q.   When you received this general

25   review of medical from the police department,
```

79

1

2  do they include each one of the documents

3  that they refer here along with the medical

4  report, along with the general review

5  medical?

6      A.   In general, not specific to

7  Mr. Roth, in general you are asking me.

8  Specific to Mr. Roth, I don't recall.

9      Q.   I figured that would have been your

10 response, that is why I was asking more

11 really in general.

12     A.   I have seen ambulance calls

13 included in the documents from the police

14 department in the past.

15     Q.   But you don't have a recollection

16 one way or the other whether it was included

17 in the specific incident?

18     A.   I don't, no.

19     Q.   Going back now to 107, it says here

20 in that same listing his phase two records

21 indicate multiple ambulance calls involving

22 low blood sugar, confusion and passing out.

23 We have already looked at the passing out

24 issue.  Now let's go to the confusion issue.

25 What formed the basis of your knowledge that

1                        Tapply

2    he had multiple calls involving confusion?

3        A.    I have it in my submission to the

4    commission in quotations, which means quoting

5    some other source, so I can take a few

6    minutes and find out where.

7            MR. COVELLO:  Let's take a break,

8        if we may.  Let's go off the record.

9            MS. MESIDOR:  Can I have a response

10       before we go off the record?  There is a

11       question pending.

12           THE WITNESS:  My response was I was

13       quoting another source and I am not sure

14       where it came from, it was either

15       something provided to me.

16       Q.    But you have no recollection of

17   what that document is or where it came from?

18       A.    At this time I don't know.

19           MS. MESIDOR:  Now we can go off the

20       record.

21                        (Whereupon, a brief recess was

22                        taken at this time.)

23       Q.    What was the reason for the denial

24   of Mr. Roth's appeal?

25       A.    Mr. Roth was examined by a

81

```
 1                          Tapply

 2    specialist, the commissioners reviewed the

 3    specialist's opinion and his appeal was

 4    denied.

 5         Q.   Do you know who the specialist was

 6    that Mr. Roth was reviewed by?

 7         A.   Dr. Rosenthal, I believe his name

 8    is Rosenthal, and he was at Nassau University

 9    Medical Center.

10         Q.   Are you aware that Dr. Rosenthal

11    has been deposed in this matter?

12         A.   I am aware, yes.

13         Q.   Have you reviewed Dr. Rosenthal's

14    transcript?

15         A.   I did.

16         Q.   Are you aware that Dr. Rosenthal

17    disqualified Mr. Roth due to his diabetic

18    condition?

19              MR. COVELLO:  Objection.

20         A.   Dr. Rosenthal doesn't disqualify

21    anyone, neither do I.  Actually, the

22    commission only disqualifies.

23         Q.   Are you aware that Dr. Rosenthal

24    had come to a conclusion, to the conclusion

25    that due to Mr. Roth's diabetic condition he
```

82

                      Tapply

1
2    would not be able to perform the essential
3    functions of his job as police officer?
4          MR. COVELLO:  Objection.  You have
5       to answer verbally, whatever it is.
6          A.   I am shaking my head.  Could we
7    look at --
8          Q.   I am asking are you aware.  You
9    don't need to look at anything.  I am asking
10   you do you know.  If you don't know, the
11   answer is "I don't know".
12         A.   His words, you did not in my
13   opinion represent his opinion correctly.
14         Q.   Tell me what your recollection of
15   what his opinion was?
16         MR. COVELLO:  Objection.
17         A.   My recollection is more close to he
18   had some serious concerns about placing,
19   allowing any individual with Mr. Roth's
20   history, physical and in particular regarding
21   an insulin pump into the police officer
22   title.  He had serious reservations.  That is
23   more my recollection of his opinion.
24         Q.   Do you recall Dr. Rosenthal
25   indicating that regardless of whether or not

83

1                    Tapply

2    Mr. Roth or anyone with a diabetic condition

3    was using insulin pump or not, that he would

4    still have the same reservations regarding

5    anyone with diabetes being in the position of

6    police officer?

7              MR. COVELLO:  Objection, if you

8         know.

9         A.   I would have no way of knowing

10   that.

11        Q.   So, you are not aware of that

12   testimony one way or the other; is that

13   correct?

14        A.   Correct.

15        Q.   I am going to go back to

16   defendant's production Roth 108.

17        A.   Okay.

18        Q.   According to this document there

19   were four incidents in which the ambulance

20   was dispatched to Mr. Roth's home address; is

21   that correct?

22        A.   I have four on the bottom of that

23   page and there's other information on 109.

24        Q.   Did you understand the question

25   that I asked you?

84

                          Tapply

1

2        A.    I believe so.  I see four incidents

3    on 108.

4        Q.    Here, regarding home address only.

5    Do you see how it says Nassau County police

6    ambulance was dispatched to the applicant's

7    home four times?

8        A.    Okay.

9        Q.    So, according to this document,

10   four times the ambulance was dispatched to

11   his home; correct?

12       A.    That's what it says.

13       Q.    So, the first incident seemed to be

14   in 2006; do you see that there?

15       A.    Yes.

16       Q.    And that is the incident that we

17   already discussed in which he passed out and

18   he was actually taken to the hospital?

19       A.    Okay.

20       Q.    Do you see that there?

21       A.    Yes.

22       Q.    The next incident was two years

23   later in which there was an incident of low

24   blood sugar?

25       A.    Um-hum.

85

1                    Tapply

2       Q.   And in that circumstance there was

3   a refusal of medical attention, do you see

4   that there?

5            MR. COVELLO:  Objection.  Go ahead.

6       A.   I see that it says that.

7       Q.   The next incident, which is an

8   incident that we spoke about a little bit in

9   which it indicates that Mr. Roth suffered a

10  diabetic seizure in 2011, do you see that

11  there?

12      A.   Yes.

13      Q.   And in that incident there was also

14  a refusal to be transported to the hospital;

15  do you see that there?

16      A.   I do see it.

17      Q.   And the final incident as it

18  relates to ambulance dispatching to his home

19  was in 2012 in which there was an incident of

20  also low blood sugar; do you see that there?

21      A.   I see it here, yes.

22      Q.   Is this what you were referring to

23  when you cited multiple ambulance calls

24  involving low blood sugar, confusion and

25  passing out, in the prior page of 107?

1                    Tapply

2        A.   I see low blood sugar.  I said, I

3   used quotations earlier in my deposition, low

4   blood sugar would have been that quotation

5   and I used the word "confusion" also taken

6   from that last entry you just mentioned, so,

7   that would have been referencing that page,

8   yes.

9        Q.   Now we are going to the next page

10  and this had to do with incidents that had

11  occurred when Mr. Roth was in school --

12       A.   Okay.

13       Q.   -- and there were three incidents

14  that occurred during Mr. Roth's four-year

15  college tenure while he was at University of

16  New Haven.  The first one was in 2009, do you

17  see that there?

18       A.   Yes.

19       Q.   And it said, "Applicant appeared to

20  have suffered a seizure, glucose was

21  administered and aided refused transport to

22  the hospital and signed a waiver".  Do you

23  see that there?

24       A.   Yes.

25       Q.   Then we have the two incidents of

87

                        Tapply

1                       Tapply

2       pump failures that happened in 2010, do you

3       see that there, October 24, 2010 and

4       October 27, 2010; do you see that there?

5           A.   Yes.

6           Q.   Is that what you were referring to

7       when you cited the last incident, when you

8       cited the candidate reports pump failure

9       twice in 2010?

10          A.   Yes.

11          Q.   When you indicate that the last

12      incident was apparently from January 2012,

13      when it was for a suffering of low blood

14      sugar?

15          A.   Yes.

16          Q.   So, at the time when the report was

17      being given to the commission in terms of the

18      synopsis of Mr. Roth's medical history there

19      had not been any incidents of anything in

20      approximately three years; is that correct?

21          MR. COVELLO:  Objection.  I suspect

22          in the process there were two reports.

23          Could you identify which?  Either one is

24          probably going to be answered the same.

25          Q.   April 1, 2015 report?

88

1                    Tapply

2        A.   This submission to the commission

3    is reflected in the underlying ambulance

4    reports, yes.

5        Q.   That wasn't my question.

6        A.   Okay.

7        Q.   My question was at the time that

8    this report was submitted to the commission

9    on April 1st, 2015 it had been more than

10   three years since there had been any incident

11   regarding Mr. Roth's diabetic condition,

12   according to the information that you had,

13   isn't that correct?

14       A.   I believe so.  I am not 100 percent

15   sure because there is more material that is

16   reviewed other than just a couple of papers

17   from the police department, there's other

18   material, but.

19       Q.   If there were any subsequent

20   conditions to 2012, would you have

21   represented to the commission that the last

22   incident was apparently in January of 2012?

23            MR. COVELLO:  Objection.  You can

24       answer.

25       A.   I would imagine I would have put in

89

1                    Tapply

2    the last incident to my knowledge at the time

3    of the submission.

4        Q.    Prior to making the submission on

5    April 1, 2015 did you meet with Mr. Roth?

6        A.    I don't believe so.  I don't

7    recall, honestly.

8        Q.    You don't recall having a 10 or

9    15-minute conversation with Mr. Roth when you

10   went over these medical, the information that

11   is included in the general review medical?

12       A.    I don't meet with candidates when

13   we review their medical information.

14       Q.    I am not asking you whether you met

15   with him when you reviewed his medical

16   information.  I am asking you do you recall

17   having a 10 to 15-minute conversation with

18   Mr. Roth where the topic of conversation was

19   the information that we see here in the

20   general review medical.

21       A.    I don't recall that conversation,

22   no.

23       Q.    You don't recall Mr. Roth

24   indicating to you that he had been offered a

25   position at the New York Police Department

90

1                              Tapply

2      and that he was due to enter the academy in a

3      few weeks?

4          A.   I am aware that was his situation

5      because I read it in preparation for this.  I

6      just don't remember the conversation.

7          Q.   You don't recall responding to

8      Mr. Roth that it was impossible that he would

9      have been offered a position and cleared to

10     go to the academy with his diabetic

11     condition?

12              MR. COVELLO:  Objection.  You can

13         answer.

14         A.   I don't recall having a

15     conversation with Mr. Roth.

16         Q.   Or indicating what I have just

17     stated?

18         A.   Restate it then.  I'm sorry.

19              MS. MESIDOR:  Let's have the

20         reporter read it back.

21                   (Whereupon, the reporter read

22                    back as requested.)

23              THE WITNESS:  That I said that to

24         him, is that what you said?

25              MS. MESIDOR:  Yes.  Do you recall

1              Tapply

2     saying that to him?

3          THE WITNESS:  I will repeat for the

4          third time I don't remember speaking to

5          him at all.  For the record those don't

6          sound like words in my wildest dreams I

7          would ever say.

8          MR. COVELLO:  That wasn't part of

9          the question.

10          THE WITNESS:  I would never, ever,

11          we go to enormous lengths -- shut up?

12          MR. COVELLO:  There is no question.

13          THE WITNESS:  Okay.

14     Q.    Feel free.  You go to enormous

15     lengths to do what?

16     A.    To try to treat people like

17     individuals, a lot of work goes into, case by

18     case, every single one of them, case by case.

19     Q.    Let's look at defendant's

20     production Roth 113.

21     A.    (Witness perusing document).

22     Q.    Defendant's Roth's 113, which is

23     still part of the exhibit that has been

24     marked for identification Tapply 1, is a

25     letter from Dr. Herson.  It is dated

92

                          Tapply

1

2    December 4, 2014.  Have you ever seen this

3    letter before?

4         A.    Yes, I am sure I have.

5         Q.    Who is Dr. Herson?

6         A.    That would be Mr. Roth's private

7    endocrinologist.

8         Q.    Going to the substantive portion of

9    the letter from Dr. Herson, it indicates,

10   "Please be advised that the above patient is

11   type one diabetic controlled, he is under

12   adequate control to perform his duties as

13   police officer.  Please feel free to call me

14   with questions".  Do you see that?

15        A.    Yes, I do.

16        Q.    Did you review this letter prior to

17   making your determination?

18        A.    I did.

19        Q.    Did you call Dr. Herson as he

20   invited you to do if you had any questions?

21        A.    I called Dr. Herson regarding

22   another matter, not regarding this matter.

23        Q.    Not regarding Mr. Roth?

24        A.    Yes, regarding Mr. Roth but not

25   regarding this letter.

93

1                        Tapply

2        Q.    What did you call Dr. Herson about?

3        A.    Some questionable medical entries

4    that Dr. Herson had initialed the bottom of

5    the pages.

6        Q.    What were those medical entries it

7    is regarding?

8        A.    They were his blood sugar logs,

9    blood sugar logs.

10       Q.    Going to page 119 through 120, are

11   those the blood sugar logs that you are

12   referring to?

13       A.    Yes.

14       Q.    Which did you call Dr. Herson

15   regarding?

16       A.    119 and 120, each asterisk.

17             MS. MESIDOR:  I don't see 119.

18       Which one?

19             MR. COVELLO:  Pages 119 and 120.

20       Q.    Looking at page 119, which one did

21   you call him about?

22       A.    There is an asterisk on page 119.

23       Q.    For the November 22, 2014 entry?

24       A.    Correct.

25       Q.    What did you call Dr. Herson about?

94

Tapply

2    A.   I was asking if he was aware that

3    he had signed and stamped the page that

4    didn't match the rest of the pages, it looked

5    like it had a handwritten entry, in two

6    cases, that case and the following page.

7    Q.   What was his response?

8    A.   He had no recollection.  That's a

9    reprint of the same.

10    Q.   Did you ask Dr. Herson anything

11    else?

12    A.   No.  My concern was about the

13    glucose logs and that was it.  Well, I should

14    say I don't remember fully the content of the

15    conversation that was the reason for the

16    phone call.

17    Q.   Did you ask Dr. Herson about the

18    basis upon which that he had recommended or

19    had indicated that Mr. Roth was able of

20    completing his duties as a police officer?

21    A.   I don't recall the entire

22    conversation.  It wouldn't be something I

23    would probably go into on the phone because

24    his opinion was on record already in this

25    letter, so, he had his recommendation

95

```
 1                    Tapply

 2   submitted in writing.

 3        Q.    Did you have an understanding as to

 4   why he came to that conclusion?

 5            MR. COVELLO:  Objection.

 6        A.    That wasn't the discussion.

 7        Q.    That is not the question that I

 8   asked you.  I am only asking you did you have

 9   an understanding as to the reasons why Dr.

10   Herson had given that recommendation --

11            MR. COVELLO:  Objection.

12        Q.    -- or had made his opinion that

13   Mr. Roth could be a police officer?

14        A.    I wouldn't guess as to Dr. Herson's

15   reasoning.

16        Q.    So, the answer to the question is

17   that you don't know?

18        A.    Correct.

19        Q.    Going to the last page, which is a

20   May 27, 2015 handwritten note also by Dr.

21   Herson, did you see this note prior to making

22   your determination or making your report, I

23   should say?

24        A.    We are confusing two different

25   parts of the process here.  I believe there
```

1                          Tapply

2    was the original disqualification and then

3    there was Mr. Roth's appeal and we had our

4    expert examine Mr. Roth and then there was

5    the commission's final decision and I don't

6    know if this second handwritten letter by

7    Mr. Roth's doctor, where that fell in that

8    process.

9          Q.    Did you review it, the second

10   handwritten letter?

11         A.    Yes.

12         Q.    When?

13         A.    I am not sure when I reviewed it.

14         Q.    Dr. Herson's opinion after treating

15   Mr. Roth, his May 27, 2015 opinion, was

16   consistent with his December 5, 2014 opinion;

17   is that correct?

18         A.    Correct.

19         Q.    What are the duties of a police

20   officer that Mr. Roth would not be able to

21   execute due to his diabetic condition?

22         A.    The duties of concern would be

23   severe or intense physical activity, bursts

24   of, possibly unexpected bursts of physical

25   exertion.

97

1                    Tapply

2      Q.   Was there anything in his medical

3  record to suggest that he had had prior

4  diabetic incidents after a spontaneous burst

5  of physical activity or exertion?

6      A.   Not that I recall.

7      Q.   Were you aware that Mr. Roth

8  regularly works out?

9           MR. COVELLO:  Objection, but you

10          could answer it.

11     A.   Was I aware?

12     Q.   Yes.

13     A.   I don't specifically remember his

14  medical history in that regard.

15     Q.   Do you recall, were you aware that

16  Mr. Roth actively lifts weights?

17     A.   I can't answer to that level of

18  detail.  I don't recall.

19     Q.   Were you aware that Mr. Roth was a

20  competitive athlete?

21          MR. COVELLO:  Objection.

22     A.   Same answer.  The same answer, that

23  level of detail, I can't recall.

24     Q.   Do you recall being provided the

25  American Diabetic Association's guidelines

98

1                          Tapply

2     with the review of diabetic medical records

3     for the purposes of employment?

4          A.    It was not the American Diabetic

5     Association, it was American College of

6     Occupational and Environmental Medicine,

7     ACOEM, guidelines for evaluation of diabetic

8     law enforcement officers.

9          Q.    Where did you receive those

10    guidelines from?

11         A.    I am not 100 percent.  Mr. Roth

12    might have provided them in his medical

13    evaluation.  He might have brought them in

14    spontaneously.

15         Q.    Did you review them?

16         A.    I did.

17         Q.    Did you follow those guidelines?

18         A.    There was nothing for me to follow.

19    I reviewed the form.  It is a form that his

20    private doctor fills out.

21         Q.    The guideline provides a time frame

22    that, a suggested time frame for which

23    medical records should be released in

24    reviewing the candidate's diabetic condition

25    in support of an application for employment;

99

1                    Tapply

2    is that correct?

3              MR. COVELLO:  Objection.  You can

4         answer.

5         A.    I'm sorry.  That was too

6    convoluted.  I don't understand your

7    question.

8         Q.    Do you recall the guidelines

9    providing a time frame for which an employer

10   should be looking at a diabetic candidate's

11   medical history in order to evaluate whether

12   or not they are qualified for the position?

13        A.    Yes.

14        Q.    Do you recall what that standard

15   time frame was?

16             MR. COVELLO:  Objection.

17        A.    For the purposes of glucose logs,

18   just the numbers, glucose numbers, it was six

19   months, but the template itself recommends a

20   comprehensive, a more comprehensive look back

21   on the patient's history.

22        Q.    Which template are you referring

23   to?

24        A.    By template, I mean the American

25   College of Occupational and Environmental

1                    Tapply

2    Medicine, the guidelines, you want to look at

3    the patient's broader history as well.

4        Q.   What time frame did the broader

5    guidelines articulate, how far back did the

6    guidelines articulate you should look at the

7    employee's medical history?

8        A.   Not specific, when did he or she

9    become diabetic, is he or she on a pump, has

10   he or she been trained in the use of a pump.

11   It is a long document.

12       Q.   Do you recall whether or not, in

13   reviewing that document, whether or not you

14   followed the suggested guidelines?

15           MR. COVELLO:  Objection.

16       A.   The verb is wrong.  I am not

17   following.  It is a review of a form that an

18   endocrinologist fills out, the

19   endocrinologist signs at the bottom, yes or

20   no, I recommend or I do not recommend my

21   patient for this job, and that was presented

22   to the commission, not the form but the

23   doctor's recommendation.

24       Q.   What was done with the form?

25       A.   It is part of his medical report.

Case 1:15-cv-06358-... Document 52-1 06/26/2018 ... Page 116 of 214

101

```
 1                        Tapply

 2         Q.   That form was never given to the

 3   commission?

 4         A.   I have to review, that was a bunch

 5   of submissions on Mr. Roth's behalf.  One of

 6   them in here has to do with ACOEM requesting

 7   a cardiac evaluation, small piece of the form

 8   in that I was asking on Mr. Roth's behalf of

 9   the commission could he be granted more time

10   to complete what ACOEM suggested.

11         Q.   Dr. Tapply, do you understand my

12   question?  I just want to know whether you

13   gave the form to the commission.

14         A.   They don't review that, no.

15         Q.   I am asking you did you give the

16   commission the form.

17         A.    I paraphrased the form, that the

18   form suggested --

19              MR. COVELLO:  It is a yes or no

20         question.

21         Q.   It really is a yes or no question.

22   Did you give the form to the commission?

23         A.   Not to my recollection.

24         Q.   Did you include any of the content

25   in the form in what you did give to the
```

1                    Tapply

2  commission?

3       A.   Yes.

4       Q.   Now please refer me to in what has

5  been marked as Tapply 1 the information that

6  you provided to the commission that came from

7  that form.

8       A.   I don't see it in this exhibit, the

9  commission submission regarding an extension

10 of time to complete the ACOEM

11 recommendations.

12      Q.   Where is it?

13      A.   Perhaps I am missing it in the

14 exhibit.

15      Q.   You don't believe that it is part

16 of these documents here?

17      A.   I don't see it in this exhibit.  I

18 could be missing it.  I don't see it.  It is

19 part of the submissions to the commission

20 that they voted on at a later time.  B,

21 under, 099 looks like the page.

22      Q.   Page 99?

23      A.   Yes, and she is referring to

24 attached Exhibit B and she is correct, so now

25 we are at Roth 104.

103

```
1                          Tapply
2        Q.   Okay, so, the only portion of the
3   form that Mr. Roth's endocrinologist had
4   filled out consistent with the guidelines,
5   the only portion of the contents of that form
6   is in that last paragraph of Bates 104; is
7   that correct?
8             MR. COVELLO:  Objection.
9             MS. MESIDOR:  Dr. Tapply?
10            THE WITNESS:  Say it one more time.
11            MS. MESIDOR:  Read back the
12        question.
13                      (Whereupon, the reporter read
14                      back as requested.)
15        A.   No, this isn't what the commission
16   saw.  This was a letter to Mr. Roth.  The
17   commission saw a slightly different.
18        Q.   My question again to you is what
19   content from the form that Mr. Roth's private
20   endocrinologist filled out consistent with
21   the ADA guidelines did the commission see.
22            MR. COVELLO:  Objection.
23        A.   They didn't see what the form that
24   Mr. Roth's endocrinologist filled out.
25        Q.   My second question to you was, was
```

A0578

104

Case 1:15-cv-06358 Document 52-1 06/26/2018 2063158 Page 119 of 214

```
1                         Tapply
2    there any information from that form, any
3    content from that form that you provided to
4    the commission?
5         A.   Yes.
6         Q.   My understanding was that you said
7    yes, so, I wanted to know what was that
8    content.
9         A.   I thought this was what
10   Mr. Tokarski was referring to and it is not,
11   so I do not see it in this exhibit or
12   whatever.  Tapply 1, it doesn't seem to be
13   included in there.
14        Q.   Are you familiar with the
15   Metropolitan Police Training Council's
16   physical standards?
17        A.   I am.
18        Q.   What portion of the Metropolitan
19   Police Training Council's physical standard
20   do you believe that Mr. Roth would not be
21   able to meet or qualify?
22             MR. COVELLO:  Objection.
23        A.   Endocrine condition, extent of
24   control of an endocrine condition in this
25   case.
```

Tapply

2    Q.    Does the MPTC have any specific

3    requirements as it relates to an endocrine

4    condition?

5         MR. COVELLO:  Objection.

6    A.    MPTC literally states in the

7    guidelines case-by-case basis, case-by-case

8    basis, candidate would be considered

9    qualified or disqualified depending on the

10   discretion of the commission.

11   Q.    But is there anything within the

12   actual listing of the physical standard

13   required by the MPTC that in your opinion

14   Mr. Roth would not be able to meet based upon

15   his endocrine condition?

16        MR. COVELLO:  Objection.

17   A.    There is no numbers, there is no

18   cut-offs.  If you are looking for a

19   quantitative number, produced by Albany, no.

20   It is extent of control or lack of control of

21   an endocrine condition, that is the wording

22   that they use, no numbers.

23   Q.    But isn't Mr. Roth's endocrine

24   condition a controlled condition?

25        MR. COVELLO:  Objection.

```
 1                    Tapply
 2      A.   It is a matter of opinion.  As I
 3 might have said earlier, in keeping his A1C
 4 under 8 isn't what an endocrinologist, I
 5 don't want to speak for an endocrinologist, I
 6 don't believe that is, I know that is not the
 7 goal, that is not what we would normally
 8 consider tight control or good control.
 9      Q.   What would you consider tight
10 control or good control?
11           MR. COVELLO:  Objection.
12      A.   6.5 A1C is a nice goal.  7, fine.
13 7.5 A1C value is also not bad.
14      Q.   Do you know whether those levels
15 would have been good and tight control for
16 Mr. Roth specifically?
17           MR. COVELLO:  Objection.
18      A.   I don't understand your point.
19      Q.   Do you have an understanding
20 whether an A1C level at the 6.5 to the 7.5
21 level would have been good control for
22 Mr. Roth specifically?
23           MR. COVELLO:  Objection.
24      A.   That is impossible to answer.
25      Q.   How is it impossible to answer?
```

107

1                    Tapply

2        A.    Because I don't know him.  I am not

3    his physician.  I am just reviewing other

4    physician's work.  That is why we use an

5    expert.

6        Q.    That is a very interesting point

7    that you just highlighted.  You don't know

8    Mr. Roth but you did have occasion to review

9    the recommendation of someone who did know

10   Mr. Roth and who did treat him over a period

11   of time and the recommendation that he made

12   to you was that he could fulfill the duties

13   of that of a police officer; isn't that

14   correct?

15       A.    Let's go for his exact words.  His

16   words were carefully chosen.

17       Q.    Yes, they were very carefully

18   chosen.  "His glycemic control is excellent,

19   he has had no episodes of hypoglycemia, I

20   believe he would be fully able to perform his

21   duties as a Nassau County police officer",

22   that is from the May 25, 2015 letter.  From

23   the December 2014 letter, "Please be advised

24   the above patient is type 1 diabetic

25   controlled, he is under adequate control to

108

1                    Tapply

2   perform his duties as a police officer".

3       A.   Um-hum.

4       Q.   Did you have any other separate

5   understanding than the two quotes that I just

6   gave from two separate letters from

7   Mr. Herson?

8       A.   Those are two very different

9   letters.  His December 4 letter predates his

10  disqualification and the doctor's sentence

11  was he is under adequate control.  Not an

12  endorsement.  His May letter followed his

13  disqualification.

14      Q.   When you called him about the logs

15  you had an opportunity to find out exactly

16  what kind of endorsement he was given one way

17  or the other; correct?

18           MR. COVELLO:  Objection.

19      A.   I had an opportunity.

20      Q.   But you didn't do so?

21      A.   It is not my job.

22      Q.   Then whose job is it?

23           MR. COVELLO:  Objection.

24      Q.   If it is not your job, whose job is

25  it, Dr. Tapply?

1                    Tapply

2        A.   A recommendation was made based on

3   his medical history to the commission.

4        Q.   Not the question that I am asking

5   you.

6        A.   Okay.

7        Q.   Whose job is it?  If it is not your

8   job to have the discussion as you

9   individually said, that you said you go

10  through great lengths to treat everyone as an

11  individual --

12       A.   Um-hum.

13       Q.   -- right, so if it is not your job

14  to contact the doctor to see exactly, after

15  reading this letter, find out what the basis

16  of their opinion is, why did they come to the

17  conclusion, ask the question somebody who

18  does know your patient, as you admitted you

19  don't know Mr. Roth, if it is not your job to

20  do that, then whose job is it to do that?

21            MR. COVELLO:  Objection.

22       A.   My answer to your other question

23  was --

24       Q.   No, this question please.

25       A.   On the phone I would never flush

110

```
 1                      Tapply

 2   out the specialist's reasoning for his

 3   letter.  I have the data, I have the numbers,

 4   I have his medical records with my own eyes

 5   to review.  I am not going to discuss with

 6   the specialist.

 7       Q.   Dr. Tapply, that is not the

 8   question I am asking you.

 9       A.   You said whose job is it.

10       Q.   Right.

11       A.   It is the specialist's job that was

12   so kind to help us, because --

13       Q.   Are you referring to Dr. Rosenthal?

14       A.   Correct.

15       Q.   According to the document which was

16   a response to an EEOC complaint, complaint

17   that was prepared by the County Attorney's

18   Office, it indicates that you were the one

19   that did Mr. Rosenthal's medical examination;

20   is that accurate?

21            MR. COVELLO:  Objection.

22       Q.   Mr. Roth's medical examination?

23            MR. COVELLO:  Objection.  First

24            question is I think does the document

25            say that, the second question is did
```

111

1                    Tapply

2      you.

3             MS. MESIDOR:  No.

4      Q.    My question to you is I am

5  representing to you that the document says

6  this.  I want to know whether it is an

7  accurate statement.

8      A.    I would have to see the document.

9      Q.    Sure, 96.

10     A.    No, the document of the physical

11  checkup, not someone saying that that is the

12  case.

13     Q.    No.  I am asking you whether you

14  know whether that is the case, whether it is

15  accurate.  If you don't know, let me know you

16  don't know.

17     A.    I need to see the checkup page.

18     Q.    So the answer to the question is

19  you don't know?

20            MR. COVELLO:  Where are you reading

21      from?

22     Q.    Second paragraph, it says the

23  medical examination was performed by Dr.

24  Tapply, the medical director for the Civil

25  Service Commission?

1                          Tapply

2        A.    Okay.

3        Q.    Do you know whether that is indeed

4    the case?

5        A.    I don't know.  I am fairly sure it

6    is incorrect.  She meant more globally the

7    medical evaluation.  If she had substituted

8    the word "evaluation" for "examination", it

9    should be correct.

10       Q.    You didn't see this prior to it

11   being submitted to the EEOC?

12       A.    I don't recall whether I saw it or

13   not.

14       Q.    Third paragraph, first sentence,

15   "Upon receipt of his reports Dr. Tapply

16   reviewed his medical records and recommended

17   he be disqualified from the position of

18   police officer".  Do you see that there?

19       A.    I do.

20       Q.    Is that accurate?

21       A.    That is accurate.

22       Q.    Going to 98, third to last

23   paragraph, are you there where it says, "Dr.

24   Tapply recommended"?

25       A.    Yes.

```
 1                      Tapply
 2       Q.   So, it says, "Dr. Tapply
 3   recommended that Mr. Roth be disqualified
 4   from the position of police officer as his
 5   diabetes precludes him from fulfilling the
 6   physical requirements of police officer"; is
 7   that accurate?
 8       A.   That is what the sentence says,
 9   yes.
10       Q.   But that is accurate that that was
11   the basis of your recommendation?
12       A.   Yes.
13       Q.   Then a follow-up to say, "She made
14   this recommendation based on the records
15   indicating multiple ambulance calls involving
16   low blood sugar"; do you see that there?
17       A.   Yes.
18       Q.   There were three ambulance calls
19   regarding low blood sugar specifically, isn't
20   that correct?  If you need to look at 108 and
21   109 again to refresh, there is the October 4,
22   2008 low blood sugar, then there was the
23   January 13, 2012 low blood sugar.
24       A.   Um-hum.
25       Q.   It is under the December 11, 2009
```

1                    Tapply

2    notes where it says, "The applicant

3    remembered his roommate had called the

4    University of New Haven Police in 2010

5    because of low blood sugar", do you see that

6    there?

7         A.    Um-hum.

8              MR. COVELLO:  Is that a yes?

9              THE WITNESS:  Yes.  I'm sorry.  I

10        did it again.

11        Q.    So, is that sentence then accurate,

12    going back to '98?

13             MR. COVELLO:  Objection as to

14        whether the sentence is accurate.

15        Q.    "She made this recommendation based

16    on the records indicating multiple ambulance

17    calls involving low blood sugar"?

18        A.    Is there a question?  That is what

19    the sentence says.  You just represented it

20    as being three examples of low blood sugar.

21    I would disagree with that conclusion.

22        Q.    That it is three incidents?

23        A.    Calls, yes.

24        Q.    Three ambulance calls regarding low

25    blood sugar?

115

```
 1                     Tapply
 2        A.    Right, because --
 3        Q.    Where are the other examples of
 4   ambulance calls regarding low blood sugar?
 5             MR. COVELLO:  Because what?
 6        A.    Well, just one example, 10-24-2010
 7   the pump dispensed too much insulin, the rest
 8   of that sentence there, Mr. Roth's blood
 9   sugar would have dropped precipitously, so
10   that is low blood sugar.
11        Q.    There is no rest of the sentence
12   there.
13        A.    I'm sorry.  I am being facetious.
14   If the pump dispensed too much insulin, then
15   his blood sugar dropped precipitously.
16        Q.    Wouldn't that have depended on
17   where his blood sugar was at the point that
18   the insulin was dispensed as to whether or
19   not his blood sugar would have dropped
20   precipitously?
21        A.    If he convulsed due to pump failure
22   and too much insulin was delivered, there is
23   really only one conclusion you can make.
24        Q.    Which is?
25        A.    Low blood sugar causing the
```

116

1                    Tapply

2    convulsion.

3         Q.    So, we go from three to four?

4         A.    Okay, the 10-2010, you were looking

5    for the exact words where it says low blood

6    sugar, I believe.

7              MR. COVELLO:  No.

8         Q.    There is no 10-2010.

9         A.    October 27, 2010 on page 109.

10        Q.    Okay, what about that?

11        A.    I can't comment on that one.  There

12   is not enough information there to comment.

13   Okay, 12-11-2009, you mentioned for low blood

14   sugar.  I think you cited that one already.

15        Q.    That one is actually in reference

16   to something that happened in 2010 --

17        A.    Right.

18        Q.    -- so, it is not a separate

19   incident because you have already indicated

20   that the October 24, 2010 must be low blood

21   sugar, and the note from 2009 is just saying

22   that he only remembers an incident in 2010 of

23   there being low blood sugar.  So, presumably

24   they would be the same incident?

25              MR. COVELLO:  How could he remember

117

1                          Tapply

2          something that precedes it by a year?

3                  MS. MESIDOR:  It says the applicant

4          remembered that his roommate had called

5          the university.

6                  MR. COVELLO:  The note is a year

7          earlier.

8                  MS. MESIDOR:  But these are the

9          notes of the police investigator when he

10         was questioning the applicant about each

11         one of these.

12                 MR. COVELLO:  It couldn't have been

13         a year earlier than the 12-11-09 note.

14         We could go off.  I am trying to

15         understand.

16                         (Whereupon, discussion held off

17                          the record.)

18         Q.   Go ahead.

19         A.   I would add 12-11-09 to one of the

20    incidents of ambulance call because --

21         Q.   Of low blood sugar?

22         A.    -- of low blood sugar needing an

23    ambulance call because the officer wrote

24    glucose was administered and then aid was

25    refused so the sugar must have been low

1                    Tapply

2    because they administered glucose, so that

3    would have been another one you would infer.

4         Q.    So, we are still at four?

5         A.    Isn't it five?

6         Q.    No.  We have one in 2010, one in

7    2009 and one in 2008 and one in 2012, we are

8    still at four.

9         A.    So, you are saying May 25, 2011

10   where it says diabetic seizure and refused

11   transfer to the hospital, transport to the

12   hospital, you are not including?

13        Q.    Are you including that?

14        A.    It could go either way.  You can

15   have a diabetic seizure --

16        Q.    So, do you have enough

17   information --

18             MR. COVELLO:  Let her finish.

19        A.    -- most likely would be low blood

20   sugar causing a seizure because the other

21   way, would is high blood sugar, would be what

22   we call DKA or diabetic ketoacidosis which

23   can indeed cause seizures but really much,

24   much less frequently than low blood sugar.

25   Frankly, the point to me is whether it is

Case 18-966, Document 52-1, 06/26/2018, 2363198, Page134 of 214

119

1                          Tapply

2    really high or really low, either way is an

3    important issue in his medical history.

4         Q.   Do you have enough information

5    based on the notes that you see here on

6    May 25, 2011 to ascertain whether or not this

7    incident in which the ambulance was called to

8    his home was due to low blood sugar?  That is

9    the question before you, Dr. Tapply.

10        A.   Do I have enough information there?

11        Q.   Yes.

12             MR. COVELLO:  Based on that note.

13        A.   No.

14        Q.   So, we are still at four incidents?

15        A.   Okay.

16        Q.   Are you aware that since Mr. Roth's

17   disqualification that Mr. Roth not only

18   attended the New York Police Department's

19   Police Academy but concluded it with high

20   marks?

21        A.   I am not aware of that.

22        Q.   Are you aware that Mr. Roth has

23   been an active NYPD police officer for the

24   past two plus years since being disqualified

25   by the Nassau County Police Department?

Case 18-966, Document 52-1, 06/26/2018, 2363108, Page135 of 214

120

```
 1                          Tapply

 2        A.    I am not sure.  I believe when we

 3   were processing him he might have been at the

 4   beginning of NYPD, but that is only from

 5   reviewing notes.

 6        Q.    Are you aware that Mr. Roth has

 7   been given a number of commendations for his

 8   performance as a New York police officer

 9   since being disqualified from the Nassau

10   County police department?

11        A.    I am not aware.

12        Q.    Do any of those facts in any way,

13   do any of those facts, knowing them now,

14   would any of them form the basis of you

15   changing your opinion or recommendation that

16   he should be disqualified from the process?

17             MR. COVELLO:  Objection.  Yes or

18        no.

19        A.    It would play no role, no.

20        Q.    Do you know how the training for

21   Nassau Police Department and New York Police

22   Department differ?

23        A.    No.

24        Q.    Do you know whether the job duties

25   of an NYPD officer is any different than the
```

A0595

121

```
 1                          Tapply

 2       job duties of a Nassau County police officer?

 3              A.   No.

 4                   MS. MESIDOR:  I have no further

 5              questions for you.

 6                   MR. COVELLO:  No questions.  Thank

 7              you.

 8                   MS. MESIDOR:  Thank you.

 9                        (Time noted: 2:00 p.m.)

10

11                        ------------------------

12                        MARLAINE TAPPLY

13       Subscribed and Sworn to before me

14       this      day of        2016.

15

16       -----------------------------------

17              Notary Public

18

19

20

21

22

23

24

25
```

122

1

2                          INDEX

3

4                        EXHIBITS

5

6       TAPPLY

        FOR I.D.  DESCRIPTION                    PAGE
7

        1         Response to EEOC Complaint     40
8                 Bates 94-121

9

10

11       INFORMATION/DOCUMENTS REQUESTED

12                    DESCRIPTION                PAGE

13      Produce entire file that Dr. Tapply      77
        reviewed regarding Mr. Roth's
14      candidacy for police officer

15

16

17

18

19

20

21

22

23

24

25

123

1

2                              C E R T I F I C A T E

3          I, ELLORI EISEMAN, hereby certify that the

4    examination of said witness named in the foregoing

5    transcript was held before me at the time and place herein

6    named; that said witness was duly sworn before the

7    commencement of the testimony; that the testimony was taken

8    stenographically by myself and then transcribed under my

9    direction; that the party was represented by counsel as

10   appears herein;

11         That the within transcript is a true record of the

12   examination of said witness;

13         That I am not connected by blood or marriage with

14   any of the parties; that I am not interested directly or

15   indirectly in the outcome of this matter; that I am not in

16   the employ of any of the counsel.

17         IN WITNESS WHEREOF, I have hereunto set my hand this

18   26th day of September, 2016.

19

20

21                                    - - - Ellori Eiseman

22                                      ELLORI EISEMAN

23

24

25

A0598

124

```
 1
 2                        ERRATA SHEET
           PAGE/LINE      -  CHANGE -           REASON
 3         _____     _____     _____
           _____     _____     _____
 4         _____     _____     _____
           _____     _____     _____
 5         _____     _____     _____
           _____     _____     _____
 6         _____     _____     _____
           _____     _____     _____
 7         _____     _____     _____
           _____     _____     _____
 8         _____     _____     _____
           _____     _____     _____
 9         _____     _____     _____
           _____     _____     _____
10         _____     _____     _____
           _____     _____     _____
11         _____     _____     _____
           _____     _____     _____
12         _____     _____     _____
           _____     _____     _____
13         _____     _____     _____
           _____     _____     _____
14         _____     _____     _____
           _____     _____     _____
15         _____     _____     _____
           _____     _____     _____
16         _____     _____     _____
           _____     _____     _____
17         _____     _____     _____
           _____     _____     _____
18         _____     _____     _____
           _____     _____     _____
19         _____     _____     _____
           _____     _____     _____
20         _____     _____     _____
           _____     _____     _____
21         _____     _____     _____
           _____     _____     _____
22         _____     _____     _____
           _____     _____     _____
23         _____     _____     _____
           _____     _____     _____
24         _____     _____     _____
           _____     _____     _____
25         _____     _____     _____
           _____     _____     _____
```

Case 1:15-cv-06358-LDW-AYS Document 52-1 06/26/2018 2063198 Page 140 of 214
Case 1:15-cv-06358-LDW-AYS Document 41-31 Filed 06/16/17 Page 127 of 140 PageID #: 736

Page 125

**A**

a.m 1:17
A1C 69:25
  70:10 106:3
  106:12,13,20
ability 9:3,7
  75:15
able 36:19
  82:2 94:19
  96:20 104:21
  105:14
  107:20
absolutely
  14:15
academy 90:2
  90:10 119:19
accommodation
  23:25
accurate 75:12
  110:20 111:7
  111:15
  112:20,21
  113:7,10
  114:11,14
accurately
  24:23
ACOEM 98:7
  101:6,10
  102:10
action 4:16
active 119:23
actively 97:16
activity 96:23
  97:5
actual 29:12
  105:12
ADA 103:21
add 14:7
  117:19
addition 7:16
  38:22
additional
  29:10
address 4:11
  4:12 71:10
  71:12 83:20
  84:4
adequate 92:12
  107:25
  108:11
adjust 57:23
adjusted 63:21
  64:5
administer
  3:15
administered
  86:21 117:24
  118:2
administra...
  35:24
admitted
  109:18
adolescence
  63:18 64:4

adolescent
  14:10 18:12
  58:5 63:20
advance 33:4
advised 57:20
  92:10 107:23
advisement
  78:8
affairs 74:20
against- 1:7
ago 16:17
  56:21 76:2
agree 74:10,17
  74:18 75:2
AGREED 3:4,9
  3:13
ahead 6:22 8:2
  85:5 117:18
aid 117:24
aided 76:18
  86:21
ailments 28:23
  30:17
Albany 105:19
alcohol 8:17
allow 6:19,21
allowed 24:20
allowing 82:19
alluded 29:16
ambulance
  55:17 56:10
  56:13 57:3
  72:14 73:2
  74:5 75:19
  76:14,19
  79:12,21
  83:19 84:6
  84:10 85:18
  85:23 88:3
  113:15,18
  114:16,24
  115:4 117:20
  117:23 119:7
American 97:25
  98:4,5 99:24
amount 61:19
and- 2:12
answer 6:12,15
  7:6 12:14
  18:21,22
  25:10 28:6
  28:16 41:22
  55:2 60:9
  63:23 64:8
  64:11,13,18
  65:19,21
  70:3,6 82:5
  82:11 88:24
  90:13 95:16
  97:10,17,22
  97:22 99:4
  106:24,25
  109:22
  111:18

answered 7:23
  43:25 87:24
apparently
  55:16 67:18
  75:8 76:15
  87:12 88:22
appeal 80:24
  81:3 96:3
appeared 86:19
appears 123:10
applicant
  29:19 36:5
  42:19 86:19
  114:2 117:3
  117:10
applicant's
  84:6
application
  24:15 41:14
  48:25 49:20
  98:25
applications
  63:4
applied 42:11
  42:15,15,25
applying 25:23
  26:12
appointment
  33:24
appointments
  24:25
appropriate
  37:21
approximate
  15:18
approximately
  12:22 20:4
  49:21,22
  87:20
April 87:25
  88:9 89:5
area 20:17
articulate
  100:5,6
ascertain
  119:6
ashamed 7:5
asked 7:14
  22:13 42:5
  77:2 83:25
  95:8
asking 4:18,23
  8:12 15:9
  57:5,9 64:10
  75:23 79:7
  79:10 82:8,9
  89:14,16
  94:2 95:8
  101:8,15
  109:4 110:8
  111:13
asks 35:22,24
assigned 14:8
  19:14 29:19

assigns 29:18
assist 27:6
  48:21
assistance
  20:3
assisting
  19:22
associated
  25:21
ASSOCIATES 2:3
Association
  98:5
Association's
  97:25
assure 25:6
asterisk 93:16
  93:22
athlete 97:20
attached
  102:24
attended
  119:18
attention
  45:12 52:7
  66:14 67:4
  85:3
Attorney's
  110:17
attorneys 2:4
  2:9 3:5
auspices 22:7
authorized
  3:15
aware 42:8,22
  45:3,7,19
  46:5 50:21
  69:3,5,10
  73:11 81:10
  81:12,16,23
  82:8 83:11
  90:4 94:2
  97:7,11,15
  97:19 119:16
  119:21,22
  120:6,11
awhile 21:6

**B**

B 102:20,24
Bachelor's
  9:21
back 11:7
  12:22 17:5
  17:22 19:20
  21:23 24:12
  26:25 27:3
  27:17 31:18
  36:8 38:13
  40:15,17
  44:22,25
  48:12,15
  51:12 53:18
  53:21 58:18
  58:19,22

assigns 29:18
59:9 60:13
  61:15 64:19
  69:17 72:19
  72:23 79:19
  83:15 90:20
  90:22 99:20
  100:5 103:11
  103:14
  114:12
background
  35:14 36:7
bad 71:6
  106:13
barometer
  61:14
based 33:4
  43:16,19
  46:16 50:3
  68:9 69:14
  105:14 109:2
  113:14
  114:15 119:5
  119:12
basically
  24:19
basis 37:14
  79:25 94:18
  105:7,8
  109:15
  113:11
  120:14
Bates 48:7
  49:7,9 53:25
  103:6 122:8
bears 5:17
beginning
  120:4
begins 66:25
behalf 54:15
  101:5,8
belief 49:18
believe 11:20
  13:17 16:22
  19:21,24,25
  41:23 51:9
  61:25 62:3
  65:20 66:10
  66:14 68:6
  72:11,12
  81:7 84:2
  88:14 89:6
  95:25 102:15
  104:20 106:6
  107:20 116:6
  120:2
believed 71:21
better 55:18
  70:9 75:13
bit 12:5 18:14
  20:23 25:11
  29:24 53:17
  85:8
black 51:19
  73:22

blood 34:6,8
  39:19 56:4
  56:20,25
  57:2 66:9
  72:15 79:22
  84:24 85:20
  85:24 86:2,4
  87:13 93:8,9
  93:11 113:16
  113:19,22,23
  114:5,17,20
  114:25 115:4
  115:8,10,15
  115:17,19,25
  116:5,13,20
  116:23
  117:21,22
  118:19,21,24
  119:8 123:13
BOROOSAN 2:13
Boston 9:16
bottom 49:7
  76:12 83:22
  93:4 100:19
break 7:17,19
  7:20 8:2
  40:6 80:7
breast 19:8
brief 40:8
  80:21
bring 33:10
brittle 65:9
  65:13,14,15
  65:19,22
  69:19,23
broad 28:6
  33:9
broader 31:20
  100:3,4
Broadway 2:5
brought 98:13
brutal 65:11
bulk 15:2
  76:13
bunch 28:13
  29:21,23
  101:4
burst 97:4
bursts 96:23
  96:24
business 4:12
  17:10

─────────────
        C
─────────────
C 2:2 52:8
  123:2,2
call 16:19
  19:16,17
  22:4 45:24
  75:19 76:18
  77:23 92:13
  92:19 93:2
  93:14,21,25
  94:16 117:20

117:23
118:22
called 25:19
  29:23,25
  47:6 57:3
  74:5 76:19
  92:21 108:14
  114:3 117:4
  119:7
calls 55:17
  56:4,10
  72:15 73:2
  76:14,18
  79:12,21
  80:2 85:23
  113:15,18
  114:17,23,24
  115:4
candidacy
  45:19 46:7
  47:12,22
  48:24 72:9
  78:2 122:14
candidate 28:2
  28:11,12,18
  29:5 30:3,16
  30:20 31:6
  31:12,16
  32:7 33:3
  34:17,19
  35:18,25
  39:4 41:5
  45:12 51:16
  51:18 66:25
  67:6,8 69:6
  87:8 105:8
candidate's
  33:18 46:18
  75:8 98:24
  99:10
candidates
  22:21 27:22
  29:21 41:16
  42:11 45:3
  47:9 54:24
  89:12
capable 6:18
capacity 20:21
  27:6
cardiac 101:7
care 15:11
careful 35:10
carefully
  107:16,17
case 27:20,20
  28:7,7 41:8
  45:10 51:21
  55:6 57:11
  57:17 70:16
  74:4 75:15
  75:18 76:7
  76:21 91:17
  91:18,18,18
  94:6 104:25
  111:12,14

112:4
case-by-case
  105:7,7
cases 94:6
casual 39:23
category 47:6
  47:7
cause 118:23
causing 115:25
  118:20
caution 43:4
center 20:24
  21:2 39:15
  81:9
certification
  3:6
certify 123:3
CHANGE 124:2
changed 15:15
  58:14
changes 57:22
  57:23 63:20
  64:6
changing 57:22
  120:15
characteri...
  69:18,22
characterize
  75:9
characterized
  70:20
characteri...
  66:3
checking 23:19
checks 21:5
checkup 23:12
  23:13,17
  29:8 35:15
  35:20 50:14
  51:10 52:2
  111:11,17
checkups 23:14
children 59:21
  59:23
choice 36:22
  37:3
chosen 107:16
  107:18
circumstance
  27:14 36:11
  39:3 85:2
circumstances
  17:20 34:23
  35:5
cite 72:14
cited 85:23
  87:7,8
  116:14
civil 22:6,12
  24:17,22,24
  25:18 29:16
  41:25 46:24
  46:25 52:25
  62:20 63:3
  77:15 111:24

classifica...
  25:19
clear 11:5
  66:10
cleared 71:13
  90:9
clearly 63:24
  74:22
clerical 23:5
clinic 14:12
  14:12 15:25
  15:25 16:8
  16:18 18:11
  18:12,17,17
  19:3,7,7
  20:11,17
clinics 13:7
  14:8,9,11
  15:21 18:8
  19:10,15,23
  20:4,13
  21:10,17,17
  59:24 61:6
  62:7
close 82:17
collected
  34:12
college 86:15
  98:5 99:25
colloquial...
  6:6
colloquy 37:20
come 14:23
  17:22 22:6
  22:13 23:12
  27:7 29:8
  31:21 32:13
  81:24 109:16
comes 30:3
  35:14 39:17
  53:23
commencement
  123:7
commendations
  120:7
comment 71:5
  116:11,12
commission
  24:18 32:4
  54:18 60:13
  80:4 81:22
  87:17 88:2,8
  88:21 100:22
  101:3,9,13
  101:16,22
  102:2,6,9,19
  103:15,17,21
  104:4 105:10
  109:3 111:25
commission's
  96:5
commission...
  33:13
commissioners
  32:2,8 33:11

81:2
common 60:2
communication
  39:23
competitive
  97:20
complaint
  110:16,16
  122:7
complete 25:16
  26:4 101:11
  102:10
completely
  8:11 23:7
  37:7,25
  39:15
completeness
  23:19
completing
  94:20
complicated
  20:23
complication
  43:20 44:6
  44:15
comprehensive
  99:20,20
concept 50:13
concern 94:12
  96:22
concerns 82:18
conclude 31:24
concluded
  119:19
conclusion
  32:8 74:25
  81:24,24
  95:4 109:17
  114:21
  115:23
conclusions
  30:9,11,13
  32:9 33:10
condition 8:24
  9:3,7 23:24
  41:11,17,24
  42:12,16
  43:2,17,21
  43:21,23
  44:7,13,15
  45:5 47:5
  59:10,18
  60:3,25
  61:21 62:18
  64:15 65:23
  81:18,25
  83:2 88:11
  90:11 96:21
  98:24 104:23
  104:24 105:4
  105:15,21,24
  105:24
conditions
  30:17,23
  31:9 59:2

Case 1:15-cv-06358-LDW-AYS Document 52-1 06/26/2018 2683108 Page 142 of 214
Case 1:15-cv-06358-LDW-AYS Document 41-21 Filed 06/16/17 Page 129 of 140 PageID #: 738

Page 127

60:18 88:20
conduct 50:5
conducts 30:15
conflict 33:11
conflicts 33:7
confused 45:20
confusing 13:4
 95:24
confusion
 72:15 79:22
 79:24 80:2
 85:24 86:5
conjecture
 55:8 63:5
connected
 123:13
conscious
 74:14
consider 61:12
 106:8,9
consideration
 44:16 54:3
 73:14
considered 5:5
 21:14 24:4
 71:8 77:6
 105:8
consistent
 96:16 103:4
 103:20
constantly
 57:22
contact 37:23
 109:14
contained
 54:21
content 94:14
 101:24
 103:19 104:3
 104:8
contents 50:3
 103:5
context 30:13
continue 20:12
 20:20 47:8
 51:22
continued
 19:24
continues
 37:22 57:19
 76:12
Continuing
 71:18 76:11
contributor
 44:2
control 16:3
 70:9,14,15
 71:3,4 92:12
 104:24
 105:20,20
 106:8,8,10
 106:10,15,21
 107:18,25
 108:11

controlled
 92:11 105:24
 107:25
conversation
 89:9,17,18
 89:21 90:6
 90:15 94:15
 94:22
convoluted
 99:6
convulsed
 115:21
convulsion
 116:2
correct 13:24
 14:16,18
 15:15 16:10
 17:7 21:20
 30:17,18
 31:4 32:16
 35:3 40:4
 41:12,13
 44:8,10
 46:21,25
 56:8 60:13
 63:8,9,13
 65:25 66:5
 67:13,17,25
 68:8,12,13
 69:8,9,16
 72:13 74:16
 76:11 83:13
 83:14,21
 84:11 87:20
 88:13 93:24
 95:18 96:17
 96:18 99:2
 102:24 103:7
 107:14
 108:17
 110:14 112:9
 113:20
correctly
 82:13
corresponding
 78:15
Council's
 104:15,19
counsel 24:9
 36:23 37:18
 123:9,16
counting 13:14
Country 1:16
 2:10
county 1:8 2:9
 4:16,22 11:2
 11:4,9,12,21
 11:25 12:10
 12:23 13:2,6
 13:15,24,25
 15:11,20
 16:9 17:23
 17:24 18:2
 18:10 19:6
 20:21,24,25

21:3,6,12,16
 22:5,7,12,23
 23:2,3 24:2
 24:21 27:23
 42:17 50:23
 51:3,6 61:7
 84:5 107:21
 110:17
 119:25
 120:10 121:2
couple 88:16
course 43:6
court 1:2 3:16
 5:10,22 6:17
COVELLO 1:15
 2:8,12 12:15
 12:19 13:23
 18:20 22:9
 24:6 25:9
 26:7,11,14
 27:8,19 28:5
 29:14 32:15
 32:17 36:21
 36:25 37:9
 37:15 38:20
 40:5 43:4
 44:18,22
 48:10 50:24
 54:25 58:9
 59:3,6 60:8
 61:8,22,24
 63:14,22
 64:7,17
 65:13 68:14
 68:16,19,23
 70:3,17
 71:16 74:13
 75:21 76:10
 77:11,18
 78:7,10 80:7
 81:19 82:4
 82:16 83:7
 85:5 87:21
 88:23 90:12
 91:8,12
 93:19 95:5
 95:11 97:9
 97:21 99:3
 99:16 100:15
 101:19 103:8
 103:22
 104:22 105:5
 105:16,25
 106:11,17,23
 108:18,23
 109:21
 110:21,23
 111:20 114:8
 114:13 115:5
 116:7,25
 117:6,12
 118:18
 119:12
 120:17 121:6

Craig 1:4 2:4
 2:16 4:15,20
 41:8 45:13
 46:2
Cumulative
 11:8
current 10:25
 13:7
currently 8:23
 9:2,6 10:23
 28:24 38:24
cut 11:5
cut-offs
 105:18

---
 D
---
data 110:3
date 34:2
 69:12 78:17
 78:18,20
dated 49:4,11
 67:12 72:19
 91:25
dates 11:16,17
 11:19 66:13
day 20:12
 23:18 121:14
 123:18
dealing 60:6
December 92:2
 96:16 107:23
 108:9 113:25
decision 77:7
 96:5
decorum 5:12
Defendant 1:9
 2:9
defendant's
 49:10 52:8
 66:15 78:15
 83:16 91:19
 91:22
degree 9:12,20
 9:21 10:17
delivered
 115:22
demographic
 61:5,18
denial 80:23
denied 81:4
department
 29:17,20
 30:14,25
 31:20 36:5
 40:22 52:20
 53:2,7,24
 76:8 78:25
 79:14 88:17
 89:25 119:25
 120:10,21,22
department's
 30:2,6
 119:18
depended

115:16
depending
 105:9
depends 27:20
deposed 55:20
 81:11
deposing 8:14
deposition
 3:14 37:5,7
 86:3
DESCRIPTION
 122:6,12
desk 23:19
 30:3 33:13
 33:13,17
 39:21
detail 97:18
 97:23
determination
 4:19 29:3
 55:22 92:17
 95:22
determinat...
 59:11
determine 28:8
 41:4
determining
 25:15
development
 58:5
diabetes 42:20
 60:7 65:10
 65:11,15,23
 66:4,6 69:18
 69:22 83:5
 113:5
diabetic 41:11
 41:17,24
 42:12,16
 43:2,17,20
 43:22,23
 44:6,13,15
 45:5 54:23
 59:2,18,21
 59:22 60:18
 60:24 61:21
 62:9,18
 63:18 64:15
 73:18,23
 74:6 75:11
 81:17,25
 83:2 85:10
 88:11 90:10
 92:11 96:21
 97:4,25 98:2
 98:4,7,24
 99:10 100:9
 107:24
 118:10,15,22
diagnose 60:17
 60:20
diagnosed 60:3
diagnosing
 61:21

diagnosis
58:25 59:17
diem 16:24
18:4
differ 120:22
different
19:12 22:22
39:15 47:25
51:18 60:19
64:24 70:18
73:12 95:24
103:17 108:8
120:25
direction 71:7
123:9
directly
123:14
director 19:17
22:7,17,19
49:12,15
59:16 60:12
62:6,15
111:24
disagree 74:25
75:5 114:21
disagreeing
75:6
discipline
10:7
disclose 30:20
31:17
disclosed 45:5
discretion
105:10
discuss 110:5
discussed
34:23 52:19
84:17
discussing
19:20 51:13
discussion
6:13 10:13
44:20 78:12
95:6 109:8
117:16
discussions
58:12
diseases 16:5
dispatched
83:20 84:6
84:10
dispatching
85:18
dispensed
115:7,14,18
disqualifi...
40:2 43:9,14
43:19,24
44:8,17
64:20,22,25
65:2,5 96:2
108:10,13
119:17
disqualified
4:21 34:20

41:10,20
43:3,8,12
44:3 45:6,8
54:5 65:8,25
81:17 105:9
112:17 113:3
119:24 120:9
120:16
disqualifies
81:22
disqualify
77:7 81:20
disqualifying
73:15 78:5
distinguish
52:22
DISTRICT 1:2,3
disturbed
31:15
division 25:18
DKA 118:22
doctor 9:14
10:2 14:7,19
15:13,23
17:12,14
23:17 36:17
39:3,12,17
52:5 71:21
71:24 96:7
98:20 109:14
doctor's 36:14
100:23
108:10
doctors 27:9
27:10,15,16
38:25 58:12
document 7:23
7:25 48:5,9
48:17 51:12
52:15,16
53:22,25
54:9,20,22
55:22 56:7
57:7,11,12
66:19 75:23
75:25 76:3
80:17 83:18
84:9 91:21
100:11,13
110:15,24
111:5,8,10
documentation
36:16 40:19
40:21 51:14
72:3 73:12
78:4
documenting
76:17
documents
30:10 34:12
38:16 45:25
48:20 51:25
53:8 54:2
76:6 77:5
78:3 79:2,13

102:16
doing 13:9
14:11 15:22
18:7,9 23:13
40:20 47:15
Dr 1:13 4:14
10:15 17:15
24:11 38:3
48:16 50:15
50:18 77:25
78:14 81:7
81:10,13,16
81:20,23
82:24 91:25
92:5,9,19,21
93:2,4,14,25
94:10,17
95:9,14,20
96:14 101:11
103:9 108:25
110:7,13
111:23
112:15,23
113:2 119:9
122:13
draw 25:20
67:4
drawing 52:7
66:14
dreams 91:6
dropped 115:9
115:15,19
drugs 8:21
due 41:11
57:21 58:15
63:19 81:17
81:25 90:2
96:21 115:21
118:11
duly 4:3 123:6
DUNNE 1:15 2:8
duties 15:4
22:18 25:17
25:20,20,21
25:22,25
36:20 71:14
92:12 94:20
96:19,22
107:12,21
108:2 120:24
121:2

_____
        E
_____
E 2:1,2 4:2
123:2,2
earlier 86:3
106:3 117:7
117:13
early 12:24,25
earned 9:20
EASTERN 1:3
education 9:13
EEOC 110:16
112:11 122:7

effect 3:16
EISEMAN 123:3
123:22
either 11:18
60:23 62:25
80:14 87:23
118:14 119:2
either/or 63:2
EKG 34:7
elevated 6:3,3
ELLORI 123:3
123:22
embarrassed
7:5 8:8
emergency 56:4
employ 123:16
employed 10:23
11:6,9,12,21
11:25 13:14
21:4
employee 11:3
employee's
25:6 100:7
employees
23:22 24:2
24:22,25
46:24
employer 10:25
99:9
employment
13:5 14:6
15:2,10,12
22:21,22,24
24:15 98:3
98:25
enclosed 51:24
encompassed
19:8
endocrine
104:23,24
105:3,15,21
105:23
endocrinol...
51:24 71:9
71:11,13
72:4,8 92:7
100:18,19
103:3,20,24
106:4,5
endocrinology
64:9
endorsement
108:12,16
enforcement
23:6,7 26:13
27:23 28:3
35:23 98:8
English 9:10
enormous 91:11
91:14
enter 90:2
entire 15:10
16:12 77:24
94:21 122:13

entirety 77:16
entity 17:11
entries 93:3,6
entry 86:6
93:23 94:5
environment
5:7,9
Environmental
98:6 99:25
episodes
107:19
ERRATA 124:2
ESQ 2:6,12,13
essential 82:2
essentially
18:25 28:17
establish
63:15
established
63:11
evaluate 99:11
evaluation
4:19 51:23
66:11 98:7
98:13 101:7
112:7,8
events 57:20
64:23
exact 11:19
107:15 116:5
exactly 32:21
51:20 57:6
66:13 67:3
75:5 76:3
108:15
109:14
exam 19:8
26:16
examination
1:12 4:6
18:23 26:15
27:15 29:7
33:24 34:3,4
34:11 35:7
36:12 38:18
39:12 40:21
49:25 50:6
50:12,19,23
51:2,4
110:19,22
111:23 112:8
123:4,12
examinations
22:21 23:2
26:10 27:22
35:11
examine 96:4
examined 4:4
19:4 47:6
50:9 80:25
examining
38:25 39:4
example 13:6
13:13 14:10
23:16 31:22

Case 1:15-cv-06358-LDW-AYS Document 52-1 06/26/2018 2663198 Page 144 of 211
Case 1:15-cv-06358-LDW-AYS Document 49-31 Filed 06/16/17 Page 131 of 140 PageID #: 740

Page 129

115:6
examples
  114:20 115:3
exams 27:10
excellent
  107:18
exception
  31:14
exceptions
  35:15
execute 96:21
exempt 24:25
exertion 96:25
  97:5
exhibit 40:11
  40:12 52:7
  91:23 102:8
  102:14,17,24
  104:11
EXHIBITS 122:4
exists 75:23
experience
  58:24 59:13
  59:20 60:6
expert 96:4
  107:5
explain 53:16
  55:18 70:22
exposure 60:5
extension
  102:9
extent 104:23
  105:20
eyes 31:20
  110:4

                F

F 123:2
facetious
  115:13
facility 19:3
  20:11
fact 58:15
factor 43:23
  58:5
factors 43:11
facts 120:12
  120:13
failing 31:17
failure 67:9
  67:15,22
  69:4 87:8
  115:21
failures 87:2
fairly 112:5
familiar 41:7
  104:14
family 14:12
  16:16
far 24:7 61:9
  68:11 100:5
federal 37:4,6
feel 6:12 8:7
  8:8 31:16

43:25 91:14
  92:13
fell 96:7
field 15:12
figured 79:9
file 42:22
  45:22 76:5
  77:4,10,14
  77:17,20,25
  122:13
filing 3:6
fill 23:11,15
  29:12,15,21
  29:22
filled 29:16
  46:19 103:4
  103:20,24
fills 28:12,18
  98:20 100:18
final 64:21
  85:17 96:5
find 5:8 80:6
  108:15
  109:15
finding 69:13
findings 31:13
  58:6 64:24
  65:4
fine 73:24
  106:12
finish 6:20,21
  7:24,25
  39:13 118:18
finished 28:15
  41:5 47:9
first 4:3 8:5
  9:10 11:12
  11:20,24
  13:20 14:14
  14:15 15:24
  18:5 45:11
  50:5 54:10
  54:13 66:2
  68:4,5 78:22
  84:13 86:16
  110:23
  112:14
fit 25:16
five 67:17
  69:11 118:5
flag 47:3
flags 32:12
flip 23:16
flipped 23:18
float 16:18,19
Florida 12:3
flush 109:25
focus 22:12
follow 78:6
  98:17,18
follow-up
  113:13
followed
  100:14
  108:12

following
  75:11 94:6
  100:17
follows 4:5
force 3:15
foregoing
  123:4
forgotten 38:5
form 3:10
  18:20 23:11
  23:15 28:12
  28:19,19
  29:2,13
  37:13 98:19
  98:19 100:17
  100:22,24
  101:2,7,13
  101:16,17,18
  101:22,25
  102:7 103:3
  103:5,19,23
  104:2,3
  120:14
format 32:8
formed 79:25
forward 34:19
found 41:25
  42:13
four 13:18,18
  20:7 83:19
  83:22 84:2,7
  84:10 116:3
  118:4,8
  119:14
four-year
  86:14
fragile 65:9
  65:12,16,20
  65:23 69:20
  69:21,23
frame 98:21,22
  99:9,15
  100:4
Frankly 118:25
free 19:17
  91:14 92:13
frequently
  118:24
frivolous 63:6
fulfill 107:12
fulfilling
  113:5
full 16:20
  17:24 18:12
  19:25 20:8
  20:10
fully 94:14
  107:20
functions 82:3
further 3:9,13
  29:3 34:15
  35:21 47:5
  121:4
furtherance
  30:11

                G

GARTNER 1:15
  2:8
gather 32:11
gathered 33:15
  33:16
general 52:12
  78:24 79:4,6
  79:7,11
  89:11,20
generally
  35:16
generate 54:11
gentleman 22:4
gestures 6:5
give 4:25 37:2
  47:16 48:5
  57:12 60:4
  76:9 101:15
  101:22,25
given 87:17
  95:10 101:2
  108:16 120:7
giving 6:16
  20:3
glass 7:18
Global 50:13
globally 112:6
glucose 70:9
  70:14 86:20
  94:13 99:17
  99:18 117:24
  118:2
glycemic
  107:18
go 6:22 8:2
  10:11 18:24
  22:9 27:16
  36:8 50:22
  50:25 68:4
  78:10 79:24
  80:8,10,19
  83:15 85:5
  90:10 91:11
  91:14 94:23
  107:15 109:9
  116:3 117:14
  117:18
  118:14
goal 70:25
  106:7,12
goes 31:25
  91:17
going 4:17,23
  5:2,24,25
  6:14 7:12
  8:6,12 11:15
  28:10 31:23
  31:24 37:19
  45:9 48:5
  51:12 52:11
  54:12,14
  58:15 61:2
  61:15 64:8

64:11,13
  67:3,4 68:4
  69:17 79:19
  83:15 86:9
  87:24 92:8
  93:10 95:19
  110:5 112:22
  114:12
good 4:14 71:4
  71:6,8 106:8
  106:10,15,21
granted 101:9
great 109:10
ground 5:2
group 75:20
guaranteed
  20:15
guess 24:23
  55:13 75:11
  95:14
guessing 55:12
  62:12
guesstimate
  11:17
guideline
  98:21
guidelines
  25:3,14
  97:25 98:7
  98:10,17
  99:8 100:2,5
  100:6,14
  103:4,21
  105:7
gynecology
  16:2

                H

half 61:13,15
hall 18:25
hand 32:3
  55:24 56:2
  75:8 123:17
handwriting
  55:23 56:3,5
handwritten
  94:5 95:20
  96:6,10
happened 22:3
  29:19 57:3
  74:22 87:2
  116:16
happy 47:23
Haven 86:16
  114:4
head 6:5 82:6
heard 24:7
held 1:14
  10:13 44:20
  78:12 117:16
  123:5
help 37:17
  48:3,21
  110:12

helping 39:24
hemoglobin
  69:25
Hempstead 4:13
hereunto
  123:17
Herson 91:25
  92:5,9,19,21
  93:2,4,14,25
  94:10,17
  95:10,21
  108:7
Herson's 95:14
  96:14
Hi 45:25
high 39:19
  118:21 119:2
  119:19
highest 9:12
highlight
  32:12
highlighted
  107:7
HIPAA 24:19
  29:13
hired 13:20
  19:25 22:16
  22:23
histories
  22:20,25
  23:9 24:3
  27:11 34:25
history 23:15
  24:19 25:7
  26:3,9 27:11
  27:16 28:2
  28:10,20
  29:4,12 35:7
  35:14,18,19
  35:20 36:12
  38:18 39:5
  39:14 40:23
  46:18 65:6,8
  67:19,21
  75:12,13
  82:20 87:18
  97:14 99:11
  99:21 100:3
  100:7 109:3
  119:3
hodgepodge
  18:11 19:23
hold 10:15
  46:6,8,13
home 74:5
  83:20 84:4,7
  84:11 85:18
  119:8
honestly 89:7
honor 30:19
hopefully
  17:23
hormonal 57:21
  63:19 64:5

hospital 20:25
  21:10,14
  56:13,15
  73:6 74:7,12
  74:16,24
  84:18 85:14
  86:22 118:11
  118:12
hours 17:2,4
  20:15
hum 24:23
human 22:5
hypoglycemia
  107:19

────────────
        I
────────────
I.D 122:6
idea 62:13
  68:13
identifica...
  40:11,13
  48:7,18
  91:24
identified
  23:23 76:24
identify 87:23
imagine 88:25
imaging 18:18
  18:25 19:9
impairs 8:24
  9:7
impede 25:7
impedes 9:3
important 6:2
  15:7 119:3
impossible
  90:8 106:24
  106:25
improved 71:3
improving 71:5
inaccurate
  11:18
inappropriate
  37:8 38:2
incidence
  69:11
incident 56:16
  56:19 57:2
  68:11,17,17
  68:18,20
  72:18 73:8
  74:8 79:17
  84:13,16,22
  84:23 85:7,8
  85:13,17,19
  87:7,12
  88:10,22
  89:2 116:19
  116:22,24
  119:7
incidents
  56:14 58:4
  69:3,7 73:5
  83:19 84:2

86:10,13,25
  87:19 97:4
  114:22
  117:20
  119:14
include 28:22
  32:25 34:3,4
  34:8 79:2
  101:24
included 32:6
  76:15 77:4
  79:13,16
  89:11 104:13
including
  28:19 42:23
  42:24 78:3
  118:12,13
incorrect
  112:6
independent
  41:22 44:14
Index 1:6
  122:2
indicate 79:21
  87:11
indicated
  45:22 53:23
  94:19 116:19
indicates 73:5
  85:9 92:9
  110:18
indicating
  82:25 89:24
  90:16 113:15
  114:16
indirectly
  123:15
individual
  34:24 36:18
  43:12 44:17
  82:19 109:11
individual's
  26:3 43:16
individually
  109:9
individuals
  26:12 27:5
  60:18,24
  61:20 62:15
  91:17
infer 118:3
influence 8:16
  8:19
information
  24:16 27:25
  28:9,22
  29:11 30:8,9
  31:2,17,19
  32:4,12 33:5
  33:8,12,14
  33:17,20
  34:14 36:7,9
  41:6 46:19
  47:18 52:5
  54:16,21,22

55:6 64:12
  68:10 77:5
  83:23 88:12
  89:10,13,16
  89:19 102:5
  104:2 116:12
  118:17 119:4
  119:10
INFORMATIO...
  122:11
initialed 93:4
instability
  58:7
instructed
  37:20
insulin 57:22
  58:14 63:21
  64:4 67:25
  68:7 82:21
  83:3 115:7
  115:14,18,22
intense 96:23
interested
  123:14
interesting
  107:6
intermittent
  13:3
interpreta...
  71:20
interruption
  21:11
interview
  22:13
investigate
  24:20 34:16
  35:22
investigation
  27:12 29:20
  29:25 30:2,6
  30:15 31:3
  31:23 32:6
  32:23,25
  33:9,22
  34:12,13
  35:13 36:6
  40:23 52:19
  53:24
investigator
  30:21 31:7,8
  31:10,12,15
  32:11 56:11
  74:3 117:9
investigators
  29:18 32:20
invited 92:20
inviting 22:5
involved 18:16
  18:18 47:11
  47:14,21
  48:23 49:19
  49:24 50:14
  56:14 73:6
involvement
  30:5

involves 56:19
involving
  72:15 79:21
  80:2 85:24
  113:15
  114:17
issue 37:22
  51:20 79:24
  79:24 119:3
issues 29:8

────────────
        J
────────────
January 49:4
  49:11 51:14
  87:12 88:22
  113:23
job 23:3 25:16
  25:22 32:19
  32:21 82:3
  100:21
  108:21,22,24
  108:24 109:7
  109:8,13,19
  109:20 110:9
  110:11
  120:24 121:2
JOSEPH 2:12
judge 5:7,17
  37:23
jump 6:14,16
jury 5:7,10

────────────
        K
────────────
K-A-M-P-E
  22:14
Kampe 22:14
keep 6:2
keeping 106:3
kept 76:7
  77:10,14
ketoacidosis
  118:22
kind 13:10
  18:8 39:9
  51:14 54:22
  108:16
  110:12
knew 68:12
know 7:3 12:21
  36:25 37:5
  38:8,14 42:7
  42:14 45:21
  46:2 48:2
  50:8,11,15
  50:16,17
  51:6 52:16
  54:19 55:5,9
  55:19 57:11
  57:18 60:10
  63:7,8,17
  64:3,10,11
  68:2 71:9,23
  71:25 72:21
  75:24 76:3

Case 1:15-cv-06358-LDW-AYS Document 52-1 06/26/2018 2663198 Page 146 of 214 Filed 06/16/17 Page 133 of 140 PageID #: 742

Page 131

78:20 80:18
81:5 82:10
82:10,11
83:8 95:17
96:6 101:12
104:7 106:6
106:14 107:2
107:7,9
109:18,19
111:6,14,15
111:15,16,19
112:3,5
120:20,24
knowing 83:9
120:13
knowledge
74:19 79:25
89:2

**L**

L 3:2 4:2,2
L-A-S-A-L-A
17:14
laborer 23:4
lack 105:20
ladies 16:2
18:24
laid 21:6,19
language 9:10
large 35:20
LaSala 17:14
LaSala's 17:15
17:20
law 23:6,7
26:13 27:22
28:3 35:23
98:8
lay 15:7
learn 43:7
leave 17:22
39:20
leaving 17:20
led 44:7
left 5:24
11:14 54:13
lengths 91:11
91:15 109:10
let's 10:11
14:13 40:5
40:14 60:15
78:10 79:24
80:7,8 90:19
91:19 107:15
letter 49:4,11
50:2,3 51:15
51:21 72:7
91:25 92:3,9
92:16,25
94:25 96:6
96:10 103:16
107:22,23
108:9,12
109:15 110:3
letters 72:2

108:6,9
level 5:11
70:14 97:17
97:23 106:20
106:21
levels 57:23
58:14 64:4
106:14
license 10:4,9
licensed 10:2
licenses 10:16
lifts 97:16
light 29:8
31:21
likewise 6:21
line 73:24
list 25:13,25
55:15,17
56:10 72:25
76:13
listing 76:22
79:20 105:12
literally
25:20 32:2
105:6
litigation
77:19
little 13:12
18:13 25:11
29:24 35:10
39:19 53:17
85:8
LLP 1:15 2:8
located 17:16
logs 93:8,9,11
94:13 99:17
108:14
long 11:3,8,24
12:6,21,25
16:17 19:21
20:20 50:8
71:23,25
76:2 100:11
longer 11:21
look 12:20
25:14 26:2
27:17 35:18
47:23 48:10
82:7,9 91:19
99:20 100:2
100:6 113:20
looked 79:23
94:4
looking 30:10
39:13 49:9
52:4 54:8
68:25 93:20
99:10 105:18
116:4
looks 31:3
102:21
lot 28:14
35:17 47:25
91:17

loud 12:2
51:21
low 56:4,20,25
57:2 72:15
79:22 84:23
85:20,24
86:2,3 87:13
113:16,19,22
113:23 114:5
114:17,20,24
115:4,10,25
116:5,13,20
116:23
117:21,22,25
118:19,24
119:2,8
lower 55:24
LYNN 1:15 2:8

**M**

M 4:2
ma'am 62:23
Main 4:12
making 53:9
54:3 55:22
59:11 77:7
89:4 92:17
95:21,22
mammographies
19:5
mammography
18:13,16,19
19:7
Manhasset
17:18
margin 55:24
56:2
Marjorie 2:6
4:15
mark 12:20
40:10
marked 40:13
48:6,17
91:24 102:5
marker 73:22
marks 119:20
Marlaine 1:13
2:10 4:10
121:12
marriage
123:13
match 94:4
material 88:15
88:18
math 75:14
matter 81:11
92:22,22
106:2 123:15
MD 9:15 15:11
15:14
mean 18:19
36:4 42:9
46:11 53:13
59:8 63:7

65:18 66:7
70:23 71:16
71:19 99:24
meaning 5:11
7:22 71:2
means 78:21
80:4
meant 112:6
measurements
70:10
medical 9:14
10:2,8,17
14:7,19
15:13,23
19:16 20:24
21:2 22:7,17
22:19,20,25
23:9,15,21
23:23 24:3
24:14,16,18
25:6,24 26:3
26:9,9,15
27:9,11,11
27:15,16,21
28:2,9,19
29:4,11,22
30:2 31:7,8
31:11,22
32:5 33:4,8
33:22,23
34:4,10,25
35:6,7,12,14
35:25 36:9
36:12,12
38:17 39:13
39:15 40:20
40:23 43:10
43:12,18,24
44:16 46:6,8
46:13,14,18
49:12,15,25
49:25 50:6
50:19 51:2,4
51:22 52:2,3
52:4,5,12
58:3,24
59:15 60:12
62:6,15 65:6
65:7 67:19
67:20 70:8
78:3,25 79:3
79:5 81:9
85:3 87:18
89:10,11,13
89:15,20
93:3,6 97:2
97:14 98:2
98:12,23
99:11 100:7
100:25 109:3
110:4,19,22
111:23,24
112:7,16
119:3

medically 4:20
25:16 33:19
33:19 41:10
43:3,8 44:3
45:5,6 54:5
65:19,25
73:15 77:7
78:5
medicine 14:11
18:12 98:6
100:2
medium 46:3
meet 22:13
36:19 89:5
89:12 104:21
105:14
meetings 77:22
memory 8:24
57:15
men 16:2
mention 33:6
69:25
mentioned 86:6
116:13
Mesidor 2:6
4:7,15 10:11
14:2 24:9
26:17,20,24
36:23 37:4
37:11,18
38:7,23 40:7
40:10,14
48:12 53:18
58:19 59:5,8
61:23,25
62:4 63:16
68:18,21
77:19,23
78:9 80:9,19
90:19,25
93:17 103:9
103:11 111:3
117:3,8
121:4,8
met 89:14
metric 26:2
Metropolitan
104:15,18
Mid-Suffolk
22:2
middle 12:23
67:5 73:17
mind 8:11
Mineola 1:16
2:11
minor 75:14
minutes 80:6
missing 102:13
102:18
moment 21:12
41:4 47:8
74:20
month 16:12
months 12:4
99:19

Case 1:15-cv-06358-LDW-AYS Document 52-1 06/26/2012 266311987 Page1473of 2114
Case 1:15-cv-06358-LDW-AYS Document 41-31 Filed 06/16/17 Page 134 of 140 PageID #:
743

Page 132

morning 4:14
    4:17
morphed 20:25
MOSHE 2:13
move 34:19
MPTC 105:2,6
    105:13
muddy 13:12
    37:19
multifacto...
    43:9,13
multiple 72:14
    79:21 80:2
    85:23 113:15
    114:16

─────────────
        N

N 2:2 3:2 4:2
name 4:8,14
    45:13 50:17
    54:12 81:7
named 123:4,6
names 43:5
Nassau 1:8 2:9
    4:16,22 11:2
    11:4,9,12,21
    11:25 12:9
    12:22 13:2
    13:14 16:9
    17:24,25
    19:6 20:21
    20:24,25
    22:12 23:2
    24:2,21,23
    27:23 41:15
    42:17 50:23
    51:3 61:7
    81:8 84:5
    107:21
    119:25 120:9
    120:21 121:2
nature 8:7
necessarily
    14:9 35:9
necessary
    63:19
necessitated
    5:12
need 6:21 7:17
    7:18,19
    12:13,21
    19:18 23:24
    25:5 26:22
    36:9 40:22
    41:6 53:16
    64:5 75:13
    82:9 111:17
    113:20
needed 19:16
    20:14,16
    29:4
needing 117:22
needs 47:5
    63:21

neither 81:21
never 91:10
    101:2 109:25
New 1:3,16,18
    2:5,5,11 4:4
    4:13 86:16
    89:25 114:4
    119:18 120:8
    120:21
nice 106:12
nine 68:11,20
nods 6:5
Non-Party 1:12
    2:10
normally 106:7
Notary 1:17
    4:3 121:17
notations
    55:12
note 51:23
    95:20,21
    116:21 117:6
    117:13
    119:12
noted 24:10
    36:24 121:9
notes 114:2
    117:9 119:5
    120:5
Notice 1:14
November 93:23
nuanced 44:5
    44:12
number 10:4
    49:6,7 63:5
    63:8 78:17
    78:19 105:19
    120:7
numbers 48:7
    99:18,18
    105:17,22
    110:3
NYPD 119:23
    120:4,25

─────────────
        O

O 2:13 3:2
oath 3:15 4:24
    5:13,17
objected 68:24
objection
    18:20 24:6
    24:10 25:9
    26:7,11,14
    27:8,19 28:5
    29:14 32:15
    32:18 36:21
    36:24 37:13
    37:13 38:20
    44:18 54:25
    58:9 60:8
    61:8,22
    63:22 64:7
    64:17 68:14

70:17 74:13
    77:11 81:19
    82:4,16 83:7
    85:5 87:21
    88:23 90:12
    95:5,11 97:9
    97:21 99:3
    99:16 100:15
    103:8,22
    104:22 105:5
    105:16,25
    106:11,17,23
    108:18,23
    109:21
    110:21,23
    114:13
    120:17
objections
    3:10 37:6,12
    37:21,25
occasion 27:10
    27:24 31:15
    107:8
Occasionally
    35:10
occasions
    67:16
Occupational
    98:6 99:25
occur 64:6
occurred 56:15
    56:20 67:16
    73:7 86:11
    86:14
October 87:3,4
    113:21 116:9
    116:20
offered 89:24
    90:9
offers 23:4
office 1:15
    33:17 35:22
    39:16 46:12
    46:15,20
    110:18
officer 3:14
    4:22 23:5
    28:4 41:15
    42:17 45:4
    45:14 46:7
    64:16 66:25
    71:14,22
    72:10 78:2
    82:3,21 83:6
    92:13 94:20
    95:13 96:20
    107:13,21
    108:2 112:18
    113:4,6
    117:23
    119:23 120:8
    120:25 121:2
    122:14
officers 29:18
    40:25 41:3

41:24 63:11
    98:8
offices 1:14
officially
    16:24
okay 5:3,4
    12:18,19
    13:8 15:6,10
    22:3 25:13
    37:8 38:11
    42:6 44:4
    48:9,11
    60:15,16,22
    62:4 69:21
    72:24 73:3
    83:17 84:8
    84:19 86:12
    88:6 91:13
    103:2 109:6
    112:2 116:4
    116:10,13
    119:15
Old 1:15 2:10
once 29:2
    30:25 31:10
    33:20 34:10
    46:18 47:3
one's 70:25
one-year 11:22
onus 31:5
open 16:8
opening 62:19
opinion 27:13
    81:3 82:13
    82:13,15,23
    94:24 95:12
    96:14,15,16
    105:13 106:2
    109:16
    120:15
opportunity
    36:8 108:15
    108:19
order 24:3,4
    25:16 51:22
    99:11
organizati...
    35:16
original 36:7
    64:20,25
    65:5 96:2
outcome 123:15
over-the-c...
    8:21
overlap 31:19
overlapping
    13:5,11

─────────────
        P

P 2:2,2 3:2
    4:2,2
p.m 121:9
packet 72:12
page 49:6

52:14,21,21
    52:23,23
    53:4 54:8,9
    73:23 75:21
    75:22 76:9
    83:23 85:25
    86:7,9 93:10
    93:20,22
    94:3,6 95:19
    102:21,22
    111:17 116:9
    122:6,12
PAGE/LINE
    124:2
pages 93:5,19
    94:4
paper 24:16
    51:10
papers 75:20
    88:16
paperwork
    76:16
paragraph
    66:24 67:15
    68:3 69:15
    71:2 103:6
    111:22
    112:14,23
paraphrased
    101:17
parents 15:17
part 13:5,9,17
    16:14,22,24
    18:4,16 19:3
    23:6,6 52:18
    53:8,24
    55:10 73:22
    91:8,23
    100:25
    102:15,19
partially 21:3
    21:3
particular
    25:6,8 28:11
    29:5 30:16
    33:2,3 34:16
    36:14 51:20
    62:17 82:20
particularly
    71:4
parties 3:5
    123:14
parts 33:9
    95:25
party 123:9
pass-out 73:13
passed 56:16
    72:22 73:8
    73:17 74:11
    84:17
passing 72:16
    72:19 73:25
    79:22,23
    85:25

Case 1:15-cv-06358-LDW-AYS Document 52-1 06/26/2012 2681097 Page140 of 211
Case 1:15-cv-06358-LDW-AYS Document 41-23 Filed 06/16/17 Page 139 of 140 PageID #: 744

Page 133

patient 92:10
  100:21
  107:24
  109:18
patient's
  99:21 100:3
patients 60:7
  62:9
PD 35:24 36:3
pediatric 14:9
  19:15
pediatrician
  13:22 14:5,8
  14:16,23
  21:15
pediatricians
  21:7,11
pediatrics
  10:20 16:15
  18:13 20:19
  22:2 59:19
penalty 5:19
pending 7:21
  37:24 80:11
pension 13:13
people 6:18
  23:14 36:6
  47:15,15
  91:16
percent 61:10
  61:10,10
  62:8,11 63:6
  88:14 98:11
percentage
  61:11 62:24
perfect 39:20
  67:2
perform 26:5
  27:9 36:19
  82:2 92:12
  107:20 108:2
performance
  120:8
performed 19:2
  111:23
performing
  14:10 39:12
period 6:12
  11:22 14:17
  16:12,21
  17:16 55:4
  63:18,20
  64:4 107:10
periods 19:12
person 8:13
  25:15,23
  35:23 41:19
  45:23 47:4
  54:11,14
  71:10 74:21
person's 29:11
  43:19
personal 8:6
personally
  50:16

pertained
  56:12
perusing 48:9
  91:21
phase 29:25
  35:12 79:20
PHILLIPS 2:3
phone 22:4
  94:16,23
  109:25
physical 18:23
  24:13 29:6
  35:11 51:10
  82:20 96:23
  96:24 97:5
  105:12
  111:10 113:6
physician
  40:19 59:15
  59:17 72:3
  107:3
physician's
  107:4
physicians
  51:5
piece 43:18
  101:7
place 35:6
  123:5
placed 7:24
  46:6 58:13
placing 82:18
plaintiff 1:5
  1:13 2:4
  41:7
Plandome 17:18
planning 14:12
  16:16
play 58:5
  120:19
please 4:8 6:5
  7:3 38:7
  49:6 51:23
  52:22 70:22
  92:10,13
  102:4 107:23
  109:24
PLLC 2:3
plus 119:24
point 47:10,16
  47:21 48:22
  49:3,19
  57:13 58:7
  59:3,6 62:5
  106:18 107:6
  115:17
  118:25
pointed 45:10
police 4:21
  23:5 28:4
  29:17,18,20
  30:2,6,14,25
  31:20 34:13
  36:5 40:22

40:25 41:3
  41:15,24
  42:16 45:4
  45:14 46:7
  52:18 53:2,7
  53:23 63:10
  64:16 71:14
  71:21 72:10
  76:8,16,17
  76:18 78:2
  78:25 79:13
  82:3,21 83:6
  84:5 88:17
  89:25 92:13
  94:20 95:13
  96:19 104:15
  104:19
  107:13,21
  108:2 112:18
  113:4,6
  114:4 117:9
  119:18,19,23
  119:25 120:8
  120:10,21,21
  121:2 122:14
political
  24:25
polygraph
  31:18,22
portion 32:13
  61:4 92:8
  103:2,5
  104:18
position 4:21
  13:7,21 14:5
  15:24 16:11
  17:24 18:3
  25:24 26:5
  28:3 41:15
  41:17 42:16
  45:4,14 54:6
  62:17 72:9
  83:5 89:25
  90:9 99:12
  112:17 113:4
positions 24:5
  24:22 25:5
  26:13 27:23
positive 21:4
  41:21 70:12
possible 50:18
possibly 96:24
practice 11:7
  12:5,7,8,10
  13:10 14:4
  17:7,9,21
  19:21 21:24
  60:2 62:6,8
Practicing
  59:19
pre-2004 60:15
precedes 117:2
precipitously
  115:9,15,20

precludes
  113:5
predates 108:9
preparation
  90:5
prepared 54:9
  66:19 110:17
prepares 52:16
prescriptive
  8:20
present 2:15
  32:4
presented
  45:22 100:21
presenting
  33:12,14
pressure 34:6
pressures
  39:19
presumably
  116:23
presume 7:12
presuming
  51:25
presumption
  56:8
pretty 73:16
previously
  28:23 34:22
  51:13 52:19
prideful 7:4
prior 9:19
  22:8 34:22
  38:21 41:14
  42:8,9,11,19
  46:17 50:2
  53:9 55:22
  57:4 60:17
  60:23 62:6
  66:11 67:17
  67:22 69:2
  77:2 78:4
  85:25 89:4
  92:16 95:21
  97:3 112:10
private 11:6
  12:4,6,10
  13:10 14:4
  17:6,9 19:21
  21:23 51:23
  52:5 60:2
  62:8 71:13
  71:20,23
  72:3,4,8
  92:6 98:20
  103:19
privatized
  21:3
privilege
  37:14
probably 12:4
  13:18 17:4
  20:6 87:24
  94:23

problem 43:22
problems 66:10
proceeding 5:6
proceedings
  5:2 50:17
process 32:14
  33:18 51:15
  52:6 87:22
  95:25 96:8
  120:16
processing
  47:8,12,21
  48:24 49:20
  120:3
Produce 122:13
produced
  105:19
production
  49:10 52:8
  66:15 77:24
  78:16 83:16
  91:20
profession...
  5:11
proper 32:21
  41:21 71:10
  76:9
properly 75:3
proportion
  62:7
provide 24:17
  27:12 31:6
  47:19
provided 25:4
  27:18 36:6
  48:20 52:3
  52:25 53:6
  54:17 72:7
  76:8 80:15
  97:24 98:12
  102:6 104:3
provides 98:21
providing 19:6
  99:9
proviso 33:7
puberty 57:21
  58:16 64:6
public 1:17
  4:4 15:25
  16:7 121:25
pulling 16:14
pump 66:10
  67:8,15,22
  67:25 68:7
  68:17,18,22
  69:2,4,10
  82:21 83:3
  87:2,8 100:9
  100:10 115:7
  115:14,21
pure 63:5
purely 46:14
purpose 8:9
purposes 14:6
  35:17 98:3

99:17
pursuant 1:14
put 33:25
  69:14 88:25
putting 32:3
_____

**Q**

qualification
39:2, 25
59:12 62:16
qualificat...
25:8
qualified 41:5
99:12 105:9
qualify 104:21
quantify 59:20
60:10 63:2
quantitative
105:19
quazi-judi...
5:6
question 3:10
6:11, 13, 15
6:17, 20, 23
6:25 7:4, 6, 7
7:11, 13, 21
7:22, 25
12:14 15:8, 9
22:10 24:11
26:18, 21, 23
26:24 37:10
37:24 38:3, 6
38:8, 21, 23
42:4 44:4, 11
44:12, 23
45:20 46:8
46:10 48:13
50:5 53:17
53:19 57:8
57:14 58:20
61:16, 24
63:24 64:3, 3
70:4 76:20
77:2, 12
80:11 83:24
88:5, 7 91:9
91:12 95:7
95:16 99:7
101:12, 20, 21
103:12, 18, 25
109:4, 17, 22
109:24 110:8
110:24, 25
111:4, 18
114:18 119:9
questionable
93:3
questioning
117:10
questions 4:18
4:24 8:5, 9
28:14, 14
29:23 45:9
60:20 92:14

92:20 121:5
121:6
quite 11:5
quotation 86:4
quotations
80:4 86:3
quote-unquote
19:7, 23
70:24
quotes 108:5
quoting 80:4
80:13
_____

**R**

R 2:2 4:2
123:2
range 60:4
Rarely 27:24
re-review
27:17
read 26:24
27:2 38:12
40:15, 16
44:22, 24
48:12, 14
53:18, 20
58:17, 19, 21
90:5, 20, 21
103:11, 13
reading 51:21
57:6, 12 75:3
109:15
111:20
really 12:13
12:21 55:8
79:11 101:21
115:23
118:23 119:2
119:2
reason 7:20
44:3 65:24
80:23 94:15
124:2
reasoning
95:15 110:2
reasons 46:14
95:9
recall 16:13
16:16 41:19
42:19 45:11
45:16, 18, 23
48:3 55:21
57:10, 10
58:11, 23
62:14 67:21
67:23 74:7
79:8 82:24
89:7, 8, 16, 21
89:23 90:7
90:14, 25
94:21 97:6
97:15, 18, 23
97:24 99:8
99:14 100:12

112:12
receipt 112:15
receive 5:13
29:2 30:8
32:22 33:20
35:6 36:14
36:16 38:15
38:17 98:9
received 33:5
33:8, 23
34:10 40:18
46:19 72:2
78:24
receives 30:25
receiving
32:22
recess 40:8
80:21
recognize
78:20
recollection
41:23 47:11
47:14, 20
48:22 56:24
57:6, 15
79:15 80:16
82:14, 17, 23
94:8 101:23
recommend
100:20, 20
recommenda...
27:18 33:2
34:18 36:15
36:17 38:15
38:17 39:2, 6
39:8, 9, 25
53:10, 13
54:4 94:25
95:10 100:23
107:9, 11
109:2 113:11
113:14
114:15
120:15
recommenda...
102:11
recommended
94:18 112:16
112:24 113:3
recommending
46:13
recommends
99:19
record 4:9
8:11 10:12
10:14 24:10
36:24 37:19
44:19, 21
51:18 52:23
55:10 78:11
78:13 80:8
80:10, 20
91:5 94:24
97:3 117:17
123:11

records 23:21
31:7, 11 36:2
42:2 49:25
52:3 58:3
70:8 79:20
98:2, 23
110:4 112:16
113:14
114:16
recreational
8:20
red 32:12
refer 11:16
12:13, 16
16:23 49:7
66:22 72:23
79:3 102:4
reference 16:5
57:13 116:15
referencing
86:7
referred 27:12
referring
40:25 56:3
64:21 68:16
68:21 70:7
75:22 78:15
85:22 87:6
93:12 99:22
102:23
104:10
110:13
reflect 70:8
reflected 88:3
reflection
70:13
refrain 6:6
refresh 47:20
113:21
refreshing
48:21
refusal 85:3
85:14
refuse 75:10
75:16
refused 74:6
74:11, 23
75:10 86:21
117:25
118:10
regard 32:5
62:16 97:14
regarding 4:18
29:11 31:8
46:2 76:6
77:25 82:20
83:4 84:4
88:11 92:21
92:22, 23, 24
92:25 93:7
93:15 102:9
113:19
114:24 115:4
122:13

regardless
82:25
regularly 97:8
reiterate
51:17
relates 60:24
63:10 85:18
105:3
relative 70:25
71:5
release 24:2
24:14, 16
29:13, 22
released 77:16
77:21 98:23
remember 16:17
42:3 45:15
50:7 58:10
66:13 76:23
76:25 90:6
91:4 94:14
97:13 116:25
remembered
22:8 114:3
117:4
remembers
116:22
repeat 26:23
38:7 91:3
repeating
69:15
rephrase 38:10
report 26:16
67:12 74:4
75:18, 19
76:16, 21
79:4 87:16
87:25 88:8
95:22 100:25
reported 20:12
69:6
reporter 5:23
6:17 27:2
38:12 40:15
40:16 44:24
48:14 53:20
58:21 90:20
90:21 103:13
reporting
69:12 74:22
reports 67:6, 8
76:18 87:8
87:22 88:4
112:15
represent 4:15
82:13
representa...
56:25
representa...
51:5
represented
88:21 114:19
123:9
representing
111:5

reprimand 10:7
reprint 94:9
request 36:9
  54:17 78:6,8
requested 27:3
  38:13 40:17
  44:25 48:15
  53:21 54:19
  54:23 55:7,9
  55:17 56:10
  58:22 90:22
  103:14
  122:11
requesting
  101:6
requests 31:8
required 28:2
  28:9 31:11
  105:13
requirements
  105:3 113:6
reservations
  82:22 83:4
reserved 3:11
residents 16:8
resources 22:5
respective 3:5
  24:5 25:5
respectively
  75:9
respond 6:20
  7:10 15:8
  77:3
responding
  6:22 90:7
response 44:5
  79:10 80:9
  80:12 94:7
  110:16 122:7
responses 6:3
  6:4
responsibi...
  15:5 22:19
responsibi...
  5:18
rest 78:21
  94:4 115:7
  115:11
Restate 90:18
restroom 7:17
result 32:23
  32:24 44:6
results 32:25
  34:11 42:13
resume 11:16
  12:13
return 12:9
  14:4
returned 14:3
  17:25 18:5,6
  22:15
returning 18:2
revealed 30:16
review 22:20
  22:25 23:9

24:14 26:8
26:15 27:10
27:16 28:10
34:25 39:22
41:25 45:23
46:20 51:24
52:12 53:9
54:2 58:2
70:8 78:25
79:4 89:11
89:13,20
92:16 96:9
98:2,15
100:11 101:4
101:14 107:8
110:5
reviewed 25:23
  30:11 33:25
  48:16 56:11
  62:16 63:3
  63:15 76:6
  76:14 77:6
  77:25 78:4
  81:2,6,13
  88:16 89:15
  96:13 98:19
  112:16
  122:13
reviewing
  23:13 39:5
  40:19 41:25
  42:18,21
  49:24 55:21
  59:10 98:24
  100:13 107:3
  120:5
revocation
  10:8
right 5:23
  14:14 15:3
  21:13 30:22
  49:7 55:24
  55:24 56:2,6
  66:12 71:6
  74:21 109:13
  110:10 115:2
  116:17
Road 1:16 2:10
  17:18
role 120:19
room 71:20
roommate 114:3
  117:4
rooms 39:11,17
Rosenthal
  50:15,18,22
  50:22,24
  81:7,8,10,16
  81:20,23
  82:24 110:13
Rosenthal's
  81:13 110:19
rotating 21:17
rotation 19:11

Roth 1:4 2:4
  2:16 4:15,20
  41:10 42:8
  42:11,19,23
  42:24 45:13
  46:2,6 49:10
  50:8,25
  51:13,25
  52:9,25 53:3
  54:4,8,12,15
  54:17 55:16
  56:9 66:15
  66:17 67:24
  73:4,16,20
  73:21 77:8
  78:5,16 79:7
  79:8 80:25
  81:6,17 83:2
  83:16 85:9
  86:11 89:5,9
  89:18,23
  90:8,15
  91:20 92:23
  92:24 94:19
  95:13 96:4
  96:15,20
  97:7,16,19
  98:11 102:25
  103:16
  104:20
  105:14
  106:16,22
  107:8,10
  109:19 113:3
  119:17,22
  120:6
Roth's 41:8,14
  42:21 45:10
  45:19 47:12
  47:22 48:23
  48:24 49:20
  49:24 50:6
  50:12,19
  55:5 56:25
  58:2,12 59:6
  59:10 64:15
  71:20 72:8
  76:7 77:24
  78:2 80:24
  81:25 82:19
  83:20 86:14
  87:18 88:11
  91:22 92:6
  96:3,7 101:5
  101:8 103:3
  103:19,24
  105:23
  110:22 115:8
  119:16
  122:13
rule 39:14
rules 5:2
——————————
        S

S 2:2 3:2,2
sabotage 37:16
sanction 10:7
saw 72:17 76:3
  103:16,17
  112:12
saying 14:25
  55:16 91:2
  111:11
  116:21 118:9
says 39:18
  52:12 56:4,9
  57:11,19
  67:5,8 68:6
  70:7 73:12
  74:3,6,22
  79:19 84:5
  84:12 85:6
  111:5,22
  112:23 113:2
  113:8 114:2
  114:19 116:5
  117:3 118:10
scheduled
  33:23
school 86:11
scope 66:4
screwing 11:15
sealing 3:6
second 12:3
  13:2 18:6
  19:19 20:14
  96:6,9
  103:25
  110:25
  111:22
secretarial
  23:5
secretaries
  23:10 24:8
secretary
  23:16
see 5:22 6:13
  26:3 47:20
  49:4 51:10
  51:10 52:11
  56:17,21
  57:23 67:9
  72:16 73:8
  74:8 76:21
  78:16,18,23
  84:2,5,14,20
  85:3,6,10,15
  85:16,20,21
  86:2,17,23
  87:3,4 89:19
  92:14 93:17
  95:21 102:8
  102:17,18
  103:21,23
  104:11
  109:14 111:8
  111:17
  112:10,18
  113:16 114:5

119:5
seek 29:10
seeking 45:13
seen 75:25
  79:12 92:2
seizure 73:18
  73:23 74:2,6
  75:12 85:10
  86:20 118:10
  118:15,20
seizures
  118:23
sending 45:25
sense 31:16
  35:17 46:10
sent 50:2
  51:16
sentence 68:4
  68:5 70:18
  70:23 71:12
  73:4 108:10
  112:14 113:8
  114:11,14,19
  115:8,11
separate 18:17
  44:14 64:22
  108:4,6
  116:18
September 1:16
  123:18
serial 78:17
  78:18
series 4:18,24
  8:5
serious 82:18
  82:22
serve 20:20
served 59:25
  61:5,17,17
  61:18
service 20:13
  21:12 22:6,8
  22:12 24:18
  24:22,24
  25:19 29:16
  42:2 46:24
  46:25 53:2
  62:20 63:4
  77:15 111:25
session 16:24
  18:5
set 123:17
seven 21:18
severe 96:23
sexually 16:5
shaking 82:6
SHEET 124:2
short 40:5
show 39:18
showed 74:3
shut 91:11
side 23:16
signature
  49:13

signed 3:14,16
  49:11 86:22
  94:3
significance
  70:19
significant
  61:4,9,12,15
  61:17,19
signing 24:14
signs 100:19
simply 37:23
  56:19
single 25:22
  91:18
situation 90:4
six 66:11
  99:18
slightly
  103:17
small 101:7
solid 19:15
somebody 45:21
  45:24 109:17
sorry 22:11
  32:17 50:25
  53:6 58:17
  61:23 68:5
  71:18 75:2
  76:2 77:13
  90:18 99:5
  114:9 115:13
sort 23:23
  24:13 32:7
  33:2 47:4
  58:24 60:4
  69:4
sorts 23:8
sound 8:11
  91:6
source 80:5,13
speak 32:19
  106:5
speaking 6:19
  37:6,25
  54:13 55:11
  91:4
special 10:16
  24:16
specialist
  64:9 81:2,5
  110:6
specialist's
  81:3 110:2
  110:11
specialties
  10:16
specific 20:11
  23:21,22
  25:3,12,21
  47:11,13
  48:2 50:20
  53:12 55:6
  66:8 68:15
  79:6,8,17
  100:8 105:2

specifically
  28:3 65:7
  66:23 97:13
  106:16,22
  113:19
specifics 61:3
  64:14
speculating
  32:20
speech 37:2
spelled 6:7
spoke 85:8
spontaneous
  97:4
spontaneously
  98:14
stabilized
  58:8
staff 35:24
stage 64:6
stamp 49:7,9
stamped 94:3
standard 99:14
  104:19
  105:12
standards
  104:16
standpoint
  42:10
starts 52:8
  69:2
state 1:18 4:4
  4:8 74:20
stated 90:17
statement 8:10
  57:24 58:13
  111:7
states 1:2
  105:6
stating 57:5
  75:7
STD 15:24 16:2
  16:4,18
  18:11
steady 70:15
stem 69:24
stenograph...
  123:8
step 14:13
  24:12 33:18
  40:24
Steven 17:14
stint 13:2
  14:14,15
  17:6 19:19
STIPULATED 3:4
  3:9,13
streamline
  29:24
Street 4:13
subject 10:6
submission
  80:3 88:2
  89:3,4 102:9

submissions
  101:5 102:19
submitted 88:8
  95:2 112:11
Subscribed
  121:13
subsequent
  65:2 88:19
substance
  66:21,22
substantive
  92:8
substituted
  112:7
suffer 8:23
  9:2,6
suffered 28:23
  85:9 86:20
suffering
  28:24 87:13
sugar 56:4
  57:2,2 72:15
  79:22 84:24
  85:20,24
  86:2,4 87:14
  93:8,9,11
  113:16,19,22
  113:23 114:5
  114:17,20,25
  115:4,9,10
  115:15,17,19
  115:25 116:6
  116:14,21,23
  117:21,22,25
  118:20,21,24
  119:8
sugars 56:20
  66:9
suggest 54:14
  97:3
suggested
  98:22 100:14
  101:10,18
suggestions
  31:13
Suite 2:5,10
support 72:9
  98:25
supporting
  36:15 38:16
supposed 55:15
sure 24:7
  30:14 40:7
  43:6 57:7
  62:5 73:16
  75:14 77:20
  80:13 88:15
  92:4 96:13
  111:9 112:5
  120:2
Surely 74:14
surrounding
  17:19
suspect 87:21

suspension
  10:8
sworn 3:14,16
  4:3 121:13
  123:6
synopsis 87:18
system 13:13
  30:19

_____
          T
_____
T 3:2,2 4:2
  123:2,2
take 6:4,18
  7:17,19,19
  8:2 14:13
  40:5 54:3
  63:2 78:7
  80:5,7
taken 1:13
  40:9 80:22
  84:18 86:5
  123:7
takes 12:20
  35:6
talk 60:15
talking 13:25
  15:3 53:5,11
  53:14 66:23
  67:16
tandem 39:11
  39:17
Tapply 1:13
  2:10 4:10,14
  5:1 6:1 7:1
  8:1 9:1 10:1
  10:15 11:1
  12:1 13:1
  14:1 15:1
  16:1 17:1
  18:1 19:1
  20:1 21:1
  22:1 23:1
  24:1,11 25:1
  26:1 27:1
  28:1 29:1
  30:1 31:1
  32:1 33:1
  34:1 35:1
  36:1 37:1
  38:1,4 39:1
  40:1,11,12
  41:1 42:1
  43:1 44:1
  45:1 46:1
  47:1 48:1,6
  48:16,17
  49:1 50:1
  51:1 52:1
  53:1 54:1
  55:1 56:1
  57:1 58:1
  59:1 60:1
  61:1 62:1
  63:1 64:1

65:1 66:1
  67:1 68:1
  69:1 70:1
  71:1 72:1
  73:1 74:1
  75:1 76:1
  77:1,25 78:1
  78:14 79:1
  80:1 81:1
  82:1 83:1
  84:1 85:1
  86:1 87:1
  88:1 89:1
  90:1 91:1,24
  92:1 93:1
  94:1 95:1
  96:1 97:1
  98:1 99:1
  100:1 101:1
  101:11 102:1
  102:5 103:1
  103:9 104:1
  104:12 105:1
  106:1 107:1
  108:1,25
  109:1 110:1
  110:7 111:1
  111:24 112:1
  112:15,24
  113:1,2
  114:1 115:1
  116:1 117:1
  118:1 119:1
  119:9 120:1
  121:1,12
  122:6,13
technically
  16:23
tell 5:18
  65:17 82:14
telling 7:11
template 99:19
  99:22,24
templates
  51:19
tenure 86:15
term 61:9
terms 15:21
  18:7 27:25
  40:22 46:7
  50:21 58:4
  87:17
test 34:6
testified 4:5
testify 9:8
testimony
  23:25 32:10
  44:9 46:17
  83:12 123:7
  123:7
testing 34:4,5
  34:6,7
Thank 78:9
  121:6,8

the-- 28:15
thick 35:19
thing 7:20
  20:14
things 29:24
  47:25
think 12:2
  110:24
  116:14
third 35:22
  39:20 43:8
  73:4 91:4
  112:14,22
thought 56:11
  104:9
thousands 63:3
  63:4
three 13:18
  19:15 20:7
  41:23 42:22
  42:23,24
  56:21 57:4
  63:12,15
  86:13 87:20
  88:10 113:18
  114:20,22,24
  116:3
tight 106:8,9
  106:15
time 3:11 6:19
  6:25 7:16
  11:20,24
  13:6,9,17
  14:13 16:14
  16:20,21,22
  16:25 17:16
  17:24 18:2,4
  18:6 19:12
  19:25 20:8
  20:10 25:24
  35:8 40:9
  42:18 47:16
  47:17 49:16
  49:21 57:20
  58:16 59:4,7
  65:24 66:2
  68:10 69:16
  75:11 80:18
  80:22 87:16
  88:7 89:2
  91:4 98:21
  98:22 99:9
  99:15 100:4
  101:9 102:10
  102:20
  103:10
  107:11 121:9
  123:5
times 72:21
  84:7,10
timing 58:3
tiny 20:23
title 14:21
  15:14 22:16
  23:3 24:24

25:22 46:25
  82:22
titles 15:4
  23:8 41:2
  62:20,22
Tokarski
  104:10
topic 89:18
total 13:3
  41:23
trained 100:10
training
  104:15,19
  120:20
transcribed
  123:8
transcript 6:8
  81:14 123:5
  123:11
transfer
  118:11
transmitted
  16:5
transport
  75:16 86:21
  118:11
transporta...
  74:7,12,15
  74:23 75:10
transported
  56:12,14
  73:6 85:14
treat 60:18,20
  91:16 107:10
  109:10
treated 5:8
  60:3
treating 61:20
  71:24 96:14
treatment
  58:25 59:18
trial 1:12
  3:11
true 25:2
  123:11
truth 5:18,20
truthful 57:17
truthfully 9:8
try 6:5 37:16
  38:10 91:16
trying 16:13
  37:16 117:14
tuberculosis
  14:12 18:13
Tufts 9:23
twice 66:10
  67:9 87:9
two 6:18 20:4
  29:25 35:12
  39:18 42:25
  60:19 64:22
  64:24 67:16
  69:7 70:9,13
  79:20 84:22
  86:25 87:22

94:5 95:24
  108:5,6,8
  119:24
two-page 52:15
  53:22
two-pronged
  29:9
type 18:7,9
  35:18 63:18
  92:11 107:24
types 15:21,22
  22:22,24
_____
       U
U 3:2
uh-huh 6:7
ultimately
  44:7
um-hum 6:7
  12:11 15:19
  20:6,9 34:21
  35:2 71:15
  71:17 74:9
  84:25 108:3
  109:12
  113:24 114:7
unclear 64:2
uncomfortable
  8:8
underlying
  43:20 44:2
  88:3
understand
  5:14,20 6:9
  6:15,23 7:2
  7:3,6,7,8,12
  7:14 8:3,14
  9:4 15:17
  25:10 26:17
  26:21 30:12
  38:3,9 44:5
  48:4 60:21
  63:16 83:24
  99:6 101:11
  106:18
  117:15
understanding
  32:10 46:17
  46:23 55:14
  59:24 60:5
  63:25 69:15
  95:3,9 104:6
  106:19 108:5
understood
  7:13 57:16
  62:2
unexpected
  96:24
unit 29:20
  31:3 35:23
  36:5 52:4
UNITED 1:2
university
  9:16,23 21:2

81:8 86:15
  114:4 117:5
unqualified
  64:16
unrelated 23:7
upper 54:13
urine 34:6
use 7:17 30:12
  43:5 100:10
  105:22 107:4
usually 54:23
  55:3
_____
       V
vague 61:10
value 106:13
various 19:10
  20:13 61:6
verb 100:16
verbal 6:4
verbally 40:3
  82:5
verify 58:13
violate 5:20
visit 19:9
voice 6:3
  55:11
vote 32:2
voted 102:20
voting 32:3
_____
       W
waived 3:7
waiver 24:19
  86:22
want 6:14,16
  11:17,18
  23:20 39:18
  42:7,14
  55:13 64:19
  65:17,18,20
  73:24 74:15
  100:2 101:12
  106:5 111:6
wanted 17:22
  104:7
wasn't 50:13
  63:24 72:18
  88:5 91:8
  95:6
water 7:18
way 6:8 7:5,13
  8:9 25:7
  36:17 48:21
  72:19 79:16
  83:9,12
  108:16
  118:14,21
  119:2 120:12
weaves 13:11
week 17:5
  19:15
weeks 90:3
weights 97:16

went 11:6,7
  66:9 89:10
WHEREOF 123:17
whichever
  62:25
white 51:20
wildest 91:6
willing 24:17
withdrawn
  38:21 61:18
witness 1:12
  2:10 12:17
  18:22 22:11
  26:19,22,25
  37:24 38:5,8
  38:11 43:6
  48:9,11
  58:17 62:3
  70:5 80:12
  90:23 91:3
  91:10,13,21
  103:10 114:9
  123:4,6,12
  123:17
women 19:5
word 30:13
  31:25 69:19
  86:5 112:8
worded 63:24
wording 105:21
words 82:12
  91:6 107:15
  107:16 116:5
work 15:20,22
  17:23 18:7,9
  21:25 22:6
  23:13 34:8
  91:17 107:4
worked 17:17
  19:11,13
  20:18
working 17:3
  17:11,12
  18:8 19:4
  61:6 71:6
works 51:6
  97:8
wouldn't 8:13
  55:3 60:10
  74:11 94:22
  95:14 115:16
writing 21:5
  40:3 54:5
  78:6 95:2
written 32:6
  39:7 54:10
  55:12 56:9
  75:2
wrong 31:25
  100:16
wrote 117:23
_____
       X
x 1:4,10

xxxxx 2:16

_____ Y _____

Y 4:2
year 9:17,24
  11:11,11
  12:8,10 14:4
  45:16 117:2
  117:6,13
years 11:10
  13:4,14,16
  13:16 15:18
  20:5 56:21
  57:4 66:11
  67:17 68:11
  68:20 69:11
  70:9,13
  84:22 87:20
  88:10 119:24
York 1:3,16,18
  2:5,5,11 4:4
  4:13 89:25
  119:18 120:8
  120:21

_____ Z _____

_____ 0 _____

000104 49:10
01 21:12
099 102:21

_____ 1 _____

1 40:11,12
  48:6,17
  52:14 61:10
  87:25 89:5
  91:24 102:5
  104:12
  107:24 122:7
10 61:10 62:11
  89:8,17
10-2010 116:4
  116:8
10-24-2010
  115:6
10:15 1:17
100 88:14
  98:11
10006 2:5
103 2:10
104 49:8 51:13
  102:25 103:6
107 52:9 53:4
  53:13 66:15
  66:17 79:19
  85:25
108 52:25 53:5
  53:6,11,14
  53:25 76:10
  76:11,12,24
  78:16 83:16
  84:3 113:20
1088 52:11

109 53:3,5,7
  53:11,15,25
  76:10,12,13
  83:23 113:21
  116:9
11 73:23
  113:25
11-21-2006
  78:22
110 54:8 72:23
111 73:16,20
  73:21
113 91:20,22
11501 2:11
11550 4:13
119 93:10,16
  93:17,19,20
  93:22
12-11-09
  117:13,19
12-11-2009
  116:13
120 93:10,16
  93:19
121 48:8
13 113:23
15 12:4 16:12
15-CV-6358 1:6
15-minute 89:9
  89:17
167601 10:5
18 11:10 13:4
  13:14,16
1980 9:25
1984 9:18
1991 14:17
  15:17
1992 11:14
  15:17
1992-ish 14:17
1993 12:12
1994 12:12
  20:2,8,22
1999 20:24
1st 88:9

_____ 2 _____

2 52:14,15,15
2:00 121:9
20 17:4
2001 21:7,21
  21:22,23
  67:25 68:7
  68:22,25
2004 21:23
  22:3,15
  60:13,17,23
2006 56:15
  72:20 73:7
  73:13,14
  84:14
2008 113:22
  118:7
2009 86:16

113:25
  116:21 118:7
2010 67:9,22
  69:2,7,11,12
  87:2,3,4,9
  114:4 116:9
  116:16,20,22
  118:6
2011 73:18,24
  74:4 75:19
  85:10 118:9
  119:6
2012 85:19
  87:12 88:20
  88:22 113:23
  118:7
2014 45:17
  59:9 92:2
  93:23 96:16
  107:23
2015 45:17
  49:5,11
  51:14 59:9
  67:13 69:12
  87:25 88:9
  89:5 95:20
  96:15 107:22
2016 1:17
  121:14
  123:18
206CR0005973
  78:22
22 93:23
24 87:3 116:20
25 73:18 74:4
  75:19 107:22
  118:9 119:6
26 1:17
26th 123:18
27 87:4 95:20
  96:15 116:9
28 49:4,11
  51:14

_____ 3 _____

330 1:15 2:10

_____ 4 _____

4 92:2 108:9
  113:21
40 4:12 20:15
  122:7
45 2:5

_____ 5 _____

5 96:16
50 62:8

_____ 6 _____

6.5 106:12,20
620 2:5

_____ 7 _____

7 106:12

7.5 106:13,20
77 122:13

_____ 8 _____

8 70:10,24
  71:2,4 106:4

_____ 9 _____

90 61:10
90s 12:23,24
  12:25
91 11:13 12:3
92 11:13
94 19:25 48:7
94-121 122:8
96 111:9
98 112:22
  114:12
99 21:6 102:22

# EXHIBIT "AA"

Case 1:15-cv-06358-LDW-AYS Document 52-1 06/30/2018 2931408 Page 155 of 214

Page 1

2   UNITED STATES DISTRICT COURT

    EASTERN DISTRICT OF NEW YORK

3   --------------------------------------------- x

    CRAIG ROTH,

4

                        Plaintiff,    Case No.

5                                     1:15-CV-06358

        -against-

6

    COUNTY OF NASSAU,

7

8                       Defendant.

    --------------------------------------------- x

9

10          DEPOSITION of the Plaintiff, CRAIG ROTH,

11   taken by the Defendant, pursuant to Order, held at

12   the offices of LYNN, CARTNER, DUNNE & COVELLO, LLP,

13   330 Old Country Road, Suite 103, Mineola, New York

14   on May 10, 2017, at 10:00 a.m., before Renee

15   DeCarlos, a Notary Public of the State of New York.

16

17

18

19

20

21

22

23

24

25

```
 1
 2   A P P E A R A N C E S :
 3   PHILLIPS & ASSOCIATES, PLLC
            Attorneys for Plaintiff
 4          45 Broadway - Suite 620
            New York, New York 10006
 5
       BY:    GREGORY CALLISTE, JR., ESQ.
 6
 7
 8   LYNN, CARTNER, DUNNE & COVELLO, LLP
            Attorneys for Defendant
 9          330 Old Country Road - Suite 103
            Mineola, New York 11530
10
       BY:    JOSEPH COVELLO, ESQ. -and-
11             MOSHE O. BOROOSAN, ESQ.
12
13
14
15
                    xxxxx
16
17
18
19
20
21
22
23
24
25
```

Page 2

```
 1                    C. Roth
 2   C R A I G   R O T H,
 3       having been first duly sworn before a Notary
 4       Public of the State of New York, was examined
 5       and testified as follows:
 6   EXAMINATION BY
 7   MR. COVELLO:
 8       Q    Please state your name for the
 9   record.
10       A    Craig Roth.
11       Q    Please state your address for the
12   record.
13       A    710 Shore Road, Apartment 6D, Long
14   Beach, New York 11561.
15       Q    Good morning, sir, how are you?
16       A    Good morning.  How are you?
17       Q    Just a few simple rules again.  I'm
18   going to ask you a series of questions.  If
19   at any time you don't understand the question
20   or if you'd like it repeated or rephrased,
21   let me know and I will be happy to do that;
22   is that understood?
23       A    Yes.
24       Q    Have you had any drugs or alcohol
25   or any medication that might affect your
```

Page 4

```
 1   S T I P U L A T I O N S
 2
 3
 4       IT IS HEREBY STIPULATED AND AGREED by and
 5   between the attorneys for the respective parties
 6   herein, that filing, sealing and certification,
 7   and the same are, hereby waived.
 8
 9       IT IS FURTHER STIPULATED AND AGREED that all
10   objections except as to the form of the question,
11   shall be reserved to the time of the trial.
12
13       IT IS FURTHER STIPULATED AND AGREED that the
14   within deposition may be signed and sworn to by an
15   officer authorized to administer an oath, with the
16   same force and effect as if signed and sworn to
17   before the Court.
18
19
20                    xxxxx
21
22
23
24
25
```

Page 3

```
 1                    C. Roth
 2   ability to testify here today?
 3       A    No.
 4       Q    In the last 24 hours, I should say,
 5   I'm sorry.  No?
 6       A    No.
 7       Q    Sir, since we last met you had a
 8   disclosure, at least your attorney did, which
 9   indicated that you had emotional damages of
10   $500,000; is that correct?
11       A    I don't know the numbers offhand.
12   I would have to look at the documents.
13            MR. COVELLO:  You want to mark
14       the exhibit?
15            (Document marked Defendant's
16       Exhibit A for identification, as of
17       today's date.)
18       Q    Okay, could you turn to Exhibit A,
19   Page 2?  I see this is the disclosure dated
20   February 17, 2016 signed by Brittany A.
21   Stevens and Marjorie Mesidor.  See where it
22   says, "Emotional damages $500,000"?
23       A    Yes.
24            MR. COVELLO:  Off the record.
25            (Whereupon, a discussion was
```

Page 5

2 (Pages 2 to 5)

C. Roth

1
2    held off the record.)
3        Q    Do you remember testifying on March
4    27, 2017 in this room in an Examination
5    Before Trial?
6        A    Yes.
7        Q    Do you remember my asking you on
8    that occasion if you had seen any
9    psychologist or psychiatrist for any of the
10   damages that you have claimed?
11       A    Yes.
12       Q    And you indicated no; is that
13   correct?
14       A    Yes.
15       Q    What is the basis for your
16   emotional damage claim of $500,000 as set
17   forth in the February 17, 2016 disclosure?
18           MR. CALLISTE: Objection. Just
19   for the record, that's a legal document.
20   You can answer, if you know.
21       A    Well, the fact that I was
22   discriminated against is emotional for any
23   rational person and that means that I would
24   have emotional damages whether or not I saw a
25   psychologist.

Page 6

C. Roth

1
2        Q    Okay, but emotional damage exhibits
3    itself in various symptoms. What are your
4    symptoms?
5        A    I can't give you a straight answer
6    offhand. I will say that I'm genuinely upset
7    at the fact that I have been discriminated
8    against by the County.
9        Q    I understand that. I understand
10   that's your position and that's what you're
11   attempting to prove, but how has it affected
12   you physically and mentally?
13       A    I can't give you a further answer
14   than that.
15       Q    Has it affected you? Do you have
16   sleepless nights? Do you miss work?
17       A    I haven't missed work.
18       Q    You haven't missed a day of work
19   since you started with the NYPD?
20       A    No.
21       Q    Do you suffer from depression?
22       A    No.
23       Q    Do you have anxiety because of the
24   fact that you have been discriminated against
25   in your opinion?

Page 7

C. Roth

1
2        A    No.
3        Q    Do you have sleepless nights
4    because of it?
5        A    No.
6        Q    Do you wet your bed?
7        A    No.
8        Q    Is there anything you could
9    objectively point to as evidence or proof of
10   the fact that you have suffered emotional
11   distress?
12       A    I can say that I'm physically upset
13   at the fact that I have been discriminated
14   against by the County.
15       Q    Okay, well, again, in what way are
16   you physically? You can't run?
17       A    I can run.
18       Q    Can you walk? Can you sit?
19       A    Yes.
20       Q    Do you have any physical
21   limitations other than the fact that you're a
22   type one diabetic, assuming that is a
23   physical limitation?
24       A    Being that it's not a physical
25   limitation, I do not have any physical

Page 8

C. Roth

1
2    limitations.
3        Q    Have you gained any weight?
4        A    No.
5        Q    Have you lost any weight?
6        A    No.
7        Q    Physically you consider yourself a
8    pretty perfectly fit individual?
9        A    Absolutely.
10       Q    Emotionally, again, what problems
11   are there?
12       A    As of what I stated, that's it.
13       Q    Well, that's a conclusion. I'm
14   trying to find the basis for that conclusion.
15       A    I can't give you any further
16   information than I have already given.
17       Q    Are there any doctors that you have
18   indicated that you have been emotionally
19   scared because of this situation?
20       A    No.
21       Q    Were there symptoms or if you
22   needed medication would you have mentioned
23   that to a doctor?
24       A    If I needed it, yes.
25       Q    Are you on any medication because

Page 9

3 (Pages 6 to 9)

C. Roth

1 of an emotional disorder of any sort?
2
3    A    No.
4    Q    What medication do you take other
5 than insulin, if anything?
6    A    That's it.
7    Q    And that's been for the last four
8 years at least?
9    A    Yes.
10    Q    It might be more, but I'm limiting
11 the question to the last four years?
12    A    Yes.
13        MR. COVELLO:  Off the record.
14        (Whereupon, a discussion was
15    held off the record.)
16    Q    Have you told anyone other than
17 your lawyer, I guess, with regard to this
18 lawsuit that you have suffered any emotional
19 distress?
20    A    Yes, I mean as far as what I have
21 said, that I have been genuinely upset at the
22 fact that I was discriminated against by the
23 County.  I have shared that with my parents
24 who are very aware of the case I'm going
25 through.

Page 10

C. Roth

1
2 that you're suffering from emotional
3 distress?
4    A    When you say, "emotional distress,"
5 what exactly are you indicating?
6    Q    Whatever you're claiming is the
7 basis for your emotional damage.
8    A    Yes, but once again, I can't recall
9 who I have told it to.
10    Q    And in what capacity might you have
11 told them?
12        MR. CALLISTE:  Objection.
13    A    Could you explain what you mean by
14 "capacity"?
15    Q    Well, was it a fellow police
16 officer in a car; was it your captain; was it
17 an inspector; was it the commissioner?
18    A    It would be a fellow police
19 officer.  I have never talked to the
20 commissioner before.
21    Q    Now you indicated in this
22 disclosure or at least your attorney did on
23 your behalf that your lost wages were
24 unknown.  Is it fair to assume that at that
25 time you did not know what your lost wages

Page 12

C. Roth

1
2    Q    Do you live with them?
3    A    No.
4    Q    When did you last live with them?
5    A    Approximately two-and-a-half years
6 ago.
7    Q    And approximately two-and-a-half
8 years ago how long had you lived with them,
9 your life up until that point?
10    A    Yeah, aside from college.
11    Q    When you went away to college?
12    A    Exactly.  I lived with them my
13 entire life.
14    Q    Have you told anyone else?
15    A    About being upset?
16    Q    Yes, emotional distress.
17    A    Yes, but I can't recall offhand who
18 I have told.
19    Q    Have you sought any counseling of
20 any sort with regard to your emotional
21 distress?
22    A    No.
23    Q    Have you told the police sergeant?
24    A    No.
25    Q    Have you told anyone in the NYPD

Page 11

C. Roth

1
2 were?
3    A    At that time they may just not have
4 been calculated.
5    Q    Okay, turning to Exhibit B entitled
6 Plaintiff's Initial Disclosures dated April
7 21, 2017.
8        MR. COVELLO:  Let's have this
9    marked as Exhibit B.
10        (Plaintiff's Initial
11    Disclosures marked Defendant's Exhibit B
12    for identification, as of today's date.)
13    Q    And turning to Page 3 of that
14 Exhibit B, the damages listed are essentially
15 the same as they were in Exhibit A, correct?
16    A    Yes.
17    Q    Is it fair to assume at that point
18 damages, well, lost wages were not yet
19 calculated?
20    A    At that time, yes.
21    Q    Okay, turning to Exhibit C,
22 Plaintiff's Supplemental F.R.C.P. Rule 26
23 Disclosure dated April 27, 2017.
24        MR. COVELLO:  We'll mark that
25    Exhibit C.

Page 13

C. Roth

1    C. Roth
2    (Plaintiff's Supplemental
3    F.R.C.P. Rule 26 Disclosure marked
4    Defendant's Exhibit C for
5    identification, as of today's date.)
6       Q    And if you turn to Page 3 of that
7    exhibit which is four days after the February
8    17th disclosure, we now for the first time
9    see an amount for lost wages for 25 years,
10   correct?
11      A    Yes.
12      Q    How much is that amount being
13   claimed?
14      A    Here it says, "$474,970."
15      Q    Approximately?
16      A    Approximately.  Everything is
17   approximate.
18      Q    Who calculated that number, if you
19   know?
20      A    I believe my attorney with the help
21   of me.
22      Q    Could you bring me through the
23   process of how you calculated that?
24      A    In order to give you these numbers
25   I would need both the pensions of the NYPD,

Page 14

1    C. Roth
2    sorry, not the pensions, the union contracts
3    of both the NYPD and NCPD in front of me.
4       Q    Okay, let's see if we can
5    accommodate you.
6       A    Okay.
7       Q    We have in this book which your
8    attorney supplied us, go through the exhibits
9    and see if the necessary documents are here
10   for you to explain the calculations as to how
11   you came up with the $474,970.
12      A    Okay, this is one of the charts I
13   used to determine the salary of NCPD.
14      Q    What exhibit is that?
15      A    It would be in exhibit, it would be
16   Exhibit G.  There is no page number marked.
17      Q    Okay, you say, "one of," are there
18   others as well in the book in front of you?
19      A    There is another chart that would
20   say, "Class of 2015" which was the class I
21   was supposed to be in.  The numbers were
22   similar to that page.  I don't see that chart
23   in front of me, but in terms of numbers these
24   are somewhat the same as what I had, but the
25   chart that I looked at was part of the union

Page 15

1    C. Roth
2    contract itself.
3       Q    What exhibit is the union contract?
4       A    The NCPD contract you have, Exhibit
5    G, Exhibit F, Exhibit E.
6          MR. CALLISTE:  For the record,
7       it's contained in Exhibit H.
8          MR. COVELLO:  H is the PBA
9       contract, proposed.  Is that New York
10      City or Nassau?
11         MR. CALLISTE:  That's New York
12      City, it looks like.
13      Q    So let's go to Exhibit G that you
14   indicated there is a chart in there, correct?
15      A    Yes.
16         MR. CALLISTE:  Exhibit H.
17      You're talking about the 2015?
18      Q    I'm talking about the first one
19   that you referenced.  You rather this one?
20      A    Yeah, I based most of my
21   calculations off this chart that's in front
22   of me.
23      Q    And this is in Exhibit H, correct?
24      A    Yes, Exhibit H.
25         MR. CALLISTE:  And just for the

Page 16

1    C. Roth
2    record, those are Nassau County numbers
3    that are incorrectly attached to an NYPD
4    contract.
5       Q    This page dated February 6, 2015
6    class, what exhibit should this be attached
7    to?  It seems to have gotten separated from
8    the exhibits.
9       A    It should be, most likely, attached
10   to, I can't tell you for sure, but Exhibit F.
11      Q    What is the title on Exhibit F, PBA
12   contract extension 2013 to '15; that's Nassau
13   County, correct?
14      A    Yes.
15      Q    Let me call your attention to
16   Exhibit F.  Every page seems to be initialed
17   with the exception of the one that you're
18   suggesting belongs in there.  Are you
19   possibly mistaken that it belongs in there,
20   because it's not initialed, correct?
21      A    I can't tell you for sure what
22   exhibit it's part of, but it's part of the
23   NCPD contract, so it could be any exhibit in
24   which the NCPD contracts are contained.
25      Q    All right, let's treat it

Page 17

C. Roth

1  
2 separately because we don't know where to put
3 it.
4           MR. COVELLO:  We'll mark this
5 as Exhibit K.
6           (Document marked Defendant's
7      Exhibit K for identification, as of
8      today's date.)
9           MR. COVELLO:  We'll also marked
10 this as Exhibit G.
11           (Document marked Defendant's
12      Exhibit G for identification, as of
13      today's date.)
14      Q    Exhibit G, what do you recognize
15 Exhibit G to be?
16      A    Which part of Exhibit G are you
17 pertaining to?
18      Q    Well, what is the document itself?
19      A    Wage Free Settlement and Contract
20 Extension.
21      Q    For what county?
22      A    Nassau County.
23      Q    Now you used part of that document,
24 did you not, in calculating the differential
25 between NYPD and Nassau County PD?

Page 18

C. Roth

1  
2 the difference.
3      Q    Where do you have the salaries up
4 to the 22nd year?  I don't see that on this
5 chart.  I just see it stopping at step nine
6 which is February 6, 2023.
7      A    Yes, that's the top pay.  So after
8 the ninth year the top pay would be, because
9 I have a Bachelor's Degree, I would be
10 receiving the education stipend, it would be
11 $122,581.
12      Q    And you calculated that out to
13 when?  What year did you anticipate your
14 retirement?
15      A    22 years, so I don't know the year
16 offhand that would be.
17      Q    But you calculated, so you if my
18 math is correct, you plan on working 29
19 years?
20      A    Twenty-two.
21      Q    Okay, 22.  You started at step
22 seven?
23      A    I started at step seven, so I
24 didn't calculate 22 years.  I calculated up
25 to working 22 years.

Page 20

C. Roth

1  
2      A    I did.
3      Q    Okay?
4      A    I used these numbers in part, but
5 most of my calculations come from the chart
6 in Exhibit K.
7      Q    Turning to Exhibit K, what does
8 this document represent to you?
9      A    It's the pay scale for the class
10 that entered in February 6, 2015 which was
11 the class I was supposed to be in Nassau
12 County.
13      Q    And when you calculated the damages
14 which turned out to be $493,970,
15 approximately, how did you conclude that
16 number?  Take me through the process.
17      A    I started at step seven because
18 that's when NCPD started to make more than
19 NYPD and then I went up to 22 years.
20      Q    Okay?
21      A    Well, it's pretty simple.  You add
22 from step seven, your seventh year, the
23 salaries to your 22nd year.  You do the same
24 with NYPD, the seventh year to the salaries
25 up until the 22nd year and then you subtract

Page 19

C. Roth

1  
2      Q    Okay, now in the beginning is New
3 York City higher than Nassau County in pay,
4 step one?
5      A    Yes, up until step three NYPD pays
6 higher than NCPD.
7      Q    Did you credit that amount?
8      A    Yes.
9      Q    Do you have any of the documents
10 that you used in doing this math?
11      A    No, I used a calculator.
12      Q    You didn't write down anything?
13      A    No, I used a calculator and then I
14 exchanged information with my attorney.
15      Q    Where is the New York City pay
16 scale that you compared it to?
17      A    It could be found in Exhibit I.
18      Q    What in Exhibit I did you utilize
19 to calculate what your salary for New York
20 City would be?
21      A    Where it mentions the new schedule
22 for salaries, 1.5 years to 5.5 years.
23      Q    What number page if we counted?
24 This is called PBA Update, right?  This is
25 from Patrick Lynch?

Page 21

6 (Pages 18 to 21)

A0620

Page 22

```
 1              C. Roth
 2     A   Yes.
 3     Q   A different job, a different and
 4  better contract.
 5     A   Page 4.
 6     Q   Okay, now what is the top salary in
 7  New York City?
 8     A   As it states here, the new schedule
 9  is $85,292 and plus the neighborhood policing
10  differential it's $87,211 after
11  five-and-a-half years.
12     Q   And that remains the top?
13     A   Yes.
14     Q   Does that include overtime?
15     A   No.
16     Q   On Page 2 of the document it talks
17  about PBA proposed contract terms, 2012 to
18  2017.  Is this the contract?
19     A   This is the contract information
20  that was sent to me by the PBA.
21     Q   But it was in an attempt to have it
22  ratified, correct?  That was the union
23  president, Patrick Lynch, sending it?
24     A   This is the proposal.  Prior to
25  this the salary was actually significantly
```

Page 24

```
 1              C. Roth
 2     Q   For Nassau County?
 3     A   Yes, employees hired prior to 2014.
 4     Q   And James Carver, if I remember, is
 5  the PBA president?
 6     A   Yes.
 7     Q   This, too, is a letter from the PBA
 8  president encouraging its members to vote in
 9  favor of this contract, correct?
10     A   Yes, it's a proposed settlement.
11     Q   Okay, and take me through the
12  process of you calculating Nassau's salary --
13     A   Calculating the salary over how
14  many years?
15     Q   -- which is used in calculating
16  your damages.  So whatever number of years
17  you did.  I think you said 22 years, correct?
18     A   Yes, but I don't understand your
19  question.  Calculating years as employed?
20  Calculates years from receiving my pension?
21     Q   Well, the amount of damages you
22  claim in the 493-range.
23     A   Yes.
24     Q   Is the difference between pay of
25  NYPD and Nassau County PD correct?
```

Page 23

```
 1              C. Roth
 2  lower than what is proposed here, however,
 3  this is what the City has settled on.
 4     Q   But this isn't the contract, is it?
 5     A   This is what was sent to me by the
 6  PBA which gives an outline of the contract
 7  itself.
 8     Q   The proposed contract?
 9     A   This is what the contract is now.
10  If you want to talk about what was before
11  this, the salaries are actually significantly
12  lower.
13     Q   No, I'm not asking you what was
14  before this.  I'm asking for the contract.
15  This is a proposal to the members to
16  encourage them to vote for this contract or
17  to agree to this contract, correct?
18     A   Yes.
19     Q   Going back to Exhibit G, what in G
20  was useful in you calculating the $493,970?
21     A   Just the mere fact that the numbers
22  in G were similar to the numbers that were in
23  K.
24     Q   What is G, the exhibit itself?
25     A   It's proposed PBA salary charts.
```

Page 25

```
 1              C. Roth
 2     A   Yes.
 3     Q   Okay, I'm asking you, you said that
 4  you used the chart in G?
 5     A   Yes.
 6     Q   What in G did you use and how did
 7  you use it in calculating the differential?
 8     A   The most I can remember using the
 9  chart from G is the fact that where it says,
10  "Education" under 9E, it says $122,581 which
11  is the same as what is mentioned here for
12  step nine in the chart in K.
13     Q   So what was the total amount that
14  you would receive if you were a Nassau
15  police officer during the period that you
16  estimate you will work?  Let me withdraw it.
17     A   From what year to what year?
18     Q   Okay, how many years have you
19  estimated that you will work as a police
20  officer in calculating your damages?
21     A   Twenty-two.
22     Q   Why did you pick that number?
23     A   That is the age, well, that is the
24  time I would need to retire in New York City
25  is 22 years.
```

C. Roth

1
2     Q    When did you vest, ten?
3     A    You can vest after ten.
4     Q    And 22 years gets you what, what
5  percent?
6     A    Fifty of your salary.
7     Q    And if you were injured in the line
8  of duty, you would retire perhaps sooner than
9  22 years, correct?
10    A    Yes.
11    Q    And then would you retire at
12 three-quarters?
13    A    Yes, but I want to add that in
14 Nassau County if you retire at 22 years, it's
15 a little over 53, it's actually closer to 54
16 percent.
17         MR. COVELLO:  Move to strike
18    that as unresponsive.
19    Q    What was the total amount that you
20 calculated you would make as a police officer
21 for NYPD the period that you would work the
22 22 years?
23    A    I would need a calculator in front
24 of me in order to make the calculations.
25    Q    And if I asked you the same

Page 26

C. Roth

1
2  first 1.5 years?
3     A    Yes, so I'm going to add from 1.5
4  to 5.5, the first five years.
5     Q    In the new schedule?
6     A    Yes.
7     Q    Or the new schedule neighborhood
8  polices differential?
9     A    New schedule.
10    Q    Okay?
11    A    $316,792.
12    Q    Okay, so do you also calculate the
13 new schedule neighborhood polices
14 differential?
15    A    I did calculate that as well.
16    Q    Okay, just take me through what you
17 did.
18    A    Sure.
19    Q    Okay, what are you doing now?
20    A    Calculating the new schedule first
21 five years.
22    Q    Okay?
23    A    That will give you $323,918.
24    Q    Okay, now what?
25    A    Now in order to calculate the next

Page 28

C. Roth

1
2  question, you'd give me the same answer about
3  Nassau County as well?
4     A    Yes.
5     Q    Okay, we are getting you a
6  calculator.
7     A    Okay.
8         MR. CALLISTE:  For the record,
9    a calculator is being placed before the
10   witness.
11    Q    Take me through the easy one which
12 will be NYPD.
13    A    Okay, you could take the first five
14 years and add them.
15    Q    Hold on a second.  Go ahead, I'm
16 sorry.
17    A    Take the first five years, add them
18 together.
19    Q    No, if you can, why don't you do
20 it.  The first five years, on what chart are
21 you looking at, G or I?
22    A    Right now we are referring to the
23 salary of NYPD, so we are looking at Exhibit
24 I.
25    Q    Are you on the chart that starts

Page 27

C. Roth

1
2  17 years in the NYPD you would do 17 times
3  either $85,292 or $87,211.
4     Q    Okay, go ahead, take me through it.
5     A    For the new schedule it would be
6  $1,448,944.
7     Q    By the way, that bullet new
8  schedule, is that the left column?
9     A    The left column.
10    Q    And I assume you did the right
11 column, neighborhood polices differential?
12    A    Yes.
13    Q    Okay, what does that come out to?
14    A    $1,482,587.
15    Q    Okay, what next?
16    A    Well, now that you have the total
17 number, well, once again, I started at
18 seventh year for Nassau County and then I
19 started at seventh year for NYPD and I went
20 from there to 22 years.
21    Q    What about the differential in the
22 first seven years?
23    A    I subtracted whatever was given
24 more in the first couple of years in the NYPD
25 from the total number I got after subtracting

Page 29

8 (Pages 26 to 29)

C. Roth

1               C. Roth
2  both numbers.
3     Q  So the exercise you just brought us
4  through, you didn't do?
5     A  I never said I didn't do it.
6     Q  Okay, well, continue in calculating
7  the $493,000, whatever you did after this.
8     A  Where do you want me to start from?
9     Q  Wherever you did start.
10     A  I can't recall offhand where I
11  started.  Once again, these numbers are
12  approximate based on the formula I gave you.
13     Q  Okay, but I'm asking you to bring
14  me through your calculations that should add
15  up to $493,970, approximately.
16     A  Once again, they're approximate
17  numbers.  I did this by the calculations that
18  I gave you.
19     Q  Well, listen, give or take $20,000,
20  then fine, but let's go through the process.
21     A  Okay, so we are going to start at
22  the seventh year for NYPD.  We'll use the new
23  schedule neighborhood polices differential.
24     Q  Okay?
25     A  That's $87,211.  You're going to

Page 30

C. Roth

1               C. Roth
2  multiply that by fifteen years.
3     Q  Okay?
4     A  That's $1,308,166.
5     Q  Okay?
6     A  Okay, now we are going to go to the
7  seventh year of Nassau County.
8     Q  Okay?
9     A  In the seventh year of Nassau
10  County you make approximately $400 more than
11  you would at top pay in the NYPD on the
12  eighth step.  You make approximately $10,000
13  more than after the fifth year in the NYPD
14  and the ninth step you make approximately
15  $35,000 to $40,000 more than the fifth year
16  in the NYPD.
17     Q  Okay, so that equals,
18  approximately?
19     A  All together?
20     Q  Yes.
21        MR. CALLISTE:  Do the math.
22     A  Approximately $50,400.
23     Q  Okay, then what did you do?
24     A  Well, you have to consider that the
25  first until the third year of Nassau that,

Page 31

C. Roth

1               C. Roth
2  well, comparatively here after 2.5 years in
3  the City, you will actually be making more in
4  Nassau County by approximately $10,000.  So
5  you can add the $10,000 to the number I just
6  gave you.
7     Q  Okay?
8     A  Okay, now the first two years in
9  the City, to make this easier I will start,
10  the first year in the City you make, give or
11  take, $10,000 more than you would in Nassau
12  County and in step two in Nassau County you
13  make approximately $5,000 less than the City.
14  So that's $15,000 you could subtract from the
15  number I gave you previously which should be
16  around $60,000 or so right now.
17     Q  After you substract another fifteen
18  it was 60,000-ish?
19     A  Yes, but I'm saying you have to
20  substract approximately fifteen because of
21  the difference that you'd be making in the
22  beginning in New York City.
23     Q  Which would bring it to 45?
24     A  Approximately.
25     Q  Okay, continue?

Page 32

C. Roth

1               C. Roth
2     A  Okay, so that's $45,000 difference
3  in the, up until year nine, give or take.  It
4  could be more.
5     Q  Okay?
6     A  Okay, so now I'm going to take, now
7  that we are at the ninth year and we are
8  going to 22 years, I'm going to take 13 and
9  multiply that by 122,581.
10     Q  13 times -- what does 122,581
11  signify?
12     A  Top step for Nassau County.  That's
13  $1,593,553.
14     Q  Okay?
15     A  You ready for the next step?
16     Q  Yes.
17     A  Okay, now go to the ninth year of
18  NYPD.  You will be making with the
19  neighborhood policing differential $87,211.
20  Now multiply that by 13.  You have
21  $1,133,743.
22     Q  Okay?
23     A  Now you subtract the number I just
24  gave you from Nassau County by the number I
25  gave you from NYPD and then you will add the

Page 33

A0623

C. Roth

1
2    $45,000 that were left over and that's how
3    you got the approximate amount of the salary
4    difference which should be around the number
5    that was given.
6        Q.   Okay, what do you have,
7    education-wise, degrees in?
8        A.   I have a Bachelor's Degree.
9        Q.   In?
10       A.   Criminal Justice.
11       Q.   From?
12       A.   Long Island University.
13       Q.   And what else?
14       A.   I have a certification in dog
15   training by the New York State Board of Ed.
16       Q.   Anything else?
17       A.   I also have my NYPD Police Academy
18   which is accredited by colleges.  It's about
19   26 credits.
20       Q.   Towards a Masters or?
21       A.   I believe I can use it towards a
22   Masters.  I don't know how many credits are
23   able to be applied there.
24       Q.   The insulin that you use, what type
25   of insulin are you taking?

Page 34

C. Roth

1
2    what activity I do I could adjust the amount
3    of insulin I'm giving myself.
4        Q.   Now the type of insulin you're
5    taking, how long have you been on that type?
6        A.   A number of years.  I don't have
7    the exact amount of years.
8        Q.   More than five?
9        A.   Yes.
10       Q.   Insulin is classified by longevity,
11   is it not?
12       A.   For expiration or how long it works
13   for?
14       Q.   For how long it works for.
15       A.   Yes.
16       Q.   Okay, and the type you take, is it
17   long-acting, short-acting, somewhere in
18   between?
19       A.   It's fast-acting, but I also have
20   as a back up, I have a long-acting insulin as
21   well, but that's given through an injection
22   or an insulin pen, not my insulin pump.
23           MR. CALLISTE:  Just for the
24       record, I'm objecting to this testimony
25       as it's beyond the scope of the Judge's

Page 36

C. Roth

1
2        A.   Novalog.
3        Q.   Do you want to spell that?
4        A.   N-O-V-A-L-O-G.
5        Q.   Approximately how much do you use a
6    day?
7        A.   It varies.
8        Q.   How much do you use through the
9    pump per day, approximately?
10       A.   Well, I only give myself insulin
11   through the pump, so it varies.
12       Q.   But you could give yourself extra,
13   right?
14       A.   Yeah, depending on my blood sugar
15   or depending on how much food I'm eating.  I
16   could also give myself less.
17       Q.   How much, approximately, do you
18   consume a day in insulin?
19       A.   I can't give you an approximate
20   number because I eat different kinds of food
21   every day, so it's all fluctuated on that.
22       Q.   How about a week?
23       A.   Once again, I can't give you an
24   exact number or even an approximate number
25   because depending on what I eat, depending on

Page 35

C. Roth

1
2    order.  However, I'm giving Counsel
3    leeway just to see if it ties into
4    damages somehow.
5            MR. COVELLO:  Thank you.
6        Q.   You carry emergency insulin, do you
7    not, on a daily basis?
8        A.   Yes.
9        Q.   What type of emergency insulin do
10   you carry on a daily basis?
11       A.   When I'm at work I will always
12   carry, I carry three things for an emergency
13   that my pump would fail, which is hasn't ever
14   at work.  I carry an insulin pen with Novalog
15   insulin.  I carry a Lantus pen which is a
16   long-acting insulin in an insulin pen and
17   then I also carry extra site changes which is
18   where I would inject for my insulin pump in
19   my duty bag as well.
20       Q.   Do you carry pills of any sort?
21       A.   No.
22       Q.   You indicated your pump never
23   failed on the job.  Has it failed off the
24   job?
25       A.   Yes, a number of years ago.

Page 37

10 (Pages 34 to 37)

```
 1              C. Roth
 2     Q   Was it the same pump that you're
 3  using now or a different one?
 4     A   I believe it was a different pump.
 5     Q   You indicated that you're using a
 6  minimed, something like that?
 7     A   Minimed.
 8     Q   Are you still using that same pump?
 9     A   Yes.
10     Q   Are there various models for that
11  pump?
12     A   Yes.
13     Q   What model are you using?
14     A   I don't know the number on it.  It
15  doesn't even say it on the pump itself.
16     Q   How about your sugar testing, how
17  often do you do that a day at the present
18  time?
19         MR. CALLISTE:  Just for the
20     record, I'm directing my client not to
21     respond to these questions further.
22     This is going way beyond the scope of
23     the Judge's order regarding damages.
24     This was supposed to be a deposition
25     regarding damages and now we are talking
```

Page 38

```
 1              C. Roth
 2  about, I mean, liability or whatever
 3  else, but I don't see how this is tieing
 4  into damages and therefore I'm directing
 5  my client not to answer.
 6         MR. COVELLO:  I was tieing into
 7     damages the insulin that he uses?  He
 8     claims that he had no problem and I'm
 9     exploring that.
10         MR. CALLISTE:  Right, but the
11     scope of the Judge's order, as you know,
12     was to discuss the exhibits that were
13     presented to you in our disclosures of
14     April 25th, March 30th and the Judge
15     specifically limited the deposition to
16     those issues and now we are going back
17     into issues that could have been covered
18     at previous depositions and actually
19     probably was and I'm just objecting to
20     that and directing my client not to go
21     further unless it ties in somehow.
22         MR. COVELLO:  Well, I represent
23     to you it wasn't covered, so any asked
24     and answered isn't applicable.
25         MR. CALLISTE:  Well, I still
```

Page 39

```
 1              C. Roth
 2  gave him leeway to answer these
 3  questions even though they went beyond
 4  the scope, but now, as they're not
 5  tieing into the documents that were
 6  disclosed on March 30th or April 25th --
 7     Q   Well, you said you suffered
 8  emotional damage.  This is new, correct?
 9         MR. CALLISTE:  No, emotional
10     damages were always part of it.
11         MR. COVELLO:  Well, it was
12     unknown and then it was 500 and then it
13     was 250.
14         MR. CALLISTE:  Right, and you
15     have asked him.
16         MR. COVELLO:  Off the record.
17         (Whereupon, a discussion was
18     held off the record.)
19         MR. COVELLO:  Can we mark that
20     for a ruling, if you would.
21     Q   You indicated earlier that you have
22  not missed a day of work because of illness;
23  is that correct?
24     A   Yes.
25     Q   Now how many times a day are you
```

Page 40

```
 1              C. Roth
 2  testing?
 3     A   That can vary depending on the day.
 4     Q   Approximately, what is the range,
 5  four to six?
 6     A   Anywhere from four to six.
 7     Q   And the tester that you're using is
 8  what?
 9     A   The One Touch Ultra.
10     Q   And how long have you been using
11  that tester?
12     A   For a number of years.  I don't
13  know how many years.
14     Q   Is it uploaded computer-wise or
15  automatically?
16     A   No.
17     Q   For the NYPD, had you taken a
18  polygraph?
19     A   No.
20     Q   Not required, I guess?
21     A   They don't do polygraphs.
22     Q   I assume you're aware that NCPD,
23  Nassau County does require a polygraph,
24  correct?
25     A   Well, I did the polygraph.
```

Page 41

11 (Pages 38 to 41)

Case 1:15-cv-06358-EDW-AYS   Document 52-1   06/26/2018   23:31:09   Page 166 of 214

## Page 42

C. Roth

2  Q   Okay, do you have any formal
3  training as an economist, actuary or
4  accountant?
5  A   No.
6  Q   Turning to Exhibit C which is
7  Plaintiff's Supplemental F.R.C.P. Rule 26
8  disclosures, we were looking at that earlier,
9  correct?
10  A   Yes.
11  Q   You show loss of pension benefits,
12  $23,478, approximately.  Can you tell me how
13  you calculated that?
14  A   That's per year.
15  Q   It doesn't say that, does it?
16  A   So the number would be
17  significantly higher than what is listed
18  there.
19  Q   Per year and I'm assuming that
20  commences at year 22?
21  A   As soon as you retire it commences.
22  Q   Right, and you're planning on
23  retiring or at least your calculations were
24  at year 22?
25  A   At the very least 22 years.

Page 42

## Page 43

C. Roth

2  Q   How did you calculate that number?
3  A   The number of $23,478.  All right,
4  go to Exhibit H.
5  Q   What is H?
6  A   It shows the NYPD contract, the new
7  schedule neighborhood polices differential.
8      MR. CALLISTE:  That would be
9  Exhibit I for you.
10  A   Sorry, it's Exhibit I.
11      MR. COVELLO:  Not Exhibit I for
12  him?
13      MR. CALLISTE:  No, I'm just
14  letting you know?
15  A   It is Exhibit I for me.
16  Q   And this is the PBA update from
17  President Lynch?
18  A   Yes.
19  Q   And we are at Page 3, I guess 1.5
20  again or what page of that exhibit?
21  A   Exhibit I, 4.
22  Q   Okay?
23  A   So you take $87,211, multiply that
24  by 50 percent.
25  Q   Times?

Page 43

## Page 44

C. Roth

2  A   You would take $87,211, multiply
3  that by 50 percent.
4  Q   And that would give you 436-what?
5  A   605.
6  Q   Then what do you do with it?
7  A   Now you take the Nassau County top
8  salary which is 122,581, multiply that by 53
9  percent.
10  Q   Okay, and that equals?
11  A   $64,963.
12  Q   Okay, then what?
13  A   Subtract both numbers.
14  Q   Subtract 43 from 64?
15  A   Yes.
16  Q   Giving you?
17  A   21,000.
18  Q   21,000 even?
19  A   Not even, but you also just gave me
20  43,000 and you said 64, but both of those
21  numbers were even as well.
22  Q   No, 43,605 taken from 64,963 is how
23  much?
24  A   Give me the City number.
25  Q   The City is 43,605.

Page 44

## Page 45

C. Roth

2  A   $21,358.
3  Q   Okay, now what?
4  A   Well, in order to figure out how
5  much I would lose over the years, is that
6  what you're asking?
7  Q   Yes, how many years, if you were
8  claiming your damages in front of a injury
9  right now, how many years are you going to
10  project that?
11  A   The Social Security Office averages
12  that the average male will live to 85 years
13  old.
14  Q   Okay, so you would multiply that.
15  How old are you going to be when you retire?
16  A   Approximately 45.
17  Q   So you'd be multiplying that times
18  40?
19  A   Yes.
20  Q   And what is the number?
21  A   $854,320.
22  Q   Okay.
23      MR. COVELLO:  Off the record.
24      (Whereupon, a discussion was
25  held off the record.)

Page 45

C. Roth

1
2     Q    You have compared 50 to 53 percent
3  between the two pensions of NYPD and Nassau
4  County PD?
5     A    Yes.
6     Q    What is your basis for that
7  determination?
8     A    The 50 and the 53 percent?
9     Q    Yes.
10    A    Where did I get it from?
11    Q    Yes.
12    A    Okay, if you go to the New York
13 City pension website, it will state to you
14 that it's 22 years for New York City police
15 officers to retire.  You go on the New York
16 State pension fund website for police and
17 fire it's a 20-year pension, but after 22
18 years it's 53 percent.
19    Q    New York State?
20    A    Yes, but Nassau County is part of
21 the New York State Police and Fire Fund.
22    Q    So they have the same pension?
23    A    Yes.
24    Q    And you got it of off the website?
25    A    Yes, the official website from New

Page 46

C. Roth

1  York State.
2     Q    Going back to Exhibit C, you've got
3  special damages of $14,000.  What is that
4  from?
5     A    The lawyer fees from my Article 78.
6     Q    Okay, does that comprise the full
7  $14,000?
8     A    Approximately.  Once again, all
9  these numbers are all approximately.
10    Q    Is that money you paid?
11    A    Yes.
12    Q    Did you calculate a comparison of
13 fringe benefits between the two police
14 departments?
15    A    Explain.  What do you mean by
16 "fringe benefits"?
17    Q    Are there benefits, days off, maybe
18 they're not the same?
19    A    Yes.
20    Q    Vacation, did you compare those?
21    A    I was trying to be as fair as
22 possible so all I compared was the base pays
23 of both the NYPD and NCPD.  However, if I am
24 going to include days off, if you'd like me

Page 47

C. Roth

1  to state that, I can state that.
2         MR. CALLISTE:  He asked.  Go
3     ahead.
4     A    Okay, the NYPD --
5     Q    No one has asked you to say
6  anything.  There is no question before you.
7  I asked you if you included fringe benefits?
8         WNS ATTY:  Wait, wait, yes or
9     no?
10    A    Yes.
11    Q    Do you have any training in the
12 areas of inflation or growth index?
13    A    No.
14    Q    Are you familiar with the consumer
15 price index?
16    A    No.
17    Q    When you looked at the life
18 expectancy table of Social Security, did you
19 take into consideration a type one diabetic?
20    A    How would that make a difference?
21    Q    Well, does a type one diabetic live
22 the same period as someone without type one
23 diabetes statistically?
24    A    There are no confirmed statistics

Page 48

C. Roth

1  on that, but as long as you take care of your
2  diabetes, as I do, it would have no affect on
3  your life expectancy.
4     Q    Is that a medical opinion?
5     A    I'm not a doctor.
6     Q    Withdrawn.  Other than the document
7  you have referred to in calculating the
8  damages here today, were there any other
9  documents that you used or utilized in
10 calculating the numbers that you gave your
11 lawyer?
12    A    No.
13        MR. COVELLO:  If you'd be kind
14     enough to mark each exhibit in the book
15     and if you want we can identify them on
16     the record.
17        (Documents marked as remaining
18     exhibits in no particular order.)
19        MR. COVELLO:  For the record, A
20     is Plaintiff's Initial Disclosures.  We
21     might have done some of this.  B is
22     Plaintiff's Updated Initial Disclosures.
23     C is Plaintiff's Supplemental F.R.C.P.
24     Rule 26 disclosures.  D is transmittal

Page 49

13 (Pages 46 to 49)

A0627

**Page 50**

```
 1              C. Roth
 2    letter, April 25, 2011, additional
 3    discovery requests of Defendant replied
 4    to.  E is Nassau County PBA Associate
 5    Contract 2007-12.  E is PBA contract
 6    extension 2013 to 2015, Nassau County.
 7    F is Nassau County Wage Free Settlement
 8    and Contract Extension dated March 15,
 9    2014.
10        Q    Was there a wage freeze in Nassau
11    County at one point?
12        A    There was.  I don't know the
13    approximate dates.
14        Q    Did you take that into
15    consideration in doing your steps?
16        A    No, because if I took that into
17    consideration the salary would actually be
18    higher and I don't have those calculations
19    offhand.
20             MR. COVELLO:  H is New York
21    City PBA newsletter dated February 3,
22    2017 for the period of 2012 to 2017.  I
23    is a newsletter from New York City PBA
24    dated February 1, 2017 describing the
25    proposed contract of the City of New
```

**Page 51**

```
 1              C. Roth
 2    York for 2012 to 2017 and J is New York
 3    City Pension Fund Tier 3 Members Summary
 4    Plan.  K we have already identified.
 5        Q    Your attorney supplied this entire
 6    book, correct?
 7             MR. CALLISTE:  The exhibits in
 8    the book, yes.
 9        Q    And K, excuse me, J is a summary
10    plan description of Tier 3 New York City
11    Police Pension Fund; is that correct?
12        A    Yes.
13             (Continued on next page to
14    include jurat.)
15
16
17
18
19
20
21
22
23
24
25
```

**Page 52**

```
 1              C. Roth
 2        Q    And did you utilize that in
 3    determining what your pension percentage
 4    would be?
 5        A    No.
 6        Q    Did you utilize this document in
 7    any way in calculating the damages?
 8        A    No, I only reviewed it maybe once
 9    or twice.
10        Q    Are you Tier 3 or 4?
11        A    Three.
12        Q    I have no further questions.  Stay
13    safe.
14        A    Thank you.
15             (Time noted: 11:35 a.m.)
16
17
18             _____
19                       CRAIG ROTH
20
21    Subscribed and Sworn to before me
      this       day of       , 20 .
22
23
      ----------------------------------
24        NOTARY PUBLIC
25
```

**Page 53**

```
 1              C. Roth
 2           I N D E X
 3
 4    EXAMINATION BY                    PAGE
 5    MR. COVELLO                        4
 6
 7           E X H I B I T S
 8
 9    DEFENDANT(s) EXHIBITS:
10
11    EXHIBIT       EXHIBIT         PAGE
12    NUMBER        DESCRIPTION
13      A      Plaintiff's Initial
14             Disclosures         5
15      B      Plaintiff's Updated
16             Initial Disclosures   13
17      C      Plaintiff's Supplemental
18             F.R.C.P. Rule 26
19             disclosures         14
20      D      Transmittal letter    49
21      E      Nassau County PBA
22             Associate Contract    50
23      F      Wage Free Settlement
24             & Contract Extension  50
25      G      Document              18
```

| | | C. Roth | |
|---|---|---|---|
| 1 | | C. Roth | |
| 2 | H | NYC PBA newsletter | |
| 3 | | 2/3/17 | 50 |
| 4 | I | NYC PBA newsletter | |
| 5 | | 2/1/17 | 50 |
| 6 | J | NYC Pension Fund | |
| 7 | | Tier 3 Members | |
| 8 | | Summary Plan | 51 |
| 9 | K | Document | 18 |

Page 54

```
1
2           ERRATA SHEET
3  PAGE/LINE    - CHANGE -    REASON
4  _____    _____    _____
5  _____    _____    _____
6  _____    _____    _____
7  _____    _____    _____
8  _____    _____    _____
9  _____    _____    _____
10 _____    _____    _____
11 _____    _____    _____
12 _____    _____    _____
13 _____    _____    _____
14 _____    _____    _____
15 _____    _____    _____
16 _____    _____    _____
17 _____    _____    _____
18 _____    _____    _____
19 _____    _____    _____
20 _____    _____    _____
21 _____    _____    _____
22 _____    _____    _____
23 _____    _____    _____
24 _____    _____    _____
25 _____    _____    _____
```

Page 56

```
1              C. Roth
2          C E R T I F I C A T E
3       I, RENEE DECARLOS, hereby certify that the
4  Examination of said witness named in the foregoing
5  transcript was held before me at the time and place
6  herein named; that said witness was duly sworn
7  before the commencement of the testimony; that the
8  testimony was taken stenographically by myself and
9  then transcribed under my direction; that the party
10 was represented by counsel as appears herein;
11      That the within transcript is a true record
12 of the Examination of said witness;
13      That I am not connected by blood or marriage
14 with any of the parties; that I am not interested
15 directly or indirectly in the outcome of this
16 matter; that I am not in the employ of any of the
17 counsel.
18      IN WITNESS WHEREOF, I have hereunto set my
19 hand this 10th day of May, 2017.
20
21
22
23          RENEE DECARLOS
24
25
```

Page 55

**A**

a.m 1:14
  52:15
ability 5:2
able 34:23
Absolutely
  9:9
Academy
  34:17
accommodate
  15:5
accountant
  42:4
accredited
  34:18
activity
  36:2
actuary 42:3
add 19:21
  26:13
  27:14,17
  28:3 30:14
  32:5 33:25
additional
  50:2
address 4:11
adjust 36:2
administer
  3:15
affect 4:25
  49:3
against- 1:5
age 25:23
ago 11:6,8
  37:25
agree 23:17
AGREED 3:4,9
  3:13
ahead 27:15
  29:4 48:4
alcohol 4:24
amount 14:9
  14:12 21:7
  24:21
  25:13
  26:19 34:3
  36:2,7
and- 2:10
answer 6:20
  7:5,13
  27:2 39:5
  40:2
answered

39:24
anticipate
  20:13
anxiety 7:23
Apartment
  4:13
appears
  55:10
applicable
  39:24
applied
  34:23
approximate
  14:17
  30:12,16
  34:3 35:19
  35:24
  50:13
approxim...
  11:5,7
  14:15,16
  19:15
  30:15
  31:10,12
  31:14,18
  31:22 32:4
  32:13,20
  32:24 35:5
  35:9,17
  41:4 42:12
  45:16 47:9
  47:10
April 13:6
  13:23
  39:14 40:6
  50:2
areas 48:13
Article 47:6
aside 11:10
asked 26:25
  39:23
  40:15 48:3
  48:6,8
asking 6:7
  23:13,14
  25:3 30:13
  45:6
Associate
  50:4 53:22
ASSOCIATES
  2:3
assume 12:24
  13:17
  29:10

41:22
assuming
  8:22 42:19
attached
  17:3,6,9
attempt
  22:21
attempting
  7:11
attention
  17:15
attorney 5:8
  12:22
  14:20 15:8
  21:14 51:5
attorneys
  2:3,8 3:5
ATTY 48:9
authorized
  3:15
automati...
  41:15
average
  45:12
averages
  45:11
aware 10:24
  41:22

**B**

B 13:5,9,11
  13:14
  49:22 53:7
  53:15
Bachelor's
  20:9 34:8
back 23:19
  36:20
  39:16 47:3
bag 37:19
base 47:23
based 16:20
  30:12
basis 6:15
  9:14 12:7
  37:7,10
  46:6
Beach 4:14
bed 8:6
beginning
  21:2 32:22
behalf 12:23
believe
  14:20

34:21 38:4
belongs
  17:18,19
benefits
  42:11
  47:14,17
  47:18 48:8
better 22:4
beyond 36:25
  38:22 40:3
blood 35:14
  55:13
Board 34:15
book 15:7,18
  49:15 51:6
  51:8
BOROOSAN
  2:11
bring 14:22
  30:13
  32:23
Brittany
  5:20
Broadway 2:4
brought 30:3
bullet 29:7

**C**

C 2:2 4:1,2
  5:1 6:1
  7:1 8:1
  9:1 10:1
  11:1 12:1
  13:1,21,25
  14:1,4
  15:1 16:1
  17:1 18:1
  19:1 20:1
  21:1 22:1
  23:1 24:1
  25:1 26:1
  27:1 28:1
  29:1 30:1
  31:1 32:1
  33:1 34:1
  35:1 36:1
  37:1 38:1
  39:1 40:1
  41:1 42:1
  42:6 43:1
  44:1 45:1
  46:1 47:1
  47:3 48:1
  49:1,24

50:1 51:1
  52:1 53:1
  53:17 54:1
  55:1,2,2
calculate
  20:24
  21:19
  28:12,15
  28:25 43:2
  47:13
calculated
  13:4,19
  14:18,23
  19:13
  20:12,17
  20:24
  26:20
  42:13
Calculates
  24:20
calculating
  18:24
  23:20
  24:12,13
  24:15,19
  25:7,20
  28:20 30:6
  49:8,11
  52:7
calculat...
  15:10
  16:21 19:5
  26:24
  30:14,17
  42:23
  50:18
calculator
  21:11,13
  26:23 27:6
  27:9
call 17:15
called 21:24
CALLISTE 2:5
  6:18 12:12
  16:6,11,16
  16:25 27:8
  31:21
  36:23
  38:19
  39:10,25
  40:9,14
  43:8,13
  48:3 51:7

capacity
  12:10,14
captain
  12:16
car 12:16
care 49:2
carry 37:6
  37:10,12
  37:12,14
  37:15,17
  37:20
CARTNER 1:12
  2:8
Carver 24:4
case 1:4
  10:24
certific...
  3:6 34:14
certify 55:3
CHANGE 56:2
changes
  37:17
chart 15:19
  15:22,25
  16:14,21
  19:5 20:5
  25:4,9,12
  27:20,25
charts 15:12
  23:25
City 16:10
  16:12 21:3
  21:15,20
  22:7 23:3
  25:24 32:3
  32:9,10,13
  32:22
  44:24,25
  46:13,14
  50:21,23
  50:25 51:3
  51:10
claim 6:16
  24:22
claimed 6:10
  14:13
claiming
  12:6 45:8
claims 39:8
class 15:20
  15:20 17:6
  19:9,11
classified
  36:10

client 38:20
  39:5,20
closer 26:15
college
  11:10,11
colleges
  34:18
column 29:8
  29:9,11
come 19:5
  29:13
commence...
  55:7
commences
  42:20,21
commissi...
  12:17,20
comparat...
  32:2
compare
  47:21
compared
  21:16 46:2
  47:23
comparison
  47:13
comprise
  47:7
computer...
  41:14
conclude
  19:15
conclusion
  9:13,14
confirmed
  48:25
connected
  55:13
consider 9:7
  31:24
consider...
  48:20
  50:15,17
consume
  35:18
consumer
  48:15
contained
  16:7 17:24
continue
  30:6 32:25
Continued
  51:13

contract
  16:2,3,4,9
  17:4,12,23
  18:19 22:4
  22:17,18
  22:19 23:4
  23:6,8,9
  23:14,16
  23:17 24:9
  43:6 50:5
  50:5,8,25
  53:22,24
contracts
  15:2 17:24
correct 5:10
  6:13 13:15
  14:10
  16:14,23
  17:13,20
  20:18
  22:22
  23:17 24:9
  24:17,25
  26:9 40:8
  40:23
  41:24 42:9
  51:6,11
counsel 37:2
  55:10,17
counseling
  11:19
counted
  21:23
Country 1:13
  2:9
county 1:6
  7:8 8:14
  10:23 17:2
  17:13
  18:21,22
  18:25
  19:12 21:3
  24:2,25
  25:14
  26:14 27:3
  29:18 31:7
  31:10 32:4
  32:12,12
  33:12,24
  41:23 44:7
  46:4,20
  50:4,6,7
  50:11
  53:21

couple 29:24
Court 1:2
  3:17
COVELLO 1:12
  2:8,10 4:7
  5:13,24
  10:13 13:8
  13:24 16:8
  18:4,9
  26:17 37:5
  39:6,22
  40:11,16
  40:19
  43:11
  45:23
  49:14,20
  50:20 53:5
covered
  39:17,23
Craig 1:3,10
  4:10 52:19
credit 21:7
credits
  34:19,22
Criminal
  34:10
_____
        D
_____
D 49:25 53:2
  53:20
daily 37:7
  37:10
damage 6:16
  7:2 12:7
  40:8
damages 5:9
  5:22 6:10
  6:24 13:14
  13:18
  19:13
  24:16,21
  25:20 37:4
  38:23,25
  39:4,7
  40:10 45:8
  47:4 49:9
  52:7
date 5:17
  13:12 14:5
  18:8,13
dated 5:19
  13:6,23
  17:5 50:8
  50:21,24

dates 50:13
day 7:18
  35:6,9,18
  35:21
  38:17
  40:22,25
  41:3 52:21
  55:19
days 14:7
  47:18,25
DeCarlos
  1:15 55:3
  55:23
Defendant
  1:8,11 2:8
  50:3
Defendant's
  5:15 13:11
  14:4 18:6
  18:11
DEFENDAN...
  53:9
Degree 20:9
  34:8
degrees 34:7
departments
  47:15
depending
  35:14,15
  35:25,25
  41:3
deposition
  1:10 3:14
  38:24
  39:15
depositions
  39:18
depression
  7:21
describing
  50:24
description
  51:10
  53:12
determin...
  46:7
determine
  15:13
determining
  52:3
diabetes
  48:24 49:3
diabetic
  8:22 48:20

48:22
**difference**
20:2 24:24
32:21 33:2
34:4 48:21
**different**
22:3,3
35:20 38:3
38:4
**differen...**
18:24
22:10 25:7
28:8,14
29:11,21
30:23
33:19 43:7
**directing**
38:20 39:4
39:20
**direction**
55:9
**directly**
55:15
**disclosed**
40:6
**disclosure**
5:8,19
6:17 12:22
13:23 14:3
14:8
**disclosures**
13:6,11
39:13 42:8
49:21,23
49:25
53:14,16
53:19
**discovery**
50:3
**discrimi...**
6:22 7:7
7:24 8:13
10:22
**discuss**
39:12
**discussion**
5:25 10:14
40:17
45:24
**disorder**
10:2
**distress**
8:11 10:19
11:16,21

12:3,4
**DISTRICT** 1:2
1:2
**doctor** 9:23
49:6
**doctors** 9:17
**document**
5:15 6:19
18:6,11,18
18:23 19:8
22:16 49:7
52:6 53:25
54:9
**documents**
5:12 15:9
21:9 40:5
49:10,18
**dog** 34:14
**doing** 21:10
28:19
50:15
**drugs** 4:24
**duly** 4:3
55:6
**DUNNE** 1:12
2:8
**duty** 26:8
37:19

_____
**E**
**E** 2:2,2 16:5
50:4,5
53:2,7,21
55:2,2
**earlier**
40:21 42:8
**easier** 32:9
**EASTERN** 1:2
**easy** 27:11
**eat** 35:20,25
**eating** 35:15
**economist**
42:3
**Ed** 34:15
**education**
20:10
25:10
**educatio...**
34:7
**effect** 3:16
**eighth** 31:12
**either** 29:3
**emergency**
37:6,9,12

**emotional**
5:9,22
6:16,22,24
7:2 8:10
10:2,18
11:16,20
12:2,4,7
40:8,9
**emotionally**
9:10,18
**employ** 55:16
**employed**
24:10
**employees**
24:3
**encourage**
23:16
**encouraging**
24:8
**entered**
19:10
**entire** 11:13
51:5
**entitled**
13:5
**equals** 31:17
44:10
**ERRATA** 56:2
**ESQ** 2:5,10
2:11
**essentially**
13:14
**estimate**
25:16
**estimated**
25:19
**evidence** 8:9
**exact** 35:24
36:7
**exactly**
11:12 12:5
**Examination**
4:6 6:4
53:4 55:4
55:12
**examined** 4:4
**exception**
17:17
**exchanged**
21:14
**excuse** 51:9
**exercise**
30:3

**exhibit** 5:14
5:16,18
13:5,9,11
13:14,15
13:21,25
14:4,7
15:14,15
15:16 16:3
16:4,5,5,7
16:13,16
16:23,24
17:6,10,11
17:16,22
17:23 18:5
18:7,10,12
18:14,15
18:16 19:6
19:7 21:17
21:18
23:19,24
27:23 42:6
43:4,9,10
43:11,15
43:20,21
47:3 49:15
53:11,11
**exhibits** 7:2
15:8 17:8
39:12
49:19 51:7
53:9
**expectancy**
48:19 49:4
**expiration**
36:12
**explain**
12:13
15:10
47:16
**exploring**
39:9
**extension**
17:12
18:20 50:6
50:8 53:24
**extra** 35:12
37:17

_____
**F**
**F** 16:5 17:10
17:11,16
50:7 53:23
55:2
**F.R.C.P**

13:22 14:3
42:7 49:24
53:18
**fact** 6:21
7:7,24
8:10,13,21
10:22
23:21 25:9
**fail** 37:13
**failed** 37:23
37:23
**fair** 12:24
13:17
47:22
**familiar**
48:15
**far** 10:20
**fast-acting**
36:19
**favor** 24:9
**February**
5:20 6:17
14:7 17:5
19:10 20:6
50:21,24
**fees** 47:6
**fellow** 12:15
12:18
**fifteen** 31:2
32:17,20
**fifth** 31:13
31:15
**Fifty** 26:6
**figure** 45:4
**filing** 3:6
**find** 9:14
**fine** 30:20
**fire** 46:17
46:21
**first** 4:3
14:8 16:18
27:13,17
27:20 28:2
28:4,20
29:22,24
31:25 32:8
32:10
**fit** 9:8
**five** 27:13
27:17,20
28:4,21
36:8
**five-and...**
22:11

Case 1:15-cv-06605-LDW-AYS Document 52-1 06/26/2018 23:35/09 Page 173 of 214
Case 1:15-cv-06358-LDW-AYS Document 46-32 Filed 06/16/17 Page 20 of 254 PageID #: 769

Page 60

fluctuated
 35:21
follows 4:5
food 35:15
 35:20
force 3:16
foregoing
 55:4
form 3:10
formal 42:2
formula
 30:12
forth 6:17
found 21:17
four 10:7,11
 14:7 41:5
 41:6
Free 18:19
 50:7 53:23
freeze 50:10
fringe 47:14
 47:17 48:8
front 15:3
 15:18,23
 16:21
 26:23 45:8
full 47:7
fund 46:16
 46:21 51:3
 51:11 54:6
further 3:9
 3:13 7:13
 9:15 38:21
 39:21
 52:12

—— G ——
G 4:2 15:16
 16:5,13
 18:10,12
 18:14,15
 18:16
 23:19,19
 23:22,24
 25:4,6,9
 27:21
 53:25
gained 9:3
genuinely
 7:6 10:21
getting 27:5
give 7:5,13
 9:15 14:24
 27:2 28:23

30:19
32:10 33:3
35:10,12
35:16,19
35:23 44:4
44:24
given 9:16
 29:23 34:5
 36:21
gives 23:6
giving 36:3
 37:2 44:16
go 15:8
 16:13
 27:15 29:4
 30:20 31:6
 33:17
 39:20 43:4
 46:12,15
 48:3
going 4:18
 10:24
 23:19 28:3
 30:21,25
 31:6 33:6
 33:8,8
 38:22
 39:16 45:9
 45:15 47:3
 47:25
Good 4:15,16
gotten 17:7
GREGORY 2:5
growth 48:13
guess 10:17
 41:20
 43:19

—— H ——
H 4:2 16:7,8
 16:16,23
 16:24 43:4
 43:5 50:20
 53:7 54:2
hand 55:19
happy 4:21
held 1:11
 6:2 10:15
 40:18
 45:25 55:5
help 14:20
hereunto
 55:18
higher 21:3

21:6 42:17
 50:18
hired 24:3
Hold 27:15
hours 5:4

—— I ——
identifi...
 5:16 13:12
 14:5 18:7
 18:12
identified
 51:4
identify
 49:16
illness
 40:22
include
 22:14
 47:25
 51:14
included
 48:8
incorrectly
 17:3
index 48:13
 48:16
indicated
 5:9 6:12
 9:18 12:21
 16:14
 37:22 38:5
 40:21
indicating
 12:5
indirectly
 55:15
individual
 9:8
inflation
 48:13
information
 9:16 21:14
 22:19
Initial 13:6
 13:10
 49:21,23
 53:13,16
initialed
 17:16,20
inject 37:18
injection
 36:21
injured 26:7

injury 45:8
inspector
 12:17
insulin 10:5
 34:24,25
 35:10,18
 36:3,4,10
 36:20,22
 36:22 37:6
 37:9,14,15
 37:16,16
 37:18 39:7
interested
 55:14
Island 34:12
issues 39:16
 39:17

—— J ——
J 51:2,9
 54:6
James 24:4
job 22:3
 37:23,24
JOSEPH 2:10
JR 2:5
Judge 39:14
Judge's
 36:25
 38:23
 39:11
jurat 51:14
Justice
 34:10

—— K ——
K 18:5,7
 19:6,7
 23:23
 25:12 51:4
 51:9 54:9
kind 49:14
kinds 35:20
know 4:21
 5:11 6:20
 12:25
 14:19 18:2
 20:15
 34:22
 38:14
 39:11
 41:13
 43:14
 50:12

—— L ——
L 3:2
Lantus 37:15
lawsuit
 10:18
lawyer 10:17
 47:6 49:12
leeway 37:3
 40:2
left 29:8,9
 34:2
legal 6:19
let's 13:8
 15:4 16:13
 17:25
 30:20
letter 24:7
 50:2 53:20
letting
 43:14
liability
 39:2
life 11:9,13
 48:18 49:4
limitation
 8:23,25
limitations
 8:21 9:2
limited
 39:15
limiting
 10:10
line 26:7
listed 13:14
 42:17
listen 30:19
little 26:15
live 11:2,4
 45:12
 48:22
lived 11:8
 11:12
LLP 1:12 2:8
long 4:13
 11:8 34:12
 36:5,12,14
 41:10 49:2
long-acting
 36:17,20
 37:16
longevity
 36:10
look 5:12

looked 15:25
    48:18
looking
    27:21,23
    42:8
looks 16:12
lose 45:5
loss 42:11
lost 9:5
    12:23,25
    13:18 14:9
lower 23:2
    23:12
Lynch 21:25
    22:23
    43:17
LYNN 1:12
    2:8

**M**
making 32:3
    32:21
    33:18
male 45:12
March 6:3
    39:14 40:6
    50:8
Marjorie
    5:21
mark 5:13
    13:24 18:4
    40:19
    49:15
marked 5:15
    13:9,11
    14:3 15:16
    18:6,9,11
    49:18
marriage
    55:13
Masters
    34:20,22
math 20:18
    21:10
    31:21
matter 55:16
mean 10:20
    12:13 39:2
    47:16
means 6:23
medical 49:5
medication
    4:25 9:22
    9:25 10:4

members
    23:15 24:8
    51:3 54:7
mentally
    7:12
mentioned
    9:22 25:11
mentions
    21:21
mere 23:21
Mesidor 5:21
met 5:7
Mineola 1:13
    2:9
minimed 38:6
    38:7
missed 7:17
    7:18 40:22
mistaken
    17:19
model 38:13
models 38:10
money 47:11
morning 4:15
    4:16
MOSHE 2:11
Move 26:17
multiply
    31:2 33:9
    33:20
    43:23 44:2
    44:8 45:14
multiplying
    45:17

**N**
N 2:2 3:2
    53:2
N-O-V-A-...
    35:4
name 4:8
named 55:4,6
Nassau 1:6
    16:10 17:2
    17:12
    18:22,25
    19:11 21:3
    24:2,25
    25:14
    26:14 27:3
    29:18 31:7
    31:9,25
    32:4,11,12
    33:12,24

41:23 44:7
    46:3,20
    50:4,6,7
    50:10
    53:21
Nassau's
    24:12
NCPD 15:3,13
    16:4 17:23
    17:24
    19:18 21:6
    41:22
    47:24
necessary
    15:9
need 14:25
    25:24
    26:23
needed 9:22
    9:24
neighbor...
    22:9 28:7
    28:13
    29:11
    30:23
    33:19 43:7
never 12:19
    30:5 37:22
new 1:2,13
    1:15 2:4,4
    2:9 4:4,14
    16:9,11
    21:2,15,19
    21:21 22:7
    22:8 25:24
    28:5,7,9
    28:13,20
    29:5,7
    30:22
    32:22
    34:15 40:8
    43:6 46:12
    46:14,15
    46:19,21
    46:25
    50:20,23
    50:25 51:2
    51:10
newsletter
    50:21,23
    54:2,4
nights 7:16
    8:3

nine 20:5
    25:12 33:3
ninth 20:8
    31:14 33:7
    33:17
Notary 1:15
    4:3 52:24
noted 52:15
Novalog 35:2
    37:14
number 14:18
    15:16
    19:16
    21:23
    24:16
    25:22
    29:17,25
    32:5,15
    33:23,24
    34:4 35:20
    35:24,24
    36:6 37:25
    38:14
    41:12
    42:16 43:2
    43:3 44:24
    45:20
    53:12
numbers 5:11
    14:24
    15:21,23
    17:2 19:4
    23:21,22
    30:2,11,17
    44:13,21
    47:10
    49:11
NYC 54:2,4,6
NYPD 7:19
    11:25
    14:25 15:3
    17:3 18:25
    19:19,24
    21:5 24:25
    26:21
    27:12,23
    29:2,19,24
    30:22
    31:11,13
    31:16
    33:18,25
    34:17
    41:17 43:6
    46:3 47:24

48:5

**O**
O 2:11 3:2
    4:2
oath 3:15
objecting
    36:24
    39:19
Objection
    6:18 12:12
objections
    3:10
objectively
    8:9
occasion 6:8
offhand 5:11
    7:6 11:17
    20:16
    30:10
    50:19
Office 45:11
officer 3:15
    12:16,19
    25:15,20
    26:20
officers
    46:15
offices 1:12
official
    46:25
Okay 5:18
    7:2 8:15
    13:5,21
    15:4,6,12
    15:17 19:3
    19:20
    20:21 21:2
    22:6 24:11
    25:3,18
    27:5,7,13
    28:10,12
    28:16,19
    28:22,24
    29:4,13,15
    30:6,13,21
    30:24 31:3
    31:5,6,8
    31:17,23
    32:7,8,25
    33:2,5,6
    33:14,17
    33:22 34:6
    36:16 42:2

43:22
44:10,12
45:3,14,22
46:12 47:7
48:5
old 1:13 2:9
45:13,15
once 12:8
29:17
30:11,16
35:23 47:9
52:8
opinion 7:25
49:5
order 1:11
14:24
26:24
28:25 37:2
38:23
39:11 45:4
49:19
outcome
55:15
outline 23:6
overtime
22:14

**P**

P 2:2,2 3:2
page 5:19
13:13 14:6
15:16,22
17:5,16
21:23 22:5
22:16
43:19,20
51:13 53:4
53:11
PAGE/LINE
56:2
paid 47:11
parents
10:23
part 15:25
17:22,22
18:16,23
19:4 40:10
46:20
particular
49:19
parties 3:5
55:14
party 55:9
Patrick

21:25
22:23
pay 19:9
20:7,8
21:3,15
24:24
31:11
pays 21:5
47:23
PBA 16:8
17:11
21:24
22:17,20
23:6,25
24:5,7
43:16 50:4
50:5,21,23
53:21 54:2
54:4
PD 18:25
24:25 46:4
pen 36:22
37:14,15
37:16
pension
24:20
42:11
46:13,16
46:17,22
51:3,11
52:3 54:6
pensions
14:25 15:2
46:3
percent 26:5
26:16
43:24 44:3
44:9 46:2
46:8,18
percentage
52:3
perfectly
9:8
period 25:15
26:21
48:23
50:22
person 6:23
pertaining
18:17
PHILLIPS 2:3
physical
8:20,23,24
8:25

physically
7:12 8:12
8:16 9:7
pick 25:22
pills 37:20
place 55:5
placed 27:9
Plaintiff
1:4,10 2:3
Plaintiff's
13:6,10,22
14:2 42:7
49:21,23
49:24
53:13,15
53:17
plan 20:18
51:4,10
54:8
planning
42:22
Please 4:8
4:11
PLLC 2:3
plus 22:9
point 8:9
11:9 13:17
50:11
police 11:23
12:15,18
25:15,19
26:20
34:17
46:14,16
46:21
47:14
51:11
polices 28:8
28:13
29:11
30:23 43:7
policing
22:9 33:19
polygraph
41:18,23
41:25
polygraphs
41:21
position
7:10
possible
47:23
possibly
17:19

present
38:17
presented
39:13
president
22:23 24:5
24:8 43:17
pretty 9:8
19:21
previous
39:18
previously
32:15
price 48:16
prior 22:24
24:3
probably
39:19
problem 39:8
problems
9:10
process
14:23
19:16
24:12
30:20
project
45:10
proof 8:9
proposal
22:24
23:15
proposed
16:9 22:17
23:2,8,25
24:10
50:25
prove 7:11
psychiat...
6:9
psycholo...
6:9,25
Public 1:15
4:4 52:24
pump 35:9,11
36:22
37:13,18
37:22 38:2
38:4,8,11
38:15
pursuant
1:11
put 18:2

**Q**

question
3:10 4:19
10:11
24:19 27:2
48:7
questions
4:18 38:21
40:3 52:12

**R**

R 2:2 4:2,2
55:2
range 41:4
ratified
22:22
rational
6:23
ready 33:15
REASON 56:2
recall 11:17
12:8 30:10
receive
25:14
receiving
20:10
24:20
recognize
18:14
record 4:9
4:12 5:24
6:2,19
10:13,15
16:6 17:2
27:8 36:24
38:20
40:16,18
45:23,25
49:17,20
55:11
referenced
16:19
referred
49:8
referring
27:22
regard 10:17
11:20
regarding
38:23,25
remaining
49:18
remains

22:12
**remember** 6:3
  6:7  24:4
  25:8
**Renee** 1:14
  55:3,23
**repeated**
  4:20
**rephrased**
  4:20
**replied** 50:3
**represent**
  19:8  39:22
**represented**
  55:10
**requests**
  50:3
**require**
  41:19
**required**
  41:20
**reserved**
  3:11
**respective**
  3:5
**respond**
  38:21
**retire** 25:24
  26:8,11,14
  42:21
  45:15
  46:15
**retirement**
  20:14
**retiring**
  42:23
**reviewed**
  52:8
**right** 17:25
  21:24
  27:22
  29:10
  32:16
  35:13
  39:10
  40:14
  42:23  43:3
  45:9
**Road** 1:13
  2:9  4:13
**room** 6:4
**Roth** 1:3,10
  4:1,10  5:1
  6:1  7:1

8:1  9:1
10:1  11:1
12:1  13:1
14:1  15:1
16:1  17:1
18:1  19:1
20:1  21:1
22:1  23:1
24:1  25:1
26:1  27:1
28:1  29:1
30:1  31:1
32:1  33:1
34:1  35:1
36:1  37:1
38:1  39:1
40:1  41:1
42:1  43:1
44:1  45:1
46:1  47:1
48:1  49:1
50:1  51:1
52:1,19
53:1  54:1
55:1
**Rule** 13:22
  14:3  42:7
  49:25
  53:18
**rules** 4:17
**ruling** 40:20
**run** 8:16,17
_____
      **S**
_____
**S** 2:2  3:2,2
  53:7
**safe** 52:13
**salaries**
  19:23,24
  20:3  21:22
  23:11
**salary** 15:13
  21:19  22:6
  22:25
  23:25
  24:12,13
  26:6  27:23
  34:3  44:8
  50:17
**saw** 6:24
**saying** 32:19
**says** 5:22
  14:14  25:9
  25:10

**scale** 19:9
  21:16
**scared** 9:19
**schedule**
  21:21  22:8
  28:5,7,9
  28:13,20
  29:5,8
  30:23  43:7
**scope** 36:25
  38:22
  39:11  40:4
**sealing** 3:6
**second** 27:15
**Security**
  45:11
  48:19
**see** 5:19,21
  14:9  15:4
  15:9,22
  20:4,5
  37:3  39:3
**seen** 6:8
**sending**
  22:23
**sent** 22:20
  23:5
**separated**
  17:7
**separately**
  18:2
**sergeant**
  11:23
**series** 4:18
**set** 6:16
  55:18
**settled** 23:3
**settlement**
  18:19
  24:10  50:7
  53:23
**seven** 19:17
  19:22
  20:22,23
  29:22
**seventh**
  19:22,24
  29:18,19
  30:22  31:7
  31:9
**shared** 10:23
**SHEET** 56:2
**Shore** 4:13

**short-ac...**
  36:17
**show** 42:11
**shows** 43:6
**signed** 3:14
  3:16  5:20
**signific...**
  22:25
  23:11
  42:17
**signify**
  33:11
**similar**
  15:22
  23:22
**simple** 4:17
  19:21
**sir** 4:15  5:7
**sit** 8:18
**site** 37:17
**situation**
  9:19
**six** 41:5,6
**sleepless**
  7:16  8:3
**Social** 45:11
  48:19
**somewhat**
  15:24
**soon** 42:21
**sooner** 26:8
**sorry** 5:5
  15:2  27:16
  43:10
**sort** 10:2
  11:20
  37:20
**sought** 11:19
**special** 47:4
**specific...**
  39:15
**spell** 35:3
**start** 30:8,9
  30:21  32:9
**started** 7:19
  19:17,18
  20:21,23
  29:17,19
  30:11
**starts** 27:25
**state** 1:15
  4:4,8,11
  34:15
  46:13,16

46:19,21
47:2  48:2
48:2
**stated** 9:12
**states** 1:2
  22:8
**statisti...**
  48:24
**statistics**
  48:25
**Stay** 52:12
**stenogra...**
  55:8
**step** 19:17
  19:22  20:5
  20:21,23
  21:4,5
  25:12
  31:12,14
  32:12
  33:12,15
**steps** 50:15
**Stevens** 5:21
**stipend**
  20:10
**STIPULATED**
  3:4,9,13
**stopping**
  20:5
**straight** 7:5
**strike** 26:17
**Subscribed**
  52:21
**substract**
  32:17,20
**subtract**
  19:25
  32:14
  33:23
  44:13,14
**subtracted**
  29:23
**subtracting**
  29:25
**suffer** 7:21
**suffered**
  8:10  10:18
  40:7
**suffering**
  12:2
**sugar** 35:14
  38:16
**suggesting**
  17:18

A0636

**summary** 51:3
51:9 54:8
**Suppleme...**
13:22 14:2
42:7 49:24
53:17
**supplied**
15:8 51:5
**supposed**
15:21
19:11
38:24
**sure** 17:10
17:21
28:18
**sworn** 3:14
3:16 4:3
52:21 55:6
**symptoms** 7:3
7:4 9:21

**T**

**T** 3:2, 2 4:2
53:7 55:2
55:2
**table** 48:19
**take** 10:4
19:16
24:11
27:11,13
27:17
28:16 29:4
30:19
32:11 33:3
33:6,8
36:16
43:23 44:2
44:7 48:20
49:2 50:14
**taken** 1:11
41:17
44:22 55:8
**talk** 23:10
**talked** 12:19
**talking**
16:17,18
38:25
**talks** 22:16
**tell** 17:10
17:21
42:12
**ten** 26:2,3
**terms** 15:23
22:17

**tester** 41:7
41:11
**testified**
4:5
**testify** 5:2
**testifying**
6:3
**testimony**
36:24 55:7
55:8
**testing**
38:16 41:2
**Thank** 37:5
52:14
**things** 37:12
**think** 24:17
**third** 31:25
**three** 21:5
37:12
52:11
**three-qu...**
26:12
**tieing** 39:3
39:6 40:5
**Tier** 51:3,10
52:10 54:7
**ties** 37:3
39:21
**time** 3:11
4:19 12:25
13:3,20
14:8 25:24
38:18
52:15 55:5
**times** 29:2
33:10
40:25
43:25
45:17
**title** 17:11
**today** 5:2
49:9
**today's** 5:17
13:12 14:5
18:8,13
**told** 10:16
11:14,18
11:23,25
12:9,11
**top** 20:7,8
22:6,12
31:11
33:12 44:7

**total** 25:13
26:19
29:16,25
**Touch** 41:9
**training**
34:15 42:3
48:12
**transcribed**
55:9
**transcript**
55:5,11
**transmittal**
49:25
53:20
**treat** 17:25
**trial** 3:11
6:5
**true** 55:11
**trying** 9:14
47:22
**turn** 5:18
14:6
**turned** 19:14
**turning** 13:5
13:13,21
19:7 42:6
**Twenty-two**
20:20
25:21
**twice** 52:9
**two** 32:8,12
46:3 47:14
**two-and-...**
11:5,7
**type** 8:22
34:24 36:4
36:5,16
37:9 48:20
48:22,23

**U**

**U** 3:2
**Ultra** 41:9
**understand**
4:19 7:9,9
24:18
**understood**
4:22
**union** 15:2
15:25 16:3
22:22
**UNITED** 1:2
**University**
34:12

**unknown**
12:24
40:12
**unrespon...**
26:18
**update** 21:24
43:16
**Updated**
49:23
53:15
**uploaded**
41:14
**upset** 7:6
8:12 10:21
11:15
**use** 25:6,7
30:22
34:21,24
35:5,8
**useful** 23:20
**uses** 39:7
**utilize**
21:18 52:2
52:6
**utilized**
49:10

**V**

**Vacation**
47:21
**varies** 35:7
35:11
**various** 7:3
38:10
**vary** 41:3
**vest** 26:2,3
**vote** 23:16
24:8

**W**

**wage** 18:19
50:7,10
53:23
**wages** 12:23
12:25
13:18 14:9
**wait** 48:9,9
**waived** 3:7
**walk** 8:18
**want** 5:13
23:10
26:13 30:8
35:3 49:16
**wasn't** 39:23

**way** 8:15
29:7 38:22
52:7
**We'll** 13:24
18:4,9
30:22
**website**
46:13,16
46:24,25
**week** 35:22
**weight** 9:3,5
**went** 11:11
19:19
29:19 40:3
**wet** 8:6
**WHEREOF**
55:18
**withdraw**
25:16
**Withdrawn**
49:7
**witness**
27:10 55:4
55:6,12,18
**WNS** 48:9
**work** 7:16,17
7:18 25:16
25:19
26:21
37:11,14
40:22
**working**
20:18,25
**works** 36:12
36:14
**write** 21:12

**X**

**x** 1:3,8 53:2
53:7
**xxxxx** 2:15
3:20

**Y**

**Yeah** 11:10
16:20
35:14
**year** 19:22
19:23,24
19:25 20:4
20:8,13,15
25:17,17
29:18,19
30:22 31:7

| | | | | |
|---|---|---|---|---|
| 31:9,13,15 | **1,308,166** | 50:22 51:2 | **30th** 39:14 | 46:8,18 |
| 31:25 | 31:4 | **2013** 17:12 | 40:6 | **54** 26:15 |
| 32:10 33:3 | **1,448,944** | 50:6 | **316,792** | |
| 33:7,17 | 29:6 | **2014** 24:3 | 28:11 | **6** |
| 42:14,19 | **1,482,587** | 50:9 | **323,918** | **6** 17:5 19:10 |
| 42:20,24 | 29:14 | **2015** 15:20 | 28:23 | 20:6 |
| **years** 10:8 | **1,593,553** | 16:17 17:5 | **330** 1:13 2:9 | **60,000** 32:16 |
| 10:11 11:5 | 33:13 | 19:10 50:6 | **35,000** 31:15 | **60,000-ish** |
| 11:8 14:9 | **1.5** 21:22 | **2016** 5:20 | | 32:18 |
| 19:19 | 28:2,3 | 6:17 | **4** | **605** 44:5 |
| 20:15,19 | 43:19 | **2017** 1:14 | **4** 22:5 43:21 | **620** 2:4 |
| 20:24,25 | **1:15-CV-...** | 6:4 13:7 | 52:10 53:5 | **64** 44:14,20 |
| 21:22,22 | 1:5 | 13:23 | **40** 45:18 | **64,963** 44:11 |
| 22:11 | **10** 1:14 | 22:18 | **40,000** 31:15 | 44:22 |
| 24:14,16 | **10,000** 31:12 | 50:22,22 | **400** 31:10 | **6D** 4:13 |
| 24:17,19 | 32:4,5,11 | 50:24 51:2 | **43** 44:14 | |
| 24:20 | **10:00** 1:14 | 55:19 | **43,000** 44:20 | **7** |
| 25:18,25 | **1000** 6 2:4 | **2023** 20:6 | **43,605** 44:22 | **710** 4:13 |
| 26:4,9,14 | **103** 1:13 2:9 | **21** 13:7 | 44:25 | **78** 47:6 |
| 26:22 | **10th** 55:19 | **21,000** 44:17 | **436-what** | |
| 27:14,17 | **11:35** 52:15 | 44:18 | 44:4 | **8** |
| 27:20 28:2 | **1153** 0 2:9 | **21,358** 45:2 | **45** 2:4 32:23 | **85** 45:12 |
| 28:4,21 | **1156** 1 4:14 | **22** 19:19 | 45:16 | **85,292** 22:9 |
| 29:2,20,22 | **122,581** | 20:15,21 | **45,000** 33:2 | 29:3 |
| 29:24 31:2 | 20:11 | 20:24,25 | 34:2 | **854,320** |
| 32:2,8 | 25:10 33:9 | 24:17 | **474,970** | 45:21 |
| 33:8 36:6 | 33:10 44:8 | 25:25 26:4 | 14:14 | **87,211** 22:10 |
| 36:7 37:25 | **13** 33:8,10 | 26:9,14,22 | 15:11 | 29:3 30:25 |
| 41:12,13 | 33:20 | 29:20 33:8 | **49** 53:20 | 33:19 |
| 42:25 45:5 | 53:16 | 42:20,24 | **493-range** | 43:23 44:2 |
| 45:7,9,12 | **14** 53:19 | 42:25 | 24:22 | |
| 46:14,18 | **14,000** 47:4 | 46:14,17 | **493,000** 30:7 | **9** |
| **York** 1:2,13 | 47:8 | **22nd** 19:23 | **493,970** | **9E** 25:10 |
| 1:15 2:4,4 | **15** 17:12 | 19:25 20:4 | 19:14 | |
| 2:9 4:4,14 | 50:8 | **23,478** 42:12 | 23:20 | |
| 16:9,11 | **15,000** 32:14 | 43:3 | 30:15 | |
| 21:3,15,19 | **17** 5:20 6:17 | **24** 5:4 | | |
| 22:7 25:24 | 29:2,2 | **25** 14:9 50:2 | **5** | |
| 32:22 | **17th** 14:8 | **250** 40:13 | **5** 53:14 | |
| 34:15 | **18** 53:25 | **25th** 39:14 | **5,000** 32:13 | |
| 46:12,14 | 54:9 | 40:6 | **5.5** 21:22 | |
| 46:15,19 | | **26** 13:22 | 28:4 | |
| 46:21 47:2 | **2** | 14:3 34:19 | **50** 43:24 | |
| 50:20,23 | **2** 5:19 22:16 | 42:7 49:25 | 44:3 46:2 | |
| 51:2,2,10 | **2.5** 32:2 | 53:18 | 46:8 53:22 | |
| | **2/1/17** 54:5 | **27** 6:4 13:23 | 53:24 54:3 | |
| **Z** | **2/3/17** 54:3 | **29** 20:18 | 54:5 | |
| | **20** 52:21 | | **50,400** 31:22 | |
| **0** | **20-year** | **3** | **500** 40:12 | |
| | 46:17 | **3** 13:13 14:6 | **500,000** 5:10 | |
| **1** | **20,000** 30:19 | 43:19 | 5:22 6:16 | |
| **1** 50:24 | **2007-12** 50:5 | 50:21 51:3 | **51** 54:8 | |
| **1,133,743** | **2011** 50:2 | 51:10 | **53** 26:15 | |
| 33:21 | **2012** 22:17 | 52:10 54:7 | 44:8 46:2 | |

Case 18-966, Document 52-1, 06/26/2018, 2332169, Page179 of 214

# EXHIBIT BB

Patient Name **Roth, Craig**    Medication Allergies: ☐ No ☐ Yes : List_____    | Age__

Date: _7/6/16_ BP ___/___  Pulse_____    Height_____    Weight_____

CC_____

HPI:_____

_____

_____

_____

**Social History:** ☐ No Change  Tobacco? ☐ No ☐ Yes  ETOH? ☐ No ☐ Yes  Drugs? ☐ No ☐ Yes_____
**Family History:** ☐ No Change_____
**Medical History:** ☐ No Change_____ LMP __/__/__

**ROS:** ☐ Constitutional ☐ Ent ☐ Cardiovascular ☐ Respiratory ☐ GI ☐ Musculoskeletal ☐ Skin/Breast
☐ Neuro ☐ Psych ☐ Endocrine ☐ Hematologic ☐ GU ☐ Allergic/Immunologic ☐ Eyes/Head
☐ =Normal ☐ =Abnormal other than stated in HPI

## Physical Exam:
☐ =Examined & Normal   ☐ =Abnormal w/ Explanation

**General Appearance**
☐ Fat Distribution
☐ Facies

**Neck**
☐ Neck Exam
☐ Thyroid Exam

**Skin/Hair (pigment, lesions)**
☐ Inspection of skin and subq tissue
☐ Palpation of skin and subq tissue

**Eyes**
☐ Inspection of conjunctivae and lids
☐ Exam of optic discs
☐ Exam of pupils and irises

**ENT**
☐ External Exam ears and nose
☐ Lips, teeth and gums
☐ Oropharynx exam

**Respiratory**
☐ Respiratory Effort
☐ Auscultation of lungs

**Cardiovascular**
☐ Ausculation of Heart
☐ Extremities (edema)
☐ Pulses

**Chest/Breasts**
☐ Inspection of breasts
☐ Palpation of breasts

**GI/Abdominal**
☐ Masses or tenderness
☐ Liver
☐ Spleen

**Neurologic**
☐ Deep Tendon Reflexes
☐ Coordination
☐ Muscle Strength
☐ Sensation

**Musculoskeletal**
☐ Hands
☐ Fingers

**Psychiatric**
☐ Orientation to time, place and person
☐ Mood and Affect

**Genitourinary/Genitalia**
☐ Digital rectal exam of prostate
☐ Exam of external genitalia

**MEDICATIONS:**

A1c→
7.9

**IMP/Plan:**

**Time Spent w/ Patient:** ___ ☐ Hr ___ ☐ Min  **Estimated Counseling Time:**_____ **Reviewing**_____

**Patient to Return in**_____ ☐ Months ☐ Weeks ☐ Days

**Smoking Cessation Discussed:** ☐

**DR. SIGNATURE:**

Case 18-966, Document 52-1, 06/26/2018, 2332108, Page181 of 214

# EXHIBIT CC

## ENDOCRINOLOGY

Patient Name _Craig Roth_  Medication Allergies: ☐ No ☐ Yes ; List _____

Date: _5/16/16_  BP ___/___  Pulse ____  Height _____  Weight _____

CC _____

HPI: _____

_____

_____

_____

**Social History:** ☐ No Change  Tobacco? ☐ No ☐ Yes  ETOH? ☐ No ☐ Yes  Drugs? ☐ No ☐ Yes _____
**Family History:** ☐ No Change _____
**Medical History:** ☐ No Change _____ LMP ___/___/___

**ROS:** ☐ Constitutional ☐ Ent ☐ Cardiovascular ☐ Respiratory ☐ GI ☐ Musculoskeletal ☐ Skin/Breast
☐ Neuro ☐ Psych ☐ Endocrine ☐ Hematologic ☐ GU ☐ Allergic/Immunologic ☐ Eyes/Head
☐ =Normal ☐ =Abnormal other than stated in HPI

## Physical Exam:
☐ =Examined & Normal   ☐ =Abnormal w/ Explanation

**MEDICATIONS:**

**General Appearance**
☐ Fat Distribution
☐ Facies

**Neck**
☐ Neck Exam
☐ Thyroid Exam

**Skin/Hair (pigment, lesions)**
☐ Inspection of skin and subq tissue
☐ Palpation of skin and subq tissue

**Eyes**
☐ Inspection of conjunctivae and lids
☐ Exam of optic discs
☐ Exam of pupils and irises

**ENT**
☐ External Exam ears and nose
☐ Lips, teeth and gums
☐ Oropharynx exam

**Respiratory**
☐ Respiratory Effort
☐ Auscultation of lungs

**Cardiovascular**
☐ Ausculation of Heart
☐ Extremities (edema)
☐ Pulses

**Chest/Breasts**
☐ Inspection of breasts
☐ Palpation of breasts

**GI/Abdominal**
☐ Masses or tenderness
☐ Liver
☐ Spleen

**Neurologic**
☐ Deep Tendon Reflexes
☐ Coordination
☐ Muscle Strength
☐ Sensation

**Musculoskeletal**
☐ Hands
☐ Fingers

**Psychiatric**
☐ Orientation to time, place and person
☐ Mood and Affect

**Genitourinary/Genitalia**
☐ Digital rectal exam of prostate
☐ Exam of external genitalia

A1C →

**IMP/Plan:** _____

BASAL _____  8.5%

_____

_____

**Time Spent w/ Patient:** ____ ☐ Hr ____ ☐ Min  **Estimated Counseling Time:** _____ Reviewing _____

**Patient to Return in** _____ ☐ Months ☐ Weeks ☐ Days

**Smoking Cessation Discussed:** ☐

**DR. SIGNATURE:** _____

Case 18-966, Document 52-1, 06/26/2018, 2332108, Page183 of 214

# EXHIBIT DD

## ENDOCRINOLOGY

Patient Name ___CRG Roth___   Medication Allergies: ☐ No ☐ Yes : List _____

Date: __11/6/15__   BP __/__   Pulse _____   Height _____   Weight _____

CC: _feels great_

HPI: A1C = 8.2   12AM 1.2   1030 mg
   3AM 1.2   1.6
   9AM 2.0
   ortho dr   11 AM 2.0
   3.30PM 2.15   bolus
   1.10

Social History: ☐ No Change   Tobacco? ☐ No ☐ Yes   ETOH? ☐ No ☐ Yes   Drugs? ☐ No ☐ Yes
Family History: ☐ No Change
Medical History: ☐ No Change _____   LMP __/__/__

ROS: ☐ Constitutional ☑ Ent ☑ Cardiovascular ☐ Respiratory ☑ GI ☐ Musculoskeletal ☑ Skin/Breast
☐ Neuro ☐ Psych ☐ Endocrine ☐ Hematologic ☐ GU ☐ Allergic/Immunologic ☐ Eyes/Head
☐ =Normal ☐ =Abnormal other than stated in HPI

## Physical Exam:
☐ =Examined & Normal   ☐ =Abnormal w/ Explanation

### General Appearance
☐ Fat Distribution
☐ Facies

### Neck
☐ Neck Exam
☐ Thyroid Exam

### Skin/Hair (pigment, lesions)
☐ Inspection of skin and subq tissue
☐ Palpation of skin and subq tissue

### Eyes
☐ Inspection of conjunctivae and lids
☐ Exam of optic discs
☐ Exam of pupils and irises

### ENT
☑ External Exam ears and nose
☐ Lips, teeth and gums
☑ Oropharynx exam

### Respiratory
☐ Respiratory Effort
☐ Auscultation of lungs

### Cardiovascular
☐ Ausculation of Heart
☐ Extremities (edema)
☐ Pulses

### Chest/Breasts
☐ Inspection of breasts
☐ Palpation of breasts

### GU/Abdominal
☐ Masses or tenderness
☑ Liver
☑ Spleen

### Neurologic
☐ Deep Te...
☐ Coordin...
☐ Muscle S...
☐ Sensation

### Musculoske...
☐ Hands
☐ Fingers

### Psychiatric
☐ Orientati...
☐ Mood an...

### Genitourinary/Genitalia
☐ Digital rectal exam of prostate
☐ Exam of external genitalia

MEDICATIONS:

Afinion

DATE: 2015-11-06
TIME: 18:09
RUN#: 2
P-ID/C-ID: ROTH
LOT#: 10177890
SN: 34433
HbA1c: 8.2 %

## IMP/Plan:
9AM 2.0↑
3.30AM 2.25
No hypoglycemia
Feels great

Time Spent w/ Patient: _____ ☐ Hr _____ ☐ Min   Estimated Counseling Time: _____ Reviewing _____

Patient to Return in _____ ☐ Months ☑ Weeks ☐ Days

Smoking Cessation Discussed: ☐

DR. SIGNATURE: _____

A0644

Case 18-966, Document 52-1, 06/26/2018, 2332108, Page185 of 214

# EXHIBIT EE

# ENDOCRINOLOGY

Patient Name: Craig Roth

Medication Allergies: ☐ No ☐ Yes : List _____

Date: 3/2/14  BP ___/___  Pulse ____  Height _____  Weight _____

**CC**

**HPI:** No gusser lors

**Social History:** ☐ No Change  Tobacco? ☐ No ☐ Yes  ETOH? ☐ No ☐ Yes  Drugs? ☐ No ☐ Yes _____

**Family History:** ☐ No Change

**Medical History:** ☐ No Change _____  LMP ___/___/___

**ROS:** ☐ Constitutional ☐ Ent ☐ Cardiovascular ☐ Respiratory ☐ GI ☐ Musculoskeletal ☐ Skin/Breast
☐ Neuro ☐ Psych ☐ Endocrine ☐ Hematologic ☐ GU ☐ Allergic/Immunologic ☐ Eyes/Head
☐ =Normal  =Abnormal other than stated in HPI

## Physical Exam:
☐ =Examined & Normal  ☐ =Abnormal w/ Explanation

**General Appearance**
☐ Fat Distribution
☐ Facies

**Neck**
☐ Neck Exam
☐ Thyroid Exam

**Skin/Hair (pigment, lesions)**
☐ Inspection of skin and subq tissue
☐ Palpation of skin and subq tissue

**Eyes**
☐ Inspection of conjunctivae and lids
☐ Exam of optic discs
☐ Exam of pupils and irises

**ENT**
☐ External Exam ears and nose
☐ Lips, teeth and gums
☐ Oropharynx exam

**Respiratory**
☐ Respiratory Effort
☐ Ausculation of lungs

**Cardiovascular**
☐ Ausculation of Heart
☐ Extremities (edema)
☐ Pulses

**Chest/Breasts**
☐ Inspection of breasts
☐ Palpation of breasts

**GI/Abdominal**
☐ Masses or tenderness
☐ Liver
☐ Spleen

**Neurologic**
☐ Deep Tendon Reflexes
☐ Coordination
☐ Muscle Strength
☐ Sensation

**Musculoskeletal**
☐ Hands
☐ Fingers

**Psychiatric**
☐ Orientation to time, place and person
☐ Mood and Affect

**Genitourinary/Genitalia**
☐ Digital rectal exam of prostate
☐ Exam of external genitalia

**MEDICATIONS:**

5 AM - 9 AM
0.55
9 AM - 11 AM
1.95
11 AM - 2 PM
2.05
2 PM - 6 PM
2.0
6 PM - 12 AM
2-3
1.10 BF

**IMP/Plan:** Alig to 1.8
reel

**Time Spent w/ Patient:** ____ ☐ Hr ____ ☐ Min  **Estimated Counseling Time:** _____  Reviewing _____

**Patient to Return in** _____ ☐ Months ☐ Weeks ☐ Days

**Smoking Cessation Discussed:** ☐

**DR. SIGNATURE:**

A0646

# EXHIBIT FF

## ENDOCRINOLOGY

Patient Name _Craig Roth_    Medication Allergies: ☐ No ☐ Yes : List _____    Age __

Date: 1/6/15   BP ___/___   Pulse ____    Height _____   Weight _____

CC _____

HPI: _A1C = 7.5_

_____

_____

**Social History:** ☐ No Change  Tobacco? ☐ No ☐ Yes  ETOH? ☐ No ☐ Yes  Drugs? ☐ No ☐ Yes _____
**Family History:** ☐ No Change _____
**Medical History:** ☐ No Change _____ LMP __/__/__

**ROS:** ☐ Constitutional ☐ Ent ☐ Cardiovascular ☐ Respiratory ☐ GI ☐ Musculoskeletal ☐ Skin/Breast
☐ Neuro ☐ Psych ☐ Endocrine ☐ Hematologic ☐ GU ☐ Allergic/Immunologic ☐ Eyes/Head
☐ =Normal ☐ =Abnormal other than stated in HPI

## Physical Exam:
☐ =Examined & Normal    ☐ =Abnormal w/ Explanation

**MEDICATIONS:**

**General Appearance**
☐ Fat Distribution
☐ Facies

**Respiratory**
☐ Respiratory Effort
☐ Auscultation of lungs

**Neurologic**
☐ Deep Tendon Reflexes
☐ Coordination
☐ Muscle Strength
☐ Sensation

**Neck**
☐ Neck Exam
☐ Thyroid Exam

**Skin/Hair (pigment, lesions)**
☐ Inspection of skin and subq tissue
☐ Palpation of skin and subq tissue

**Cardiovascular**
☐ Ausculation of Heart
☐ Extremities (edema)
☐ Pulses

**Musculoskeletal**
☐ Hands
☐ Fingers

**Eyes**
☐ Inspection of conjunctivae and lids
☐ Exam of optic discs
☐ Exam of pupils and irises

**Chest/Breasts**
☐ Inspection of breasts
☐ Palpation of breasts

**Psychiatric**
☐ Orientation to time, place and person
☐ Mood and Affect

**ENT**
☐ External Exam ears and nose
☐ Lips, teeth and gums
☐ Oropharynx exam

**GI/Abdominal**
☐ Masses or tenderness
☐ Liver
☐ Spleen

**Genitourinary/Genitalia**
☐ Digital rectal exam of prostate
☐ Exam of external genitalia

**IMP/Plan:** _Does not want Susan_   HA1C 7.5%
_Notes_
12AM 0.925    11AM 1.9
5AM 0.9 25    2AM 1.9
9AM 1.85    6PM 1.9

Time Spent w/ Patient: ____ ☐ Hr ____ ☐ Min  Estimated Counseling Time: _____ Reviewing
Patient to Return in _____ ☐ Months ☐ Weeks ☐ Days   1:C   1:10
Smoking Cessation Discussed: ☐
DR. SIGNATURE:   _Pt does not want p/u rate_
_~ v 1:C C8_

A0648

# EXHIBIT GG

## ENDOCRINOLOGY

Age _____

Patient Name Craig Roth          Medication Allergies: ☐ No ☐ Yes ; List _____

Date: 10/22/14   BP 110 ? _ Pulse 53      Height _____   Weight _____

CC _____

HPI: _____ 90 - 150

S436 feels well

**Social History:** ☑ No Change  Tobacco? ☐ No ☐ Yes  ETOH? ☐ No ☐ Yes  Drugs? ☐ No ☐ Yes _____
**Family History:** ☑ No Change _____  LMP __/__/__
**Medical History:** ☐ No Change _____

**ROS:** ☑ Constitutional ☑ Ent ☐ Cardiovascular ☐ Respiratory ☑ GI ☐ Musculoskeletal ☐ Skin/Breast
☑ Neuro ☑ Psych ☑ Endocrine ☐ Hematologic ☑ GU ☐ Allergic/Immunologic ☐ Eyes/Head
☑ =Normal ☑ =Abnormal other than stated in HPI

## Physical Exam:
☐ =Examined & Normal    ☐ =Abnormal w/ Explanation

**MEDICATIONS:**

**General Appearance**
☑ Fat Distribution
☑ Facies

**Neck**
☐ Neck Exam
☐ Thyroid Exam

**Skin/Hair (pigment, lesions)**
☐ Inspection of skin and subq tissue
☐ Palpation of skin and subq tissue

**Eyes**
☑ Inspection of conjunctivae and lids
☐ Exam of optic discs
☑ Exam of pupils and irises

**ENT**
☑ External Exam ears and nose
☐ Lips, teeth and gums
☑ Oropharynx exam

**Respiratory**
☐ Respiratory Effort
☐ Auscultation of lungs

**Neurologic**
☐ Deep Tendon Reflexes
☐ Coordination
☐ Muscle Strength
☐ Sensation

**Cardiovascular**
☑ Ausculation of Heart
☑ Extremities (edema)
☑ Pulses

**Chest/Breasts**
☐ Inspection of breasts
☐ Palpation of breasts

**GI/Abdominal**
☑ Masses or tenderness
☐ Liver
☐ Spleen

**Musculoskeletal**
☐ Hands
☐ Fingers

**Psychiatric**
☐ Orientation to time, place and person
☐ Mood and Affect

**Genitourinary/Genitalia**
☐ Digital rectal exam of prostate
☐ Exam of external genitalia

Do not que to MRD
A1C 7.6% - ↑

**IMP/Plan:** Doing well polycythemia Amgen for MRD

Time Spent w/ Patient: ____ ☐ Hr ____ ☐ Min  Estimated Counseling Time: ____ Reviewing ____
Patient to Return in ____ ☐ Months ☐ Weeks ☐ Days
Smoking Cessation Discussed: ☐
DR. SIGNATURE: _____        A0650

Case 18-966, Document 52-1, 06/26/2018, 2332163, Page191 of 214

# EXHIBIT HH

CRAIG ROTH

AGE: 23 - 11/15/1991

Appointment: **01/06/2015 02:40 PM**

1796 WILSON ROAD

Resource: **PERRY B HERSON**

EAST MEADOW, NY 11554

Note:

Primary Phone:  (516) 459-9064

Pri Insurance:  GHI

Work Phone:

Pri Insured's ID:  931016316

Account Number:  12641

Sec Insurance:

Copay:  $0.00     Balance as of  $0.00
01/06/2015:

Sec Insured's ID:

**Office Visit/Consultation**
99243
99244
99245

**New Patient**
99203
99204
99205

**Established**
99212
99213
99214
99215

**Venipuncture**
36415

**Thyroid Sonogram**
76536

**FNA**
76942
10022

**Caloremetry**
94690

**HAIC**
83036

**NCV**
95905

**ANS**
95943

**ABI**
93922

**Diagnosis Codes**
252.00 HYPERPARATHYROIDISM
268.0 VIT D DEF
275.45 HYPERCALCEMIA
733.00 OSTEPOROSIS
783.1  ABN WEIGHT GAIN
780.79  FATIGUE
785.1 PALPITATIONS
794.6 ABN ENDO TEST
706.1 ACNE
227.3 PITUITARY ADENOMA
250.01 TYPE 1 DM/CONTROLLED
250.03 TYPE 1/UNCONTROLLED
250.00 TYPE 2 DM/CONTROLLED
250.02 TYPE 2/UNCONTROLLED
648.80  GESTASIONAL DM
240.9 GOITER
241.1 GOITER NON TOXIC
242.00 GRAVES DISEASE W/O
242.01 GRAVES DISEASE WITH
244.9 HYPOTHYROIDISM/PRIMARY
244.8 HYPOTHYROIDISM/ACQUIRED
193 THYROID CANCER
255.0 CUSHINGS
272.2 HYPERLIPIDEMIA
256.31 PREMATURE OVARIAN FAILURE
256.4 PCOS

**Micro/UA**
81003QW
82570QW
82044QW

Copay:     Cash          Ck          CC

Printed: 01/06/2015 02:51:50 PM          Superbill          Page:  1/1

A0652

# EXHIBIT II

CRAIG ROTH

AGE: 23 - 11/15/1991

Appointment: **07/10/2015 11:10 AM**

1796 WILSON ROAD

EAST MEADOW, NY 11554

Resource: **PERRY B HERSON**

Note:

Primary Phone: (516) 459-9064

Pri Insurance: GHI

Work Phone:

Pri Insured's ID: 931016316

Account Number: 12641

Sec Insurance:

Copay: $0.00     Balance as of $0.00
                 07/10/2015:

Sec Insured's ID:

**Office Visit/Consultation**
99243
99244
99245

**New Patient**
99203
99204
99205

**Established**
99212
99213
99214
99215

**Venipuncture**
36415

**Thyroid Sonogram**
76536

**FNA**
76942
10022

**Caloremetry**
94690

**HAIC**
83036

**NCV**
95905

**ANS**
95943

**ABI**

**Micro/UA**
81003QW
82570QW
82044QW

**Diagnosis Codes**
252.00 HYPERPARATHYROIDISM
268.0 VIT D DEF
275.45 HYPERCALCEMIA
733.00 OSTEPOROSIS
783.1 ABN WEIGHT GAIN
780.79 FATIGUE
785.1 PALPITATIONS
794.6 ABN ENDO TEST
706.1 ACNE
227.3 PITUITARY ADENOMA
250.01 TYPE 1 DM/CONTROLLED
250.03 TYPE 1/UNCONTROLLED
250.00 TYPE 2 DM/CONTROLLED
250.02 TYPE 2/UNCONTROLLED
648.80 GESTATIONAL DM
240.9 GOITER
241.1 GOITER NON TOXIC
242.00 GRAVES DISEASE W/O
242.01 GRAVES DISEASE WITH
244.9 HYPOTHYROIDISM/PRIMARY
244.8 HYPOTHYROIDISM/ACQUIRED
193 THYROID CANCER
255.0 CUSHINGS
272.2 HYPERLIPIDEMIA
256.31 PREMATURE OVARIAN FAILURE
256.4 PCOS

Copay:      Cash            Ck            CC

`AM            Superbill            Page: 1/1

A0654

# EXHIBIT JJ

Section 4.3 – Diabetes



AMERICAN COLLEGE OF
OCCUPATIONAL AND
ENVIRONMENTAL MEDICINE

# National Consensus Guideline for the Medical Evaluation of Law Enforcement Officers

**Daniel Samo, MD, FACOEM**
**Kris Arnold, MD**
**Richard Brown**
**Fabrice Czarnecki, MD, MPH**
**Stanley Haimes, MD, MPH, CIH, FACOEM**
**Thomas Hales, MD, MPH**
**William Johnson**
**Kim Kohlhepp**
**Capt. Roe Manghisi**
**Richard Miller, MD**
**David Louis, MD, MS, FACOEM**

Roth Confidential 1

A0656

Section 4.3 – Diabetes

# National Consensus Guideline for the Medical Evaluation
# of Law Enforcement Officers (LEOs)

## 4.3    Diabetes Mellitus

4.3.1    *Introduction:* The educated and motivated law enforcement officer (LEO) with well-managed diabetes mellitus[1] can be capable of safe and effective job performance. However, diabetes mellitus may place LEOs at risk for sudden incapacitation, thus jeopardizing their ability to perform critical job functions. (These job functions include those listed in Sections 3.2, 3.3.3, 3.5.1, 3.5.2, 3.6, and 3.7 and discussed in Appendix A.)

Therefore, an individualized assessment of the LEO's diabetes should be performed using the following evaluative criteria to determine whether the individual's condition permits safe and effective job performance. Such evaluation must include the following key elements, which are discussed in detail below:

- History of blood glucose control
- Knowledge of diabetes and its management
- Current stability of blood glucose
- Risk for significant hypoglycemia or hyperglycemia
- Presence of diabetic complications

4.3.2    *Overview of Medical Evaluation:* The treating endocrinologist or other physician knowledgeable regarding diabetes management should provide a narrative report certifying whether the LEO has or has not met the criteria set out in sections 4.3.2.1 through 4.3.5.4 below. In addition, the physician should include supporting data [see Appendix B for the Physician Evaluation Form].

4.3.2.1    The LEO is under the care of an endocrinologist or other physician knowledgeable regarding diabetes management. Outpatient and in-patient medical record(s) for the last three years or since date of diagnosis (whichever is shorter) should be reviewed by the treating physician and provided to the police physician.

4.3.2.2    If the LEO has type 1 diabetes, the individual has been on a basal/bolus regimen or an insulin pump using analogue insulins for the six (6) months prior to evaluation.[2]

4.3.2.3    If the LEO has type 2 diabetes on insulin, the individual has been on a stable medication regimen for the three (3) months prior to evaluation.[3] If on oral agents alone, the LEO has been on a stable medication regimen for the month prior to evaluation.[4]

4.3.2.4    If the LEO uses an insulin pump, documentation is needed as follows:
- proper understanding and education in the use of the insulin pump
- start date for the use of the pump
- history of insulin site infections[5]
- history of pump cessation and pump malfunction
- backup plan for pump malfunction including use of injectable insulin
- frequency of infusion set changes

4.3.2.5    The LEO has been educated in diabetes and its management and thoroughly informed of and understands the procedures that must be followed to monitor and manage his/her diabetes and what procedures should be followed if complications arise.[6]

Roth Confidential 2

Section 4.3 – Diabetes

### 4.3.3   Quantitative Glucose Monitoring

4.3.3.1   The LEO has documentation of ongoing self-monitoring of blood glucose.

4.3.3.2   This must be done with a glucose meter that stores every reading, records date and time of reading and from which data can be downloaded.[7]

4.3.3.3   Monitoring logs must be available covering the time period (1, 3, or 6 months) as described in Sections 4.3.2.2 and 4.3.2.3. The frequency of glucose monitoring must follow a schedule acceptable to the police physician in consultation with the treating physician.[8]

4.3.3.4   The LEO has had hemoglobin A1C measured at least four times a year (intervals of two to three months) over the last 12 months prior to evaluation if diagnosis has been present over a year.[9] If hemoglobin A1C > 8%, this may signal a problem with diabetes management that warrants further assessment.[10]

### 4.3.4   Incapacitating events

4.3.4.1   The LEO has not had any episodes within the past one (1) year and no more than two episodes in the past three (3) years, or since diagnosis of diabetes (whichever is shorter) of:

4.3.4.1.1   severe hypoglycemia (loss of consciousness, seizures, or coma requiring assistance of others or needing urgent treatment [glucagon injection/IV glucose]) or

4.3.4.1.2   blood sugar < 60 mg/dl with unawareness[11] demonstrated in current glucose logs.

### 4.3.5   Chronic complication screening

4.3.5.1   Chronic complications of diabetes are associated with increased risk for severe hypoglycemic episodes and warrant further assessment.[12]

4.3.5.2   The components of screening for chronic complications are:

4.3.5.2.1   A complete eye exam by a qualified ophthalmologist or optometrist, including a dilated retinal exam, demonstrating no more than mild background diabetic retinopathy.[13]

4.3.5.2.2   Normal vibratory testing with a 128 Hz tuning fork; normal testing with 10 gram Semmes-Weinstein monofilament[14]; and normal orthostatic blood pressure and pulse testing.[15]

4.3.5.2.3   Normal cardiac physical exam. Cardiac stress testing to at least 12 METS is recommended and should begin based on either the criteria of the American Heart Association/American College of Cardiology[16] or those of the American Diabetes Association.[17]

Diabetics who have a normal cardiac stress test will be retested every one to three years based on individual clinical assessment. This assessment should consider:

- the age of the individual
- the number and persistence of coronary artery disease (CAD) risk factors
- the severity of CAD risk factors

4.3.5.2.4   Microalbumin/creatinine ratio ≤30:1, measured or calculated creatinine clearance > 60 ml/min.[18]

Roth Confidential 3

Section 4.3 – Diabetes

## 4.3.6 Ongoing evaluation and requirements

4.3.6.1 Should have medical records and glucose meter logs reviewed periodically. Because of the nature of diabetes it is important that regular medical follow up be provided to the LEO. The frequency and content of the evaluation should be determined on an individual basis by the police physician in consultation with the treating physician.[19]

4.3.6.2 Must advise police physician of any change in type of medication.

4.3.6.3 Must advise police physician of any episodes of significant hypoglycemia or hyperglycemia (ketoacidosis, hyperosmolar hyperglycemic nonketotic state).[20]

4.3.6.4 Must provide documentation of ongoing evaluation of cardiac, ophthalmological, neurological and/or renal status [see Sections 4.3.5 above].

Roth Confidential 4

A0659

# Appendix A – Commentary

## Diabetes definitions and treatments:

Type 1 diabetes was previously called insulin-dependent diabetes mellitus (IDDM) or juvenile-onset diabetes. Type 1 diabetes develops when the body's immune system destroys pancreatic beta cells, the only cells in the body that make the hormone insulin that regulates blood glucose. This form of diabetes usually strikes children and young adults, although disease onset can occur at any age. Type 1 diabetes may account for 5% to 10% of all diagnosed cases of diabetes. In order to survive, people with type 1 diabetes must have insulin delivered by injections or a pump.

Type 2 diabetes was previously called non-insulin-dependent diabetes mellitus (NIDDM) or adult-onset diabetes. Type 2 diabetes may account for about 90% to 95% of all diagnosed cases of diabetes. It usually begins as insulin resistance, a disorder in which the cells do not use insulin properly. As the need for insulin rises, the pancreas gradually loses its ability to produce sufficient insulin. Type 2 diabetes is associated with older age, obesity, family history of diabetes, prior history of gestational diabetes, impaired glucose tolerance, physical inactivity, and race/ethnicity. Type 2 diabetes is increasingly being diagnosed in children and adolescents. Many people with type 2 diabetes can control their blood glucose by following a careful diet and exercise program, losing excess weight, and taking oral medication. Among adults with diagnosed diabetes, about 12% take both insulin and oral medications, 19% take insulin only, 53% take oral medications only, and 15% do not take either insulin or oral medications.[21]

Risk of hypoglycemia remains the major concern in regard to those with diabetes being or becoming law enforcement officers (LEOs). This risk occurs primarily in those taking insulin, particularly those with type 1 diabetes, although it may also occur in those with type 2 diabetes who take insulin and/or certain oral anti-diabetic medications. Patients treated with metformin, alpha-glucosidase inhibitors, or thiazolidinediones alone or in combination with each other are at little or no risk of significant hypoglycemia.

| Drug Class | Brand names | Generic names | Hypoglycemia risk compared to insulin |
|---|---|---|---|
| Sulfonylurea | Amaryl, Glucotrol, Micronase | Glimepiride, Glipizide, Glyburide | 0.5 |
| Short acting secretagogues | Prandin, Starlix | Repaglinide, Nateglinide | 0.2 |
| Biguanide | Glucophage | Metformin | none |
| Thiazolidinediones | Avandia, Actos | Rosiglitazone, Pioglitazone | none |
| Alpha glucosidase inhibitors | Precose, Glyset | Acarbose, Miglitol | none |

Law enforcement entails a unique set of conditions that need to be considered in regard to those with diabetes and the risks of impairment from either hypo or hyperglycemia. These may include (depending upon the duties of the particular LEO position):

- unpredictable meal schedules;
- brief periods of maximal physical exertion;
- prolonged driving with responsibility for others in the vehicle;
- high-speed pursuit driving;
- surveillance requiring sustained attention for prolonged periods of time;
- rapid decision making regarding the use of force, including deadly force;
- rapid analysis of complex visual stimuli to differentiate weapons from other objects; and
- control of one's emotions under stress.

The criteria and individualized assessment process included in this Guidance are intended to serve as a means to minimize the risk to individual LEOs and the public while allowing well motivated, well educated persons with well controlled diabetes to serve as LEOs. Nonetheless, certain persons with diabetes, despite their motivation and

Roth Confidential 5

Section 4.3 – Diabetes

adherence to optimum care, are unable to attain adequate control of their diabetes, and therefore have a greater tendency for significant hypoglycemia. Such individuals would not be acceptable candidates to be LEOs.

This individualized assessment is possible in large part because a great deal of change has occurred in the treatment of diabetes over the last number of years. Previously patients used insulins that were somewhat unpredictable in the time course of their action and generally took two or fewer injections per day. Today, there are insulins that are far more predictable and are either very long acting and essentially treat only basal hepatic glucose production (and therefore do not depend on a patient eating on a regular schedule) or are very rapid and therefore can be administered directly before or even shortly after eating, significantly decreasing the chance of insulin being taken and then the meal being interrupted due to professional duties.

Regimens now referred to as "basal bolus" are composed of a very long acting basal (or background) insulin, and rapid acting (bolus) insulins. The basal insulin controls glucose levels overnight in the absence of carbohydrate intake. The rapid acting (bolus) insulins that are dosed just prior to, during, or after meals based on blood glucose levels at that time, the amount of carbohydrate that the person expects to consume, and any anticipated change in physical activity patterns over the next several hours. These regimens have resulted in improved overall blood glucose control with significantly less risk of hypoglycemia for many patients.

Additional major advances in the size, speed, and sophistication of blood glucose meters provide for easy, accurate, and rapid assessment of blood glucose levels. All current blood glucose meters can be downloaded to computer programs, facilitating confirmation and review of blood glucose results. Such monitoring techniques, as well as the generally increased self-awareness that accompanies consistent self-monitoring, enables the motivated person with diabetes to assess blood glucose levels and ingest a safety net of carbohydrates before entering a hazardous environment. Similarly, major advances in insulin delivery systems have greatly increased the ability of the motivated individual with diabetes to achieve a level of diabetes self-management consistent with the duties of a LEO.

In order to get maximum effect from these medical advances, and to minimize the risk of hypoglycemia, patients with diabetes must check their blood glucose level frequently (as recommended based on factors such as type of therapy and glycemic history), review these results on a regular basis, and see their diabetes care provider regularly for discussion in regard to any necessary changes in treatment. Patient evaluation needs to look for any of the known risk factors for serious hypoglycemia or evidence of any of the known microvascular (eye disease, kidney disease, or nerve disease) or macrovascular (cardiovascular disease, peripheral arterial disease) complications of diabetes.

The above described individualized assessment demands a very close and good working relationship between the patient and the diabetes care provider.

**Conclusion:**
Current published data suggest that persons with diabetes who can safely and effectively function as LEOs can be reliably identified through careful individualized assessment. Thus blanket bans of all people with diabetes, in addition to being illegal, are not consistent with current medical knowledge. Because diabetes affects individuals very differently, whether or not an individual can safely perform a particular job must be determined using the combined expertise of the treating physician and the police physician. These Guidances provide the information necessary for the police physician to work with a diabetes expert on this important task.

Roth Confidential 6

Section 4.3 – Diabetes

# APPENDIX B – Physician Evaluation Form
## for Law Enforcement Officer with Diabetes

You are being asked to evaluate an individual for a position as a law enforcement officer (LEO). It is essential that the LEO undergo an individualized assessment of his or her diabetes to determine whether the individual's condition permits safe and effective job performance. This evaluation is based on the guidance established by the American College of Occupational and Environmental Medicine (ACOEM). The relevant sections of these guidances are listed below in bold, followed by the information needed to assess whether the individual meets these guidances.

## I. Introduction

The educated and motivated law enforcement officer (LEO) or applicant with well-managed diabetes mellitus can be capable of safe and effective job performance. An individualized assessment of the LEO's or applicant's diabetes should be performed including an assessment of the following:

- History of blood glucose control
- Current stability of blood glucose
- Risk for significant hypoglycemia or hyperglycemia
- Presence of diabetic complications
- Knowledge of diabetes and its management.

Risk of hypoglycemia remains the major concern in regard to those with diabetes being or becoming LEOs. This risk occurs primarily in those taking insulin, particularly those with type 1 diabetes, although it may also occur in those with type 2 diabetes who take insulin and/or sulfonylureas and other secretagogues.

Law enforcement entails a unique set of conditions that need to be considered in regard to those with diabetes and the risks of either hypo or hyperglycemia. These may include (depending upon the duties of the particular LEO position):

- unpredictable meal schedules;
- brief periods of maximal physical exertion;
- prolonged driving with responsibility for others in the vehicle;
- high-speed pursuit driving;
- surveillance requiring sustained attention for prolonged periods of time;
- rapid decision making regarding the use of force, including deadly force;
- rapid analysis of complex visual stimuli to differentiate weapons from other objects; and
- control of one's emotions under stress.

## II. Assessment

1. LEO has been under the care of an endocrinologist or other physician knowledgeable about diabetes management. Outpatient and in-patient medical record(s) of the last three years or since date of diagnosis (whichever is shorter) should be reviewed by the treating physician and provided to the police physician.

*My credentials as a physician knowledgeable about diabetes management are as follows (or attach CV):*

ENDOCRINOLOGIST

*This person has:* ☒ *type 1 diabetes* ☐ *type 2 diabetes*

*Date of diagnosis:* 10 / 31 / 98

*Attached records for prior 3 years or since onset of diabetes whichever is shorter for:*
☐ *out-patient treatment* ☐ *in-patient treatment*

Guidance for the Medical Evaluation of Law Enforcement Officers
Copyright ©2007 American College of Occupational and Environmental Medicine

7

Section 4.3 – Diabetes

2. If type 1 diabetes, has been on a basal/bolus regimen or an insulin pump using analogue insulins for the six (6) months prior to evaluation.[22,23]

Current insulin regimen:    Insulin pump brand ___MiniMed___

*Multiple dose insulin (specify regimen)*

| Rate | 0.9 U | 0.9 U | 1.85 | 1.9 | .9 |
|------|-------|-------|------|-----|-----|
| Time | 12 AM | 5 AM | 9 AM | 11 AM | 2 PM |

| Rate | .9 . | | | | |
|------|------|--|--|--|--|
| Time | 6 PM | | | | |

Bolus doses:

Breakfast    ___1:C  is  1:10 carb___
Lunch        _____
Supper       _____
Other        _____

*Multiple dose insulin (specify regimen)*

*Basal:* _____

*Bolus:* _____

_____

**Starting date on current regimen:** _1_/_6_/_15_

3. If type 2 diabetes on insulin, has been on a stable medication regimen for the three (3) months prior to evaluation.[24] If on oral agents alone, should be on a stable medication regimen for the month prior to evaluation.[25]

Current medication regimen:

oral agents                insulin

_____              _____
_____              _____
_____              _____

*Starting date on current regimen:* ____/____/_____

4. Has documentation of ongoing self-monitoring of blood glucose. This must be done with a glucose meter that stores every reading, records date and time of reading and from which data can be downloaded.

**Section 4.3 – Diabetes**

Monitoring records must be available covering the time periods (1, 3, or 6 months), as described in Sections 2 and 3, following a schedule acceptable to the police physician.[26]

*The individual has been asked to test glucose* ___4___ *times a day, and*

☒ *is adhering to my recommended schedule for testing.*

☐ *is not adhering to my recommended schedule for testing.*

*Glucose logs:*

☐ *are attached for review*

☐ *are not attached for review (please explain,*

5. Has been educated in diabetes and its management and thoroughly informed of and understands the procedures that must be followed to monitor and manage his/her diabetes and what procedures should be followed if complications arise.[27]

*The individual has completed the following diabetes education (include year of completion):*

_____1998 + at LIJ_____

_____

6. If an insulin pump user, documents:

- proper understanding and education in the use of the insulin pump
- start date for the use of the pump
- history of insulin site infections
- history of pump cessation and pump malfunction
- backup plan for pump malfunction including use of injectable insulin
- frequency of infusion set changes

*The individual has completed the following education in the use of a continuous insulin infusion pump (indicate year of completion):*

_____

_____

*The individual routinely carries appropriate supplies to compensate for pump malfunction, including syringes and insulin vials or insulin pens.*

☒ *Yes*        ☐ *No – please explain*

*The individual has had more than one pump site infection that caused him/her to miss work or usual daily activities in the preceding six months.*

☐ *Yes – please explain*        ☒ *No*

7. Has had hemoglobin A1C measured at least four times a year (intervals of two to three months) over the last 12 months prior to evaluation if diagnosis has been present over a year.[28,29]

| Date | HbA1C |
|------|-------|
| 1/6/11 | 7.5 |
| 6/12/11 | 6.9 |

8. Incapacitating events – Has not had any within the past one (1) year and no more than two (2) episodes in the past three (3) years, or since diagnosis of diabetes (whichever is shorter) episodes of:

Section 4.3 – Diabetes

a. severe hypoglycemia (loss of consciousness, seizures or coma, requiring the assistance of others or needing urgent treatment [glucagon injection or IV glucose]) or

b. a blood sugar < 60 mg/dl with unawareness demonstrated in current glucose logs.

*Has this individual had an episode of hypoglycemia as described above?*

☐ Yes      ☒ No

*If the individual has had such episode(s), please describe episodes and provide dates of episodes:*

9. Has had a complete eye exam by a qualified ophthalmologist or optometrist, including a dilated retinal exam, demonstrating no more than mild background diabetic retinopathy.[31]

   *Copy of ophthalmology or optometry report is attached:*

   ☐ Yes      ☐ No – please explain

10. Has normal vibratory testing with 128 Hz tuning fork, has normal testing with 10 gram Semmes-Weinstein monofilament[32] and normal orthostatic blood pressure and pulse testing.[33]

    *Vibration sensation:*  INTACT

    *Monofilament:* _____

    *BP supine:*  120/80        *Pulse supine:*  80

    *BP standing:*  120/80      *Pulse standing:*  80

11. Has normal cardiac physical exam and normal cardiac stress testing to at least 12 METS. Annual cardiac stress testing[34] should begin when any of the following criteria are met:

    - age greater than 35 years
    - Type 1 DM greater than 15 years duration
    - Type 2 DM greater than 10 years duration
    - signs of target organ damage (eyes, kidneys, autonomic, cardiac)
    - any other coronary artery disease risk factors

    *Copy of stress test report performed within the last 12 months is attached:*

    ☐ Yes      ☐ No – please explain

12. Has normal renal function based on albumin/creatinine ratio ≤ 30:1, and measured or calculated creatinine clearance > 60 ml/min.[35]

    *Serum Creatinine:*  NORMAL  0.97

    *Calculated creatinine clearance (Specify Method):*  > 60

       ☐ Cockcroft Gault or
       ☐ MDRD

    *Urine microalbumin/creatinine ratio:*  13  NORMAL

Guidance for the Medical Evaluation of Law Enforcement Officers
Copyright ©2007 American College of Occupational and Environmental Medicine

10

Section 4.3 – Diabetes

# References

[1] See http://care.diabetesjournals.org/cgi/content/full/27/suppl_1/s5.

[2] A basal/bolus insulin regimen consists of the use of a basal insulin (Glargine, NPH) in a once or twice daily regimen to provide between-meal insulin, combined with the use of a short acting insulin (Regular, Lispro, Aspart, or Glulisine) at mealtimes. Insulin pumps (http://care.diabetesjournals.org/cgi/content/full/27/suppl_1/s110) are small (beeper sized) battery powered devices that deliver small amounts of short acting insulin in a constant infusion to meet basal insulin requirements. The wearer selects an additional mealtime bolus to be infused at the time of meals. For more information on pumps, go to the manufacturer's web sites: www.Minimed.com; www.cozmore.com; www.animascorp.com; www.disetronic.com.

[3] A stable insulin regimen is defined as maintaining the same types of insulin (Long acting, Intermediate acting, short or rapid acting). Changes in insulin dose are part of the appropriate self-management of diabetes and do not disqualify an applicant or incumbent under this section.

[4] Changes in dose within the evaluation period will be allowed, but addition of a new class of medications or insulin should result in a new period of observation:
- one month for addition of a sulfonylurea or metformin;
- two months for the addition of a thiazolidinedione to insulin or a sulfonylurea; or
- three months for the addition of insulin.

[5] Individual has not had more than one pump site infection that caused him/her to miss work or usual daily activities in the preceding six months.

[6] See http://care.diabetesjournals.org/cgi/content/full/28/suppl_1/s72.

[7] Most meters now have this capability.

[8] Testing schedules are individual. What follows is a common pattern. Individual patterns may differ.

| Therapeutic Regimen | Glucose Testing Schedule |
|---|---|
| Diet alone | Once or twice a week |
| Metformin, Thiazolidinediones, or Alpha Glucosidase inhibitors alone or in combination | Once or twice a week |
| Sulfonylureas, meglitanides, nateglinide – alone or in combination with the above group | Twice a day – AM and at supper; with any suspected hypoglycemic episodes |
| Insulin – one shot in combination with orals | Twice a day AM and at supper, with any suspected hypoglycemic episodes. 2-3 AM once a week |
| Insulin – two or more shots, Insulin pump | 3 to 4 times a day – at meals and bedtime. 2-3 AM once a week; with any suspected hypoglycemic episodes |

[9] See http://care.diabetesjournals.org/cgi/content/full/27/suppl_1/s91.

[10] DCCT Research Group. Hypoglycemia in the Diabetes Control and Complications Trial Diabetes. 1997;46:271-286.

[11] See http://care.diabetesjournals.org/cgi/content/full/28/suppl_1/s61.

[12] Presence of chronic complications of diabetes in and of themselves may not require the implementation of work restrictions.

[13] No more than one dot, blot, or flame-shaped hemorrhages or microaneurysm in all four fundus quadrants. See www.jceh.co.uk/journal/46_04.asp.

[14] See www.med.umich.edu/mdrtc/textonlv/educmats/MNSI_howto.doc.

## Physical Assessment
For all assessments, the foot should be warm (>30°C).

*Vibration Sensation*: Vibration sensation should be performed with the great toe unsupported. Vibration sensation will be tested bilaterally using a 128 Hz tuning fork placed over the dorsum of the great toe on the boney prominence of the DIP joint. Patients, whose eyes are closed, will be asked to indicate when they can no longer sense the vibration from the vibrating tuning fork.

Roth Confidential 11

A0666

In general, the examiner should be able to feel vibration from the hand-held tuning fork for 5 seconds longer on his distal forefinger than a normal subject can at the great toe (e.g. examiner's DIP joint of the first finger versus patient's toe). If the examiner feels vibration for 10 or more seconds on his or her finger, then vibration is considered decreased. A trial should be given when the tuning fork is not vibrating to be certain that the patient is responding to vibration and not pressure or some other clue. Vibration is scored as 1) present if the examiner senses the vibration on his or her finger for < 10 seconds; 2) reduced if sensed for ≥ 10 seconds; or 3) absent (no vibration detection).

*Monofilament Testing:* For this examination, it is important that the patient's foot be supported (i.e., allow the sole of the foot to rest on a flat, warm surface). The filament should initially be pre-stressed (4-6 perpendicular applications to the dorsum of the examiner's first finger). The filament is then applied to the dorsum of the great toe midway between the nail fold and the DIP joint. Do not hold the toe directly. The filament is applied perpendicularly and briefly, (<1 second) with an even pressure. When the filament bends, the force of 10 grams has been applied. The patient, whose eyes are closed, is asked to respond yes if he/she feels the filament. Eight correct responses out of 10 applications is considered normal: one to seven correct responses indicates reduced sensation and no correct answers translates into absent sensation.

[15]Orthostatic hypotension is a physical finding defined by the American Autonomic Society and the American Academy of Neurology as a systolic blood pressure decrease of at least 20 mm Hg or a diastolic blood pressure decrease of at least 10 mm Hg within three minutes of standing.

[16]The American Heart Association recommends cardiac stress testing which should begin when any of the following criteria are met:

- age greater than 35 years
- Type 1 DM greater than 15 years duration
- Type 2 DM greater than 10 years duration
- signs of target organ damage (eyes, kidneys, autonomic, cardiac)
- signs of peripheral vascular disease
- any additional coronary artery disease risk factors

Coronary artery disease risk factors include: family history of premature [less than age 60] cardiac event in first degree relative, hypertension, hypercholesterolemia [total cholesterol greater than 240 mg/dL], or cigarette smoking.

References: Gibbons RJ, Balady GJ, Bricker JT, et al., eds. [2002]. ACC/AHA 2002 guideline update for exercise testing: a report of the American College of Cardiology/American Heart Association Task Force on Practice Guidelines (Committee on Exercise Testing). 2002 American College of Cardiology Web site: www.acc.org.clinical/guidelines/exercise/dirIndex.htm. Accessed April 2005.

[17]The evaluation of patients with diabetes for asymptomatic coronary artery disease remains controversial. The American Heart Association Prevention Conference VI Panel, in 2002, advised against routine noninvasive screening for coronary disease in asymptomatic diabetic patients. The American Diabetes Association, in the 2005 Standards of Medical Care in Diabetes, recommends testing for cardiac disease in asymptomatic patients with diabetes when two or more of the following risk factors are present:

- Total cholesterol > 240 mg/dl
- LDL cholesterol > 160 mg/dl, or HDL cholesterol < 35 mg/dl
- Blood pressure > 140/90
- Smoking
- Family history of premature coronary artery disease
- Presence of micro- or macro-albuminuria

Reference: *Practical Diabetology*, in press.

[18]See http://care.diabetesjournals.org/cgi/content/full/27/suppl_1/s79. GFR calculator www.nephron.com/mdrd/default.html

[19]The consensus of the workgroup is that the review by the Police Physician of glucose monitoring records should occur at a minimum of every 12 months, but may need to be more frequent in specific cases.

[20]See http://care.diabetesjournals.org/cgi/content/full/27/suppl_1/s94

Roth Confidential 12

---

[21]See http://www.diabetes.org/diabetes-statistics/national-diabetes-fact-sheet.jsp

[22]Times cited for durations of stable treatment regimen or stability of management are in reference to the date of current evaluation for a law enforcement position.

[23]Date sought is when patient first began current insulin regimen (pump or injection) using current types of insulin (Long acting, Intermediate acting, short or rapid acting). A stable insulin regimen is defined as maintaining the same types of insulin (Long acting, Intermediate acting, short or rapid acting). Changes in insulin amount are part of the appropriate self-management of diabetes and do not disqualify an applicant or incumbent under this section.

[24]Date sought is when patient first began current insulin or oral agent regimen defined as when patient began using current types of insulin or classes of oral medication. A stable insulin regimen is defined as maintaining the same types of insulin (Long acting, Intermediate acting, short or rapid acting). Changes in insulin amount are part of the appropriate self-management of diabetes and do not disqualify an applicant or incumbent under this section.

[25]Changes in dose within the evaluation period will be allowed but addition of a new class of medications or insulin should result in a new period of observation:

- one month for addition of a sulfonylurea or metformin
- two months for the addition of a thiazolidinedione to insulin or a sulfonylurea
- three months for the addition of insulin.

[26]Testing schedules are individual. What follows is a common pattern. Individual patterns may differ.

| Therapeutic Regimen | Glucose Testing Schedule |
| --- | --- |
| Diet alone | Once or twice a week |
| Metformin, Thiazolidinediones, or Alpha Glucosidase inhibitors alone or in combination | Once or twice a week |
| Sulfonylureas, meglitanides, nateglinide – alone or in combination with the above group | Twice a day – AM and at supper; with any suspected hypoglycemic episodes |
| Insulin – one shot in combination with orals | Twice a day AM and at supper, with any suspected hypoglycemic episodes. 2-3 AM once a week |
| Insulin – two or more shots, Insulin pump | 3 to 4 times a day – at meals and bedtime. 2-3 AM once a week; with any suspected hypoglycemic episodes |

[27]See http://care.diabetesjournals.org/cgi/content/full/28/suppl_1/s72

[28]Seehttp://care.diabetesjournals.org/cgi/content/full/27/suppl_1/s91

[29]If Hemoglobin A1C > 8% this may signal a problem with diabetes management that warrants further assessment.

[30]See http://care.diabetesjournals.org/cgi/content/full/28/suppl_1/s61

[31]No more than one dot, blot, or flame-shaped hemorrhages or microaneurysm in all four fundus quadrants. http://www.jceh.co.uk/journal/46_04.asp

[32]See www.med.umich.edu/mdrtc/textonlv/educmats/MNSI_howto.doc

[33]Orthostatic hypotension is a physical finding defined by the American Autonomic Society and the American Academy of Neurology as a systolic blood pressure decrease of at least 20 mm Hg or a diastolic blood pressure decrease of at least 10 mm Hg within three minutes of standing. http://www.aafp.org/afp/20031215/2393.html

[34]Consensus of the workgroup.

[35]See http://care.diabetesjournals.org/cgi/content/full/27/suppl_1/s79. GFR calculator: www.nephron.com/mdrd/default.html

*Guidance for the Medical Evaluation of Law Enforcement Officers*
**Copyright ©2007 American College of Occupational and Environmental Medicine**

Roth Confidential 13

Section 4.3 – Diabetes

## III. Treating Physician Statement

The above named individual meets all of the criteria provided on this form:

☒ *Yes*  ☐ *No – not recommended for position*

☐ *No, but IS recommended for position (letter of explanation attached)*

It is my opinion that the above named individual is a well-educated and well-motivated in diabetes self-management and has achieved a level of diabetes management to be capable of safe and effective job performance as a law enforcement officer. I have reached this opinion after careful review of the above criteria.

_____
Signature of Physician

*Perry Herson*
_____
Printed or Typed Name of Physician

Date  2/13/16

516 746 0772
_____
Phone Number

PERRY B. HERSON, MD
105 Hillside Avenue
Williston Park, NY 11596
(516) 746-0772

*Guidance for the Medical Evaluation of Law Enforcement Officers*
**Copyright ©2007 American College of Occupational and Environmental Medicine**

11

Roth Confidential 14

Case 18-866, Document 52-1, 06/26/2018, 2333108, Page210 of 214

# EXHIBIT KK

**State of New York**
**Governor Andrew M. Cuomo**

**Municipal Police Training Council**



# Medical and Physical Fitness Standards
## and
# Procedures for Police Officer Candidates

### prescribed by the
### Municipal Police training Council



**Sean M. Byrne**
**Acting Commissioner**
**Division of Criminal Justice Services**

**Tony Perez**
**Acting Deputy Commissioner**
**Office of Public Safety**
**Division of Criminal Justice Services**

www.criminaljustice.state.ny.us/ops/docs/registry/policeapptsmed.pdf

Defendant's Production ROTH_000218

Case 1:15-cv-06355-LDW-AYS   Document 41-42   Filed 06/16/17   Page 3 of 19 PageID #: 808
Case 1:15-cv-06355-LDW-AYS   Document 52-1   06/26/2018   2931208   Page 213 of 214

# PART 6000
## MEDICAL AND PHYSICAL FITNESS STANDARDS AND PROCEDURES FOR POLICE OFFICER CANDIDATES

(Statutory Authority: Executive Law sections 837(13) and 840;   42 U.S.C. 12101 *et seq.*)

Section
6000.1     Definitions
6000.2     Statement of purpose
6000.3     Procedures
6000.4     Post-offer medical review
6000.5     Reasonable accommodations
6000.6     Minimum components of the clinical tests
6000.7     Required medical standards; potentially disqualifying conditions
6000.8     Physical fitness screening
6000.9     Essential job functions for entry-level municipal police officers

## Section 6000.1          Definitions.

When used in this Part:

(a)     The term *council* or *MPTC* shall mean the Municipal Police Training Council.
(b)     The term *qualified physician* or *physician* shall mean a medical doctor licensed to practice medicine in the State of New York who has been determined by the appropriate municipal civil service commission to possess the necessary expertise to administer a medical review pursuant to the provisions of this Part, and who has been designated by such commission to administer such review.
(c)     The term *qualified practitioner* or *practitioner* shall mean a health-related professional who has been determined by the appropriate municipal civil service commission to possess the necessary expertise to administer a medical review pursuant to the provisions of this Part, and who has been designated by such commission to administer such review.
(d)     The term *position* shall refer to the position of an entry-level police officer.
(e)     The term *division* shall refer to the Division of Criminal Justice Services.
(f)     The term "qualified trainer" shall be an individual who has been determined by the appropriate municipal civil service commission to possess the necessary expertise to administer a physical fitness screening test pursuant to the provisions of this Part, and who has been designated by such commission to administer such test.

## Section 6000.2        Statement of purpose.

(a)     With the enactment of the Americans with Disabilities Act (ADA), 42 U.S.C. 12101 et seq., into law, the council recognized the need to revise the height, weight, and physical fitness standards for entry-level police officers to ensure that all such standards were job-related, consistent with business necessity, and did not discriminate against qualified persons with disabilities.  Over a one-year period, a comprehensive statewide job task analysis of the essential functions of an entry-level police officer was conducted with the participation of over three hundred law enforcement supervisors.  A detailed listing of the essential job functions generally common to all police agencies in the State was developed.  Based upon that list, a medical advisory group consisting of physicians and other health-related professionals who have examined police officer candidates pursuant to their employment, formulated a list of standards for entry-level police officers, and noted medical conditions which may potentially disqualify a candidate from learning and performing the essential functions of an entry-level police officer.  It is important to keep in mind that the job task analysis only identified the essential job functions generally common to all policing.  A local police agency may have additional or different essential job functions for its entry-level police officers which are not specifically addressed in the statewide listing.

(b)     The council also recognized the need to revise the physical fitness screening practice so that the test employed provides an accurate assessment of a candidate's physiological capacity to learn and perform the essential job functions of an entry-level police officer.  Pursuant to the statewide job task analysis, a battery of physical screening elements was developed, based upon the model formulated by the Cooper Institute for Aerobics Research.  The analysis recommended the adoption of such elements for physical fitness screening and determined that such elements do not adversely impact a candidate based upon his/her sex.  Each of the physical fitness screening elements of the tests were validated and correlated to the performance of essential job functions.

(c)     The purpose of this Part is to set forth the essential job functions adopted pursuant to the statewide job task analysis which are generally common among all police agencies, the minimum medical and physical fitness standards for entry-level police officer candidates, and the process for medical review by a qualified physician or a qualified practitioner to examine each candidate and allow such candidate to demonstrate on a case-by-case basis, his/her ability to perform the essential job functions of an entry-level police officer, regardless of the existence of a potentially disqualifying condition.


## Section 6000.3        Procedures.

Except as otherwise provided in this Part, all candidates interested in an entry-level police officer position shall undergo a physical fitness screening test conducted in accordance with section 6000.8 of this Part.  Candidates who successfully complete the physical fitness screening

elements as well as other relevant pre-offer conditions shall undergo a medical review conducted by a qualified physician or practitioner (unless otherwise specified) in accordance with section 6000.4 of this Part.  Such medical review shall be conducted only after a conditional offer of employment has been given to the candidate by the local police agency seeking to employ such candidate.  All candidates must be found physically able, with or without reasonable accommodations, to perform the essential job functions of an entry-level police officer for the police agency seeking to employ the candidate.

## Section 6000.4          Post-offer medical review.

(a)     The qualified physician or practitioner shall assess each candidate on a case-by-case basis to determine whether the candidate can, with or without reasonable accommodations, perform the essential functions of an entry-level police officer for the local police agency seeking to employ the candidate.

(b)     The examining physician or practitioner shall complete a medical examination form based upon the medical review of the candidate.  The existence of a potentially disqualifying condition shall **not** *(emphasis added)* preclude the qualified physician or practitioner from determining that the candidate is able to perform the essential job functions of an entry-level officer.  Nothing herein, however, shall preclude the qualified physician or practitioner from noting the existence of any other potentially disqualifying conditions not specifically set forth in this Part, which, in the opinion of such physician or practitioner, may render the candidate unable to perform the essential functions of an entry-level police officer.

(c)     Upon the conclusion of the medical examination, the  qualified practitioner or physician shall sign the medical examination form and shall render his/her medical opinion to the employing agency as to whether the candidate can perform the essential functions of an entry-level police officer, noting all relevant medical information.  However, in the event that the medical examination reveals the existence of a potentially disqualifying condition, the MPTC strongly recommends that a qualified physician sign the medical examination form (after further review if the initial examination was performed by a qualified practitioner) and render his/her medical opinion to the employing agency as to whether the candidate can perform the essential functions of an entry-level police officer, noting all relevant medical information.

(d)     The qualified physician or practitioner shall determine whether in his/her professional judgment each candidate can, with or without reasonable accommodations, perform the essential functions of an entry-level police officer upon the results of the clinical tests as set forth in section 6000.6 of this Part, the medical standards as set forth in section 6000.7 of this Part, the essential job functions for police officer candidates as set forth in section 6000.9 of this Part, and other relevant medical criteria which in the opinion of the qualified physician or practitioner, may be used to base his/her judgment.

Defendant's Production ROTH_000221